**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**STEVEN ALFANO,**

                                    Plaintiff,

        - against -                                                            **07 Civ. 9661 (GEL)**

**INA LIFE INSURANCE COMPANY OF NEW**
**YORK, LONG TERM DISABILITY**
**INSURANCE PLAN FOR CORNELL**
**UNIVERSITY MEDICAL COLLEGE, WEILL**
**MEDICAL COLLEGE OF CORNELL**
**UNIVERSITY RETIREMENT PLAN FOR**
**FACULTY AND EXEMPT EMPLOYEES,**
**CHILDREN'S TUITION SCHOLARSHIP**
**PLAN, CORNELL UNIVERSITY GROUP LIFE**
**INSURANCE PLAN, CORNELL UNIVERSITY**
**MEDICAL COLLEGE HEALTH INSURANCE**
**PLAN and CORNELL UNIVERSITY**
**MEDICAL COLLEGE DENTAL INSURANCE**
**PLAN,**

                                    Defendants.

---

### STATEMENT OF FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

        In accordance with FED. R. CIV. PRO. 56 and LOCAL RULE 56.1, Plaintiff, Steven Alfano,

hereby submits the following Statement of Material Facts in support of his Motion for Summary

Judgment against the Defendants:


#### LIST OF ANNEXED EXHIBITS

| | |
|---|---|
| ***Exhibit A*** | Long Term Disability Income Plan Summary Plan Description |
| ***Exhibit B*** | Deposition transcript of Medha Bharadwaj. [1] |
| ***Exhibit C*** | Relevant claim file documents. [2] |

---

1  References to "Tr." are to the Bharadwaj deposition transcript.

2   Numbers cited in parentheses refer to the Bates- stamped documents in the claim file that CIGNA produced.

## THE PARTIES

1.      Plaintiff is a resident of New York (104, 581, Answer ¶7).

2.      Defendant CIGNA is a business organization licensed to conduct the business of insurance in the State of New York (Answer ¶8).  According to the New York State Insurance Department, on July 19, 1999, INA Life Insurance Company of New York (INA) changed its name to CIGNA Life Insurance Company of New York (Answer ¶8).

## THE LTD PLAN

3.      Benefits are paid to participants who become disabled under the under Long Term Disability ("LTD") Insurance Plan For Cornell University Medical College (the "LTD Plan") through the group insurance contract, number NYK-1972 (the "Policy"), that INA issued (Exhibit A pp. 4, 21; 588; Answer ¶¶3, 15).

4.      After a 180 day elimination period, the LTD Plan provides, a "Monthly Benefit" equal either to (a) 60% of the employee's "Basic Earnings," which is reduced by "Other Benefits" "excluding any Other Benefits your dependents receive," or (b) 70% of the employee's "Basic Earnings," which is reduced by "Other Benefits" including those received by dependents (Exhibit A pp. 1, 6-7; 598-601).

5.      LTD benefits are adjusted for five annual cost of living increases of 3% (Exhibit A p. 8; 603; Answer ¶17).

6.      The maximum benefit period under the LTD Plan for a disability that began prior to age 61 is to age 65 (Exhibit A p. 14; 604; Answer ¶18).

7.      The LTD Plan defines "Disability" as being "unable to perform all the material duties of your regular occupation; or you are earning less than 80% of your Indexed Basic Earnings"   (Exhibit A p. 13; 43; 44, 593, 668, 721).

8.      Because the definition of disability never changes under the LTD Plan an employee's ability to perform the material duties of any occupation other than one's regular

occupation is not relevant (Exhibit A p. 13; 043, 44, 593, 721; Answer ¶20).

## VOCATIONAL BACKGROUND

9.     Plaintiff was born January 14, 1958 (104, 480).

10.     The Employer hired Plaintiff on August 5, 1991 to work as a Wage and Salary Manager (104, 527, 529-531, 668, 879).

11.     The physical requirements provided in the Employer's job description include: "Most work performed sitting at desk," and "Must be able to sit for extended periods."  (479). Using the definitions from the U.S. Department of Labor's Dictionary of Occupational Titles (the "DOT"), CIGNA classified Plaintiff's occupation as sedentary (104, 668, 879; Tr. 41-42).

12.     Plaintiff stopped working on June 5, 2000 because of his back pain (515, 527).

## SOCIAL SECURITY

13.     The LTD Plan required Plaintiff to apply for Social Security Disability ("SSD") benefits; otherwise, the LTD Plan would deduct the estimated amount of the SSD benefits (Exhibit A p. 9; 514, 601; Answer ¶27).

14.     The LTD Plan required Plaintiff to execute a reimbursement agreement that required Plaintiff to turn over 100% of his SSD benefits to the LTD Plan (474, 513, Answer ¶28).

15.     The LTD Plan required Plaintiff to provide that he had filed an application for SSD benefits (467-468; Answer ¶29).

16.     On August 27, 2002, the Social Security Administration (the "SSA") concluded that Plaintiff was totally disabled as of June 5, 2000, and awarded him a monthly SSD benefit (266; Answer ¶30).

17.     A United States Administrative Law Judge ("ALJ") determined that Plaintiff's impairments were so severe that not only was he unable to perform his past work as a wage and

salary administrator, but also was unable to do any other type of work as well (266).

18.    CIGNA accepted the SSA decision without question in order to reduce Plaintiff's LTD benefit by the amount of his SSD benefits (173-185, 217-228, 231; Answer ¶33); however, CIGNA subsequently rejected the SSA decision without question when it decided to terminate Plaintiff's LTD benefits (706-709).

19.    CIGNA never explained why it rejected the findings and conclusions of the ALJ and the SSA's vocational expert (706-710).

## PREAPPLICATION MEDICAL EVIDENCE

20.    Plaintiff began treating with his orthopedist, Dr. Michael Alexiades, on May 15, 1996, after experiencing back pain and left leg weakness after a car accident (350, 454).

21.    Plaintiff's back and leg pain became worse in May 2000 (116).

22.    Plaintiff stopped working on June 5, 2000, after seeing Dr. Alexiades, who concluded Plaintiff was "unable at this point to work," and scheduled an MRI (116).

23.    On June 9, 2000, Plaintiff's lumbar MRI revealed, among other things, moderate to severe spondylosis and spinal stenosis at the L5-S1 level, with mild impingement of the left L5 nerve root (283).

24.    On June 20, 2000, in connection with Plaintiff's request under the Family and Medical Leave Act, Dr. Alexiades stated Plaintiff could not do any lifting, prolonged standing or sitting (290-291).

25.    On July 20, 2000, Dr. Stephen Scelsa, a neurologist, interpreted Plaintiff's EMG and indicated that Plaintiff had either an L5-S1 radiculopathy or polyneuropathy (284, 485-489).

26.     Plaintiff went to see Dr. Alexiades on July 31, 2000 because of severe back pain and leg numbness despite having received two epidural injections.  Dr. Alexiades referred Plaintiff to a spine surgeon (116).

27.     On August 17, 2000, Dr. Sean McCance, a spine specialist, diagnosed Plaintiff with discogenic back pain and L5-S1 radiculopathy from impingement of the L5 nerve root, and recommended surgery because of his leg weakness (454-455).

28.     On August 23, 2000, Plaintiff saw Dr. Robert Snow, a neurosurgeon, for a second opinion, and his exam revealed positive straight leg raises and absent ankle jerk reflex (491-492), which according to the *Merck Manual* results from S1 nerve damage.[3] Dr. Snow diagnosed Plaintiff with L5-S1 radiculopathy secondary to lumbar stenosis, and recommended a laminectomy and possible discectomy (492).

29.     On August 31, 2000, Plaintiff saw Dr. James Farmer, orthopedic spine specialist at the Hospital for Special Surgery, to see if there was any alternative to surgery (292-293).  Dr. Farmer diagnosed Plaintiff with degenerative disc disease at the L5-S1 level and recommended physical therapy (293).

30.     When physical therapy failed to yield any improvement, Plaintiff saw Dr. Farmer again on September 14, 2000, whose diagnoses now included radicular symptoms probably due to L5 nerve root compression (294).

31.     On November 7, 2000, Dr. Farmer suggested more physical therapy and prescribed Vioxx (295).

## PLAINTIFF'S APPLICATION

32.     On December 8, 2000, CIGNA received Plaintiff's application for LTD benefits (513, Answer ¶ 46).

33.     CIGNA required Plaintiff's doctors to complete CIGNA's Physical Ability Assessment ("PAA") form as part of the application (497-498, 1006-1007, Answer ¶ 47).

34.     CIGNA's PAA uses the terms "continuously," "frequently," and "occasionally," which correspond to 67-100%, 34-66% and 1-33% respectively (444-445, Answer ¶ 47).  The PAA further clarified that "continuously" meant more than 5.5 hours, "frequently" meant 2.5 to 5.5 hours, and "occasionally" meant less than 2.5 hours, in an 8 hour day (444-445, Answer ¶ 47).

35.     According to Dr. Snow's PAA, Plaintiff was limited to sitting only "occasionally," *i.e.,* is, less than 2.5 hours during an 8 hour day (493).

36.     According to Dr. Scelsa's PAA, Plaintiff was limited to sitting "frequently," *i.e.*, only between 2.5 and 5.5 hours in an 8 hour day (483).

37.     On February 2, 2001, even though CIGNA had PAA's from Dr. Snow and Dr. Scelsa, CIGNA told Plaintiff that it needed an independent medical exam ("IME") before deciding his claim (388).

38.     On February 5, 2001, CIGNA requested an IME from an orthopedist specializing in back care (384; Answer ¶ 52).  One of the questions CIGNA posed for the IME was how Plaintiff's symptoms affected his ability to perform sedentary work, and added "***Please refer to Occupational Requirements form forwarded with medical" (386-387).  CIGNA failed to produce a copy of that form.

---

3  "Nerve Root Disorders"

39.     On February 7, 2001, CIGNA warned Plaintiff that if he failed to attend an IME by Dr. Joseph Paul, his LTD benefits would be terminated (359), but on February 9, 2009, CIGNA canceled the IME without telling Plaintiff the reason why it was no longer considered necessary (358; Answer ¶ 53).


## CIGNA DENIES CLAIM

40.     By letter dated February 12, 2001, CIGNA denied Plaintiff's LTD claim, concluding that his occupation fell "within the sedentary physical demand level as outlined by the U.S. Department of Labor's Dictionary of Occupational Titles" (the "DOT") (379, Answer ¶ 55).

41.     CIGNA denied Plaintiff's claim because it concluded that the PAA's that Drs. Snow and Scelsa completed showed Plaintiff had the physical capacity to sedentary work, even though none of those physicians indicated Plaintiff could sit for more than 5.5 hours during an 8 hour day (379).

42.     On February 26, 2001, Dr. Farmer recommended additional physical therapy because weight loss had not alleviated any symptoms (296).  Dr. Farmer also suggested seeing a neurologist because of Plaintiff's leg weakness, and having lumbar fusion if conservative care failed to help (296).


## CIGNA UPHOLDS DENIAL

43.     After Plaintiff notified CIGNA of his intent to appeal by letter dated March 19, 2001 (which CIGNA failed to produce, Answer ¶ 59), by letter dated April 10, 2001, Plaintiff

http://www.merck.com/mmpe/sec16/ch223/ch223g.html?qt=absent%20ankle%20jerk%20reflex&alt=sh

requested an additional 60 days because he was awaiting medical evidence (Answer ¶ 59).

44.     By letter dated April 12, 2001, while acknowledging Plaintiff's April 10, 2001 letter, CIGNA upheld its denial (Answer ¶60).

45.     On May 24, 2001, after noting physical therapy made Plaintiff's back worse, Dr. Alexiades found Plaintiff's shoulder exhibited impingement and crepitus, and was injected with Lidocaine and Depo-Medrol (116).

46.     Plaintiff had a lumbar MRI on August 18, 2001, which revealed moderate to severe spondylosis and stenosis at the L5-S1 level and mild stenosis at the L4-5 level (131).

47.     Plaintiff had a right shoulder MRI on October 12, 2001, which revealed tendonosis, hypertrophic changes, bursitis, and a labral tear (132).

48.     A couple of weeks later, November, 1, 2001, Plaintiff had a left shoulder MRI, which revealed hypertrophic acromion changes, mild inflammation, and abnormal supraspinatus tendon (130).

49.     On November 14, 2001, Dr. Alexiades injected Plaintiff's left shoulder again with Lidocaine and Depo-Medrol (116).

50.     On January 3, 2002, because the pain injections failed to alleviate Plaintiff's symptoms, Dr. Alexiades scheduled Plaintiff for surgery (116).

51.     Dr. Alexiades performed right shoulder decompression, bursectomy and and lysis surgery for impingement and arthofibrosis on January 28, 2002 (117, 126-127).

52.     On February 7, 2002, Dr. Alexiades diagnosed Plaintiff with spondylosis, stenosis and radiculopathy, and concluded that Plaintiff (a) must lie down .5 – 2 hours, two or three times, during an eight hour work day, and (b) **was limited to sitting only two (2) hours in 8 hour work day** (297-303)**.**

53.     On February 12, 2002, Dr. Keith Roach also concluded Plaintiff (a) must lie down .5 – 2 hours, three times, during an eight hour work day, and (b) **was limited to sitting only two (2) hours in 8 hour work day** (304-310)**.**

54.     On April 15, 2002, in support of his LTD claim, Plaintiff pointed out to CIGNA that sedentary work requires being seated most of the time (Answer ¶ 71).

55.     On April 22, 2002, Dr. Alexiades diagnosed Plaintiff with left shoulder tendinopathy, and scheduled a right hip MRI because it was painful (113).

56.     On April 30, 2002, an MRI of Plaintiff's right hip revealed cartilage loss, dysplasia, torn and degenerated labrum, while hip x-rays from May 6, 2002 revealed pelvic asymmetry, and bony and chondral lesions (123-125).

57.     After sending the appeal to the wrong office, CIGNA transferred Plaintiff's appeal to its Dallas office on June 3, 2002 (277-278, Answer ¶ 74).

58.     On June 13, 2002, Dr. Alexiades operated on Plaintiff's left shoulder, decompressing and resecting it to alleviate impingement and acromioclavicular arthritis (115, 121-122).

59.     In a letter dated July 12, 2002, Dr. Alexiades diagnosed Plaintiff with lumbar spondylosis, stenosis and radiculoapthy, and concluded that Plaintiff (a) had to lie down 1.5 to 2 hours a day, (b) could not sit, stand or walk for prolonged time, (c) could not lift or carry more than 5 pounds, (d) had no change in condition since June 5, 2000, and (e) remained totally disabled (253-254).

60.     In a letter dated July 24, 2002, Dr. Roach diagnosed Plaintiff with 27 different medical conditions, prescribed Vicodin and Vioxx, gave Plaintiff a poor prognosis, and specified that "he is totally disabled and should not return to work." (250-252; Answer ¶ 77).

61.    On September 13, 2002, Plaintiff notified CIGNA that the SSA found him to be totally disabled from any work as of June 5, 2000, and provided a copy of the SSA decision to CIGNA (256-267; Answer ¶ 78).

63.    On September 23, 2002, Plaintiff met with Dr. Alexiades to discuss hip surgery (113).

## Dr. David Trotter

64.    By letter dated December 2, 2002, CIGNA notified Plaintiff that it needed to "consult a health care professional with the appropriate training and experience in the field of medical (sic) involved in the medical judgment;" however, it failed to explain why none of Plaintiff's doctors were such a physician, or why the conclusions of Dr. Alexiades, Dr. Roach, and the SSA, which were based on the clinical exam findings, surgeries and diagnostic tests, were insufficient to find Plaintiff totally disabled (243; Answer ¶ 80).

65.    On December 10, 2002, Dr. David Trotter, an orthopedist, completed his report for CIGNA, and concluded that the medical evidence supported Plaintiff's "inability to perform his occupation as a wage and salary manager considered to be overwhelmingly in the sedentary category" (235, Answer ¶ 81).

66.    Dr. Trotter also concluded that the medical records showed Plaintiff's severe multilevel spinal stenosis and nerve root impingement/radiculopathy precluded him from working his full time sedentary occupation as a wage and salary manager (235, Answer ¶ 82).

67.    Dr. Trotter added that Plaintiff's symptomatic stenosis and nerve root impingement would persist regardless of what position he assumed (235).

68.    Dr. Trotter concluded that Plaintiff was disabled from his usual occupational activities even on a part time basis (236, Answer ¶ 83).

## CIGNA'S APPROVAL

69.    On December 30, 2002, Karen Haley, a CIGNA nurse, concluded that the medical records supported Plaintiff's inability to perform sedentary work (106).

70.    On January 14, 2003, Medha Bharadwaj, CIGNA's case manager, determined that Plaintiff could not do his sedentary work as a Salary and Wage Manager because his symptoms and abnormal exam and test findings supported ongoing severe multilevel spinal stenosis and nerve root impingement severe enough to preclude performing his occupation (Tr. 84-85; 105).

71.    After graduating from college, Bharadwaj worked for a mortgage company, temp agency and bank before working for CIGNA (Tr. 13-15).

72.    During the ten plus years that Bharadwaj has worked for CIGNA, she reviewed thousands of claims (Tr. 35-36), using the DOT standards to determine if the physical demands of a job make it sedentary (Tr. 41).

73.    Bharadwaj testified that she does not merely adopt the conclusions of the doctors or physical therapists who write reports, but uses her own independent judgment to determine if their conclusions are correct (Tr. 34, 37, 40, 44, 50).

74.    Bharadwaj added that: (a) Plaintiff's L5-S1 nerve roots appeared to be resulting in radiculopathy of the lower extremity, (b) surgery was indicated, (c) Plaintiff's pain correlated with his medical findings; and (d) Plaintiff's large body habitus may have contributed to his severe spinal pathology (105).

75.    Because the SSD award was in the file, Bharadwaj stated that those benefits should be offset from the LTD Plan benefits (105).

76.    On January 24, 2003, CIGNA informed Plaintiff that his LTD benefits had been approved without stating why the prior decisions were reversed, and that future benefits required Plaintiff to prove he was unable to engage in the essential duties of any occupation." (186; Answer ¶¶ 86, 87).

77.    Just three days after notifying Plaintiff that his LTD benefits had been approved, CIGNA claimed that Plaintiff's medical status was unclear (172).

78.    By letter dated March 27, 2003, the LTD Plan pointed out the CIGNA's January 24, 2003 letter was incorrect because Plaintiff only had to prove that he was unable to perform his specific occupation, and directed CIGNA to issue a corrected letter (169).

79.    By letter dated April 10, 2003, CIGNA corrected its error, and wrote Plaintiff that future benefits only required him to prove that he was unable to engage in the essential duties of his regular occupation (168, Answer ¶ 88).

## POSTAPPROVAL MEDICAL EVIDENCE

80.    On March 24, 2003, because Dr. Alexiades's exam indicated Plaintiff had a labral tear of the right hip, he was scheduled for hip surgery (113).

81.    On April 16, 2003, Dr. Alexiades performed right hip surgery to repair Plaintiff's labral tear (114, 118-119).

82.    On April 20, 2003, Plaintiff completed CIGNA's disability questionnaire, which asked about his work history, medications, SSD benefits among other things (159-161, Answer ¶ 89).

83.     On July 24, 2003, CIGNA sent its PAA form to Dr. Alexiades, and then paid him $50.00 fee to complete it on August 6, 2003 (143, CIGNA failed to produce a copy of Dr. Alexiades 2003 PAA, Answer ¶ 90).

84.     On July 31, 2003, CIGNA's Senior Claim Manager, Roberto Castellon, concluded that the medical records and Dr. Trotter's report supported total disability (103).

85.     On September 14, 2004, Plaintiff had x-rays taken of his cervical spine, which revealed degenerative disc disease, disc space narrowing and osteophytes at the C6-7 level (963).

86.     On October 20, 2004, Dr. Roach faxed the PAA that CIGNA requested on October 15, 2004 (968-971). **Dr. Roach checked the most restrictive boxes on the PAA for sitting, standing and walking, which was occasionally, less than 2.5 hours, during an 8 hour day, as well as for lifting and carrying, which failed to provide a box for less than 10 pounds** (975).

87.     On November 3, 2004, despite the fact Dr. Roach stated that Plaintiff could not even sit for 2.5 hours during an 8 hour day, CIGNA decided that an exploratory transferable skills analysis ("TSA"), which made no sense because CIGNA admitted it was irrelevant if Plaintiff could do other occupations (80, 101, 168; Answer ¶¶ 88, 93).

88.     On November 9, 2004, CIGNA required an updated medical form from Plaintiff (959; Answer ¶ 98).

89.     On November 18, 2004, based on Dr. Roach's October 20, 2004 PAA, which limited Plaintiff to sitting for less than 2.5 hours a day, CIGNA's exploratory TSA identified 9 occupations with potential transferable skills for Plaintiff could perform (99).

90.     On November 30, 2004, Dr. Roach said Plaintiff had a class 5 physical impairment, which is a severe limitation of functional capacity; incapable of even minimal

sedentary activity (961)

91.     On December 1, 2004, Mark Sodders, a CIGNA case manager, requested a formal TSA so he could send the DOT job descriptions of the identified occupation to Dr. Roach, who certified Plaintiff as disabled with class 5 limitations (957).

92.     On December 13, 2004, Holly Jule, a CIGNA vocational consultant, informed Sodders that four DOT occupational descriptions were in Plaintiff's file (944-953).

93.     On January 20, 2005, CIGNA asked Dr. Roach if Plaintiff could work at any of the four occupations, even though CIGNA knew that Plaintiff was only required to prove that he was unable to engage in his regular occupation as a Wage and Salary Manager, and could not sit for 6 hours during a work and (903, 69, 73, 91-92, 95-96, 168, 886-894, Answer ¶ 99).

94.     On April 11, 2005, Sodders told Plaintiff that unless Dr. Roach responded to the January 20, 2005 letter by April 28, 2005, Plaintiff would have to attend a functional capacity evaluation ("FCE") (885).

95.     By letter faxed to Sodders on April 19, 2005, Dr. Roach stated that Plaintiff could not perform any of the four occupations because of his limited ability to sit and need to lie down (882-883; Answer ¶ 102).

96.     On April 27, 2005, Sodders and Scott Taylor, a CIGNA osteopath, noted that while Dr. Roach said Plaintiff could not return to work, a peer to peer review was needed (880).

## CIGNA'S INTERNAL MEDICAL REVIEW

97.     Taylor reviewed Plaintiff's file, and concluded that: (a) disability was defined was any occupation; (b) Dr. Roach's PAA, that limited Plaintiff to sitting for less than 2.5 hours a day, showed Plaintiff had a sedentary work capacity; (c) the TSA showed Plaintiff had

14

transferable skills for 4 occupations; and (d) he agreed with Mark Sodders' decision to terminate Plaintiff's LTD benefits (88-89; Answer ¶ 105).

98.     Dr. Taylor failed to (a) cite a single piece of medical evidence that indicated Plaintiff's medical condition had improved, and (b) explain why the same medical evidence that CIGNA found supported the approval of Plaintiff's claim previously no longer supported it (88-89).

99.     On June 8, 2005, even though Dr. Roach supposedly told Dr. Taylor that Plaintiff could work for 3-4 hours a day and would have to lie down at least 15 minutes three or four times a day, Dr. Taylor concluded that "clinically measurable tests like an FCE" was needed to determine Plaintiff's functional capacity, but he failed to explain how CIGNA was able to determine Plaintiff's functional capacity previously without needing an FCE (88-89; Answer ¶ 112).

100.    On June 9, 2005, even though Dr. Roach responded to CIGNA's information request before April 28, 2005, Sodders told Plaintiff that a FCE was needed, and selected referral questions for it (751, 853).

101.    By letter dated June 14, 2005, Dr. Roach corrected Dr. Taylor's summary of their June 8, 2005 conversation, and stated that **Plaintiff could only work for 30 minutes at a time and not for more than two hours total in a day** (843; Answer ¶ 113).  Dr. Roach explained that based upon his treating and observing Plaintiff, he remained unable to do sedentary work because of his daily need for narcotic pain medication, need to lie down ad lib, and limited ability to sit, which showed that his condition had not improved during the past five years (843; Answer ¶ 113).

102.    Plaintiff's July 8, 2005 lumbar MRI revealed that his back condition had deteriorated in that while the August 18, 2001 MRI revealed that only the thecal sac, which encloses the nerve roots, was being impinged at the L5-S1 level, the 2005 MRI revealed "mass effect upon thecal sac and S1 nerve roots" (698).

## CIGNA's FCE

103.    CIGNA required Plaintiff to attend an FCE on July 26, 2005, which was performed by a physical therapist (726-749).

104.    The FCE **the test results showed, exactly as Dr. Roach concluded on June 14, 2005, that Plaintiff could only sit on an occasional basis, between 1 and 33% of the time, or equal to less than 2.5 hours** (726, 728, 734, Answer ¶ 118).

105.    The FCE test results also showed that Plaintiff was unable to do any lifting – floor to knuckle, knuckle to shoulder, or floor to shoulder – or carrying (728, 734, Answer ¶ 119).

106.    The FCE test results further showed that Plaintiff could not stoop, kneel, crouch, or crawl due to decreased range of motion, and weakness and buckling of the lower extremities (728, 730, 734, Answer ¶¶ 120, 121).

107.    The FCE added that Plaintiff walked with a cane, an abnormal posture, had limited flexibility, severely limited range of motion, including significantly limited lumbar range of motion, and had limited lower extremity strength (730, Answer ¶ 120).

108.    The FCE also concluded that Plaintiff could not sit for more than 10 -15 minutes at a time (731, Answer ¶ 122).

109.    The FCE found Plaintiff was "very cooperative," gave "maximal" effort, and "consistent performance" that was not "self limiting", but was unable to complete the static and

dynamic lifting and step tests due to "frequent buckeling (sic) and increased risk of falling," and twice needed assistance to avoid falling down (730, 731, Answer ¶ 123).

110.    The FCE stated that it stopped the Canadian Fitness Tests "due to the safety risk," and that Plaintiff had to lie down during the testing (730, Answer ¶ 123).

111.    Despite all of the "clinically measurable tests" from the FCE that show Plaintiff cannot meet the DOT physical demands for sedentary work, the physical therapist who performed the FCE concluded that Plaintiff could function "safely at a sedentary level for an eight hour period" (726, Answer ¶ 124).

112.    On August 9, 2005, even though Plaintiff's ability to do other occupations was irrelevant, Sodders asked Ginny Schmidt, a CIGNA vocational consultant, to do a TSA, to identify occupations that Plaintiff supposedly could do based on the FCE (718-723).

113.    Schmidt failed to point out that the FCE limited Plaintiff to sitting for less than 2.5 hours a day (46, 728, 734).

114.    Ms. Schmidt failed to explain how Plaintiff could work as a Wage and Salary Manager (or any other sedentary occupation even though irrelevant) since the FCE said Plaintiff could not sit for more than 2.5 hours a day and could not do any lifting or carrying (85-86).

## CIGNA'S TERMINATION

115.    On September 27, 2005, CIGNA made the decision to terminate Plaintiff's benefits based on the FCE and TSA (717).

116.    CIGNA notified Plaintiff about the termination of his LTD benefits by letter dated September 28, 2005 (706-710).

117.    CIGNA terminated Plaintiff's benefits based on the conclusion of the physical therapist who performed the FCE, that Plaintiff could do sedentary work, and the TSA (041), not the FCE data, which revealed Plaintiff could not even sit 2.5 hours a day.

118.    CIGNA failed to explain (a) why it accepted the physical therapist's conclusion over the opinions of Plaintiff's doctors, (b) what medical records showed that Plaintiff's condition had improved, (c) how Plaintiff could do sedentary work when the FCE and Dr. Roach limited Plaintiff's ability to sit to less than 2.5 hours in an 8 hour day, (d) why the decision of the SSA that Plaintiff could not do his regular occupation was wrong, and (e) how Plaintiff could perform at a sedentary level if unable to lift or carry any weight (706-710).

## PLAINTIFF'S APPEAL

119.    By letter dated February 22, 2006, Plaintiff appealed CIGNA's decision to terminate his LTD benefits, which included updated reports from Dr. Alexiades and Dr. Roach and lumbar MRI dated July 8, 2005 (678-698; Answer ¶ 132).

120.    Dr. Alexiades' January 11, 2006 report provided that Plaintiff (a) had to lie down for .5 to 2 hours at a time two or three times during the day, (b) was limited to sitting for a total of 2 hours during an 8 hour work day, was limited to standing and walking for less than 1.5 hours during an 8 hour work day, and (d) was limited to lifting and carrying between 0 and 5 pounds and then only on an occasional basis (684-690, Answer ¶ 133).

121.    Dr. Roach's January 6, 2006 report provided that Plaintiff (a) had to lie down several times a day, sometimes hourly, and for up to several hours, (b)was limited to sitting for a total of 2 hours during an 8 hour work day, (c) was limited to standing and walking for less than 1 hour, during an 8 hour work day, and (d) was limited to lifting and carrying between 0 and 5

18

pounds and then only on an occasional basis during an 8 hour work day (691-697, Answer ¶ 134).

## CIGNA'S MEDICAL REVIEW

122.    On March 3, 2006, a CIGNA nurse named Kay Rhodes was asked to assess if there had been a change in Plaintiff's condition that impacted his functionality since the FCE; however, CIGNA failed to asses if there had been a change in Plaintiff's condition that impacted his functionality between the time his claim was approved and the FCE (675; Answer ¶ 136).

123.    Ms. Rhodes failed to cite any medical evidence showing that Plaintiff's condition improved (673-675).

124.    While Ms. Rhodes claimed that Plaintiff had no neurological deficits (675), (a) Dr. Alexiades' report stated that Plaintiff had a positive straight leg raise, numbness associated with back pain, and weakness on walking on toes (684-690), and (b) Dr. Roach's report stated that Plaintiff had back pain radiating down the leg, quadriceps weakness, decreased patellar reflex, and positive straight leg raises (691-697).

125.    Ms. Rhodes failed to identify the neurological deficits that supported Plaintiff's disability in 2003 when CIGNA approved his benefits, or explain how those deficits no longer supported Plaintiff's claim (673-675).

126.    Ms. Rhodes stated that Plaintiff had no objective evidence to support his claim (C675), but failed to explain why the 2005 MRI that she reviewed, which showed progression from the prior MRI, or Dr. Alexiades' and Dr. Roach's clinical observations, were not objective evidence (673-675).

127.     Ms. Rhodes failed to explain why Plaintiff's orthopedic deficits were not

disabling (673-675).

128.     Ms. Rhodes failed to explain why Dr. Roach's and Dr. Alexiades' opinions were

unreliable and why the opinion of the FCE physical therapist was reliable (673-675).

129.     On March 28, 2006, CIGNA had a doctor Mendez, whose credentials CIGNA

failed to identify, review Plaintiff's file, whose entire one paragraph analysis was:

> FCE reviewed along with job requirements.  Validity measures
> met.  Exam concluded Mr. Alfano was able to perform his sedentary
> – level work.  So original decision remains supported.

(657).

130.     Dr. Mendez failed to explain why he rejected every piece of medical evidence,

including the MRIs, Dr. Alexiades' and Roach's January 2006 reports and treatment records, the

reports of all the doctors upon which CIGNA approved benefits in 2003, the operative reports,

the prescribed pain medication and Plaintiff's symptoms, and Trotter report, the FCE test data, in

favor of the opinion of the physical therapist who did the FCE (657, 726-749).


## CIGNA UPHOLDS TERMINATION

131.     In an attempt to evade the fact that no medical records showed that Plaintiff's

medical condition had improved, by letter dated March 29, 2006, CIGNA upheld its termination

of LTD benefits by erroneously referring to the termination as a denial of benefits (655-656;

Answer ¶ 147).

132.     CIGNA refused to consider any of the medical evidence predating October 28,

2005 (655).

133.    The only explanation CIGNA offered for rejecting the additional medical reports from Dr. Alexiades and Dr. Roach was a purported lack of "any clinical findings" (656). However, Dr. Alexiades and Dr. Roach stated that the clinical findings that supported Plaintiff's limited functionality included: positive straight leg raises, numbness associated with back pain, weakness on walking on toes, back pain radiating down the leg, quadriceps weakness, and decreased patellar reflex (684-697).

134.    CIGNA failed to explain what clinical findings that had supported Plaintiff's entitlement to benefits for the last several years were either no longer present or had showed improvement (655-656).

135.    The January 2006 reports from Dr. Alexiades and Dr. Roach were consistent with the medical evidence submitted prior to the FCE, and showed that Plaintiff's level of functionality had actually gotten worse (684-698).

136.    CIGNA's rationale for terminating Plaintiff's benefits was the two sentence review of the Dr. Mendez, which was based on the conclusion of the FCE physical therapist, not the FCE data that limited Plaintiff to sitting for less than 2.5 hours during an 8 hour work day (655-657, 726-749).

**PLAINTIFF APPEALS MARCH 29, 2006 DECISION**

137.    On August 24, 2006, Dr. Roach concluded that Plaintiff continued to be totally disabled from his spinal stenosis, and required large doses of narcotics (646, Answer ¶ 153).

138.    Plaintiff appealed by letter dated September 15, 2006 (641-645; Answer ¶ 152).

139.    Plaintiff noted that the side effects of his medication were so severe that he lacked the ability to concentrate well enough to perform his work tasks (642-643; Answer ¶ 153).

## CIGNA'S PAPER REVIEW

140.    On October 30, 2006, CIGNA referred some of Plaintiff's medical records to an orthopedist for a peer review, and summarized the claim by stating it was denied based on an FCE that showed Plaintiff could do sedentary work (636-637).

141.    Ms. Bharadwaj, who subsequently rendered final decision terminating Plaintiff's benefits, testified that her discussion with her manager regarding the need for a peer review should have been in the file (Tr. 25-26); however, the claim file that CIGNA produced failed to contain it.

142.    Bharadwaj testified that the peer review was needed to clarify Plaintiff's functionality (Tr. 27), but she admitted that she did not know why it was needed since Plaintiff's treating doctor was competent to clarify it (Tr. 28-31).  Bharadwaj later testified that while she supposedly used her judgment to determine that the peer review analysis was correct, she did not know the basis for its conclusion (Tr. 38).

143.    CIGNA did not explain why it failed to ask Dr. Trotter, the orthopedist it paid previously to review Plaintiff's medical records, to review the new medical records to see if Plaintiff's condition had improved (1-1027).  Instead, CIGNA asked Michael Weiss, who according to his own web site specializes in hip and knee replacements, did the review (631-633; http://www.tririversortho.com/physician_detail.asp?id=3).

144.    The first of three things Weiss was asked to do was to identify the records that CIGNA gave him to review (637, Answer ¶ 158, Tr. 72-73), which he did (632).

145.    The second thing Dr. Weiss was asked to do was to call Dr. Alexiades and Dr. Roach if he disagreed with their opinions, or if he found the medical information conflicting (637); however, Dr. Weiss failed to do so (633, Answer ¶ 159; Tr. 71).

146.    Lastly, Dr. Weiss was asked if the records supported Plaintiff's inability to do sedentary work from October 27, 2005 through the present (637, Answer ¶ 160).  His entire analysis was four sentences:

> Upon review of the medical information, the restrictions and limitations precluding the claimant from sedentary work capacity are not supported in the documentation provided to me from 10/27/05 to present.  A functional capacity evaluation of 7/26/05 recommended sedentary work duties.  The claimant would be capable of sedentary duty, but would be restricted from prolonged sitting, in that he would require intermittent standing.  He would also be restricted to limited walking, not greater than one block.

(632).

147.    Bharadwaj testified that she could not tell from the Weiss peer review what records he believed supported Plaintiff's ability to do sedentary work (Tr. 77).

148.    Bharadwaj also testified that she did not know what Dr. Weiss meant by prolonged sitting or intermittent standing (Tr. 78).  When asked how she could use her independent judgment to determine if Dr. Weiss's conclusion, that Plaintiff could do sedentary work, was valid if she did not what he meant by prolonged sitting or intermittent standing, Bharadwaj testified "I don't know" (Tr. 78, 79-80).

149.    Dr. Weiss failed to explain why he rejected (a) records from Dr. McCance, Dr. Snow, Dr. Farmer, Dr. Scelsa, Dr. Roach, and Dr. Alexiades, (b) the three lumbar, right shoulder, left shoulder, and right hip MRIs, (c) the right hip x-rays, (d) the functional assessments of Drs. Alexiades and Roach, (e) the operative reports, (f) Dr. Trotter's IME, (g) Dr. Roach's letters to Dr. Taylor, and (h) the FCE test data, all in favor of the opinion of the FCE physical therapist (631-633).

150.    Dr. Weiss failed to explain how Plaintiff could be capable of sedentary duty when the FCE limited Plaintiff to sitting for less than 2.5 hours a day (631-633).

151.    On November 20, 2006, Plaintiff reminded CIGNA that Plaintiff's narcotic pain medication caused extremely significant drowsiness that prevented him from working (638; Answer ¶ 164).

152.    Because Dr. Weiss' report was inadequate, he completed an "addendum" on November 22, 2006, in which he asserted that Dr. Roach failed to provide "objective physical findings" to support Plaintiff's inability to do sedentary work; however, Dr. Weiss failed to explain what objective physical findings supported his conclusion that Plaintiff's condition improved so he could perform sedentary work (Tr. 82; Answer ¶ 165; 634).

153.    Dr. Weiss also failed to explain (a) what objective physical findings that supported CIGNA's prior opinion that Plaintiff was disabled, no longer existed, and (b) why Dr. Roach's objective physical findings that Plaintiff had back pain radiating down the leg, quadriceps weakness, decreased patellar reflex, and positive straight leg raises, failed to support his conclusion that Plaintiff was only capable of sitting for less than 2.5 hours a day (631-634).

## CIGNA'S FINAL DECISION

154.    Bharadwaj issued CIGNA's final decision in a letter dated December 7, 2006, affirming the "denial" of Plaintiff's benefits because his claim was no longer "clinically supported" (629-630; Answer ¶ 166). Although Bharadwaj initially testified that she had never seen the letter (Tr. 18), she subsequently admitted that she had sent it (Tr. 19).

155.    Bharadwaj initially testified that she did not know the difference between a "denial" of benefits and a "termination" of benefits (Tr. 19-21), but subsequently admitted that the two terms did not mean the same thing, and that Plaintiff's claim was terminated not denied (Tr. 21-22, 24).

156.    Bharadwaj testified that her December 7, 2006 decision concluding Plaintiff could work as a Wage and Salary Manager was the opposite of her January 14, 2003 conclusion that Plaintiff could not do so (Tr. 88-89).

157.    When asked what exam abnormalities that supported Plaintiff's claim on January 14, 2003 no longer supported his claim beyond December 7, 2006, Bharadwaj testified "I don't know" (Tr. 89-90).

158.    When asked what symptoms that supported Plaintiff's claim on January 14, 2003 no longer supported his claim beyond December 7, 2006, Bharadwaj testified "I don't know" (Tr. 90).

159.    When Bharadwaj was asked what documents other than the FCE and Weiss peer review showed Plaintiff could now resume working as a Wage and Salary Manager, Bharadwaj testified that there were unspecified medical records in the file (Tr. 90).  However, after reviewing the medical records in the file that were submitted after January 14, 2003 and before December 7, 2006, Bharadwaj admitted that she could not find any (Tr. 89, 98-99)

160.    Bharadwaj testified that in order to determine if a person was able to do sedentary work, she had to know the DOT physical demands for sedentary work, and compare those demands to the medical data (Tr. 57-58).

161.    However, despite admitting that shed has reviewed thousands of claims for CIGNA for over ten years, including hundreds of claims involving sedentary work, Bharadwaj testified that she did not know the physical demands of sedentary work or how many hours of sitting a day it required! (Tr. 35-36, 41-44, 46-50, 57-59).

162.    When asked how she could tell if a claimant could do sedentary work if she did not know how many hours of sitting it required, Bharadwaj testified, "I don't know" (Tr. 50, 55).

163.    Bharadwaj claimed because the FCE supposedly showed that Plaintiff had the functional capacity to work as a Wage and Salary Manager there was no clinical support for disability after October 27, 2005 (629-630).

164.    Bharadwaj testified that she did not simply defer to the conclusion of the physical therapist who did the FCE, but made her own independent review to see if the test data supported the conclusion (Tr. 40, 50, 51).  However, when asked what FCE test data supported Plaintiff's ability to work, Bharadwaj testified that she did not know (Tr. 51, 63).  Nonetheless, Bharadwaj testified that "everything" in the FCE supported Plaintiff's ability to do sedentary work (Tr. 68), but when asked to point out everything in the FCE data that did so, Bharadwaj testified "I don't know" and explicitly withdrew her statement that "everything" supported it (Tr. 69).

165.    When asked in turn about each of the FCE test data findings to see if they supported Plaintiff's ability to do sedentary work, Bharadwaj repeatedly testified "I don't know" (Tr. 52, 53, 64-70).  When asked how she could use her independent judgment to determine if the FCE physical therapist's conclusion, that Plaintiff could do sedentary work, was correct since she did not know what data in the FCE supported Plaintiff's ability to do sedentary work, Bharadwaj testified that she did not know (Tr. 64).

166.    **Bharadwaj admitted that if the DOT required the ability to sit for between 2.5 and 5.5 hours a day, then the FCE, which revealed Plaintiff could only sit between 0 and 2.5 hours day, would not support Plaintiff's ability to do sedentary work (Tr. 55-56). Bharadwaj further admitted that if the DOT required sitting for more than 5.5 hours a day for sedentary work, then the FCE would not support Plaintiff's ability to do sedentary work (Tr. 56).**

167.    CIGNA failed to explain how the FCE showed Plaintiff could work as a Wage and Salary Manager since the FCE demonstrated Plaintiff was limited to sitting for less than 2.5 hours in an 8 hour work day, and from lifting or carrying any weight (629-630).

168.    CIGNA also failed to explain what clinical evidence supported Plaintiff's disability before October 27, 2005, but not after that date (629-630).

169.    Bharadwaj testified that she agreed with Dr Weiss' opinion by drawing her own conclusion regarding whether his opinion was correct (Tr. 34).  However, Bharadwaj failed to explain why she rejected six years of treatment records, operative reports, diagnostic tests, functional assessments, Dr. Trotter's report, and the objective FCE test data, in favor of the opinion of Dr. Weiss who merely adopted the conclusion of the FCE physical therapist, which contradicted her own FCE findings (629-630).  This makes no sense if, as Bharadwaj testified, she gave equal weight to the opinions of Plaintiff's treating doctors along with Dr. Weiss (Tr. 31-32).

170.    CIGNA purported to rely on the U.S. Department of Labor's standards for sedentary work (379, 670, 671), yet CIGNA failed to explain where the DOT identifies any occupation that can be performed if a person is limited to sitting for less than 2.5 hours, as well as restricted from lifting and carrying any weight (629-630).

Dated:  Jericho, NY
          July 25, 2008

                              LAW OFFICES OF JEFFREY DELOTT

                    By:    _____
                           Jeffrey Delott, Esq. (JD8688)

                           Attorneys for Plaintiff
                           366 North Broadway, Suite 410
                           Jericho, NY  11753
                           (516) 939-2999

27