EXHIBIT B

```
0001
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   - - - - - - - - - - - - - - - - - x
 5   STEVEN ALFANO,                    :
 6                     Plaintiff,      :
 7            -against-               : 07CIV9661
 8   CIGNA LIFE INSURANCE COMPANY OF   : (GEL)
 9   NEW YORK,                         :
10                     Defendant.      :
11   - - - - - - - - - - - - - - - - -x
12                     June 17, 2008
13                     10:17 a.m.
14
15           Deposition of MEDHA BHARADWAJ, taken by
16   Plaintiff, pursuant to Notice, held at the
17   United States Courthouse, 500 Pearl Street, New
18   York, New York, before Ann Brunetti, a
19   Shorthand Reporter and Notary Public within and
20   for the State of New York.
21
22
23
24
25
0002
 1
 2   A P P E A R A N C E S:
 3
 4   LAW OFFICES OF JEFFREY DELOTT
 5   Attorneys for Plaintiff
 6        366 North Broadway
 7        Jericho, New York 11753
 8   BY:  JEFFREY DELOTT, ESQ.
 9
10   WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
11   Attorneys for Defendant
12        150 East 42nd Street
13        New York, New York 10017-5639
14   BY:  FRED N. KNOPF, ESQ.
15              -and-
16        EMILY HAYES, ESQ.
17
18
19
20
21
22
23
24
25
0003
 1
 2           IT IS HEREBY STIPULATED AND AGREED
 3   by and among the attorneys for the respective
 4   parties hereto that the filing and sealing of
```

```
 5   the within deposition shall be and the same are
 6   hereby waived.
 7           IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the form of
 9   the question, shall be reserved to the time of
10   trial.
11           IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be signed and
13   sworn to before any officer authorized to
14   administer an oath with the same force and
15   effect as if signed and sworn to before the
16   Court.
17
18
19
20
21
22
23
24
25
0004
 1
 2   M E D H A    B H A R A D W A J,  having been
 3       first duly sworn, was examined and
 4       testified as follows:
 5   EXAMINATION BY
 6   MR. DELOTT:
 7       Q.    Okay.  Where do you reside?
 8       A.    I work in Dallas.
 9       Q.    No, where do you live?
10       A.    I work in Dallas.  My business
11   address is 12225 Greenville Avenue, Dallas,
12   Texas.
13       Q.    That's your work address?
14       A.    Yes.
15       Q.    And where do you live?
16           MR. KNOPF:  We've asked the witness
17       to indicate what town she lives in and
18       that's it because she's given her work
19       address.  She's had difficulties in the
20       past with counsel contacting her at home.
21           MR. DELOTT:  I'll represent that I
22        will not contact the client at home.  I
23        have no intention of contacting her.
24           MR. KNOPF:  Okay, that's fine.
25       A.    McKinney.
0005
 1               M. Bharadwaj
 2       Q.    That's the town?
 3       A.    Yes.
 4       Q.    What's your date of birth?
 5       A.    10/19/68.
 6       Q.    Are you currently taking any
 7   medications?
 8       A.    No.
 9       Q.    Have you ever been deposed before?
```

```
10        A.      Yes.
11        Q.      How many times?
12        A.      Once.
13        Q.      What was the name of the case?
14        A.      I don't remember.
15        Q.      When were you deposed?
16        A.      A few years ago.
17        Q.      More than two years ago?
18        A.      A couple years ago.
19        Q.      More than five years ago?
20        A.      No, less than that.
21        Q.      And what court were you in?
22        A.      I don't recall.  It was in
23   California.
24        Q.      Was this in connection with a Cigna
25   case?
0006
 1                M. Bharadwaj
 2        A.      Yes.
 3        Q.      Was it a disability case?
 4        A.      Yes.
 5        Q.      And were you represented by counsel?
 6        A.      Yes.
 7        Q.      And who was the counsel who represented
 8   you?
 9        A.      I don't recall.
10        Q.      You don't recall from two years ago?
11        A.      No, I don't.
12        Q.      Were you asked to look for any
13   documents in connection with this deposition?
14        A.      No.
15        Q.      How do you keep track of your
16   schedule at work?
17        A.      I come into work in the morning, I
18   leave at the end of the day.
19        Q.      Do you have a diary or time sheets?
20        A.      No.
21        Q.      How do you keep track of your phone
22   calls?
23        A.      I answer the phone as they come in.
24        Q.      So you don't maintain a phone log of
25   any sort?
0007
 1                M. Bharadwaj
 2        A.      I don't, no.
 3        Q.      You don't know what happens to your
 4   phone or the calls --
 5             MR. KNOPF:  No, I think the answer
 6         was "I don't.  No."  I think that was the
 7         answer.
 8        Q.      Let me ask a different question. Are
 9   your calls recorded at work?
10        A.      I don't know.
11        Q.      Do you memorialize or record, when I
12   say record I don't mean audio record, do you
13   maintain any sort of record of the phone calls
14   that you make?
```

```
15     A.      No, not really.
16     Q.      Not really.  Well, not really
17  implies that maybe you do.
18     A.      I document the phone call.
19     Q.      How do you document the phone call?
20     A.      In our computer system.
21     Q.      What computer system?
22     A.      I don't know.
23          MR. DELOTT:  I'm going to note for
24      the record that there hasn't been any
25      compliance with any of the discovery
0008
 1              M. Bharadwaj
 2      rules here it appears.
 3              I don't know if that's something
 4      you've still working on but I haven't
 5      received the responses to the discovery.
 6          MS. HAYES:  Yes, you've received
 7      the complete file.
 8          MR. DELOTT:  It's not responsive.
 9          MR. KNOPF:  Well, we're not here
10      being deposed.  If you want to ask the
11      witness questions, go right ahead.
12              You can make whatever statement
13      you want but I'm not going to debate
14      with --
15          MR. DELOTT:  Well, that's why I
16      said --
17          MR. KNOPF:  -- you on the record.
18      So if you want to take that off, we'll
19      discuss it afterwards, during the break,
20      whenever you'd like.
21     Q.      Your computer system, this is a
22  computer system that employees use at Cigna?
23     A.      Yes.
24     Q.      And how do you access it?
25     A.      I turn it on.
0009
 1              M. Bharadwaj
 2     Q.      When you turn it on, what's the first
 3  thing that pops up on the screen?
 4     A.      Windows.
 5     Q.      And when Windows pops up, do you see
 6  icons on the screen?
 7     A.      Yes, some.
 8     Q.      What are some of them that you see?
 9     A.      I don't know.  I don't have them
10  memorized.
11     Q.      You can't recall a single icon on
12  the screen?
13     A.      No, because the icons, I don't
14  remember all of them offhand off the top of my
15  head.
16     Q.      Are there any icons that are related
17  to work files?
18     A.      No.
19     Q.      Are there any materials that when
```

```
20    you're reviewing a claim you have to go onto
21    the system to look at?
22         A.    I have the paper claim file.
23         Q.    You don't use any resources, you
24    don't use any medical tools, any medical
25    references?
0010
 1                   M. Bharadwaj
 2         A.    Just our medical directors and
 3    resources that we have in the office.
 4         Q.    So there are no dictionaries or any
 5    other texts of any sort that you use?
 6         A.    There are those available.
 7         Q.    And where are they available?
 8         A.    I don't know.  Through our medical.
 9         Q.    All right.  So when you document
10    your phone calls, you're documenting it via the
11    computer?
12         A.    Generally.
13         Q.    Well, on those occasions that are
14    not generally done, how do you do it?
15         A.    On paper.
16         Q.    And does the information that you
17    maintain on paper eventually make its way into
18    the computer?
19         A.    It would be in the file.
20         Q.    Is there any information that you
21    input through the computer that does not make
22    its way into the file?
23         A.    I don't know.
24         Q.    Who would know?
25         A.    Probably my manager.
0011
 1                   M. Bharadwaj
 2         Q.    Who's your manager?
 3         A.    Gary Person.
 4         Q.    With whom did you discuss being here
 5    today?
 6         A.    My attorneys.
 7         Q.    Anyone else?
 8         A.    No.
 9         Q.    When is the first time you met your
10    attorneys, and by your attorneys you're referring
11    to the two attorneys in this office?
12         A.    Correct.
13         Q.    Anyone else?
14         A.    No.
15         Q.    When was the first time that you met
16    them?
17         A.    Yesterday.
18         Q.    Did you ever speak with them before
19    meeting with them yesterday?
20         A.    No.
21         Q.    And where did you meet them yesterday?
22         A.    In Manhattan.
23         Q.    Where?
24         A.    At their office that's listed on the
```

```
25   business card.
0012
 1                M. Bharadwaj
 2      Q.    And who was with you?
 3      A.    Ms. Hayes.
 4      Q.    Anyone else?
 5      A.    No.
 6      Q.    And how long did that meeting take?
 7      A.    Maybe around an hour, hour and a
 8   half.
 9      Q.    Were you given any documents to review
10   yesterday?
11      A.    Just a couple.
12      Q.    Which ones?
13      A.    Just the notice to be here.
14      Q.    What else?
15      A.    I believe that was it.
16      Q.    Well, you said a couple.
17      A.    Yes, the summary of the case.
18      Q.    What summary of the case?
19      A.    I don't know what you call it but
20   it's the court document that you prepared that
21   you submitted to the court.  I don't know what
22   you call it though.
23      Q.    When you say "you," you're referring
24   to the plaintiff, you're referring to the
25   defendant?
0013
 1                M. Bharadwaj
 2           MR. KNOPF:  I think she's referring
 3   to you.
 4      A.    To you.
 5      Q.    Other than the notice and a court
 6   filing, were you given anything else to look at?
 7      A.    No.
 8      Q.    Did you bring with you any materials
 9   today relating to this deposition?
10      A.    No, I didn't.
11      Q.    What year did you graduate from high
12   school?
13      A.    '86.
14      Q.    Did you go to college?
15      A.    Yes.
16      Q.    Where?
17      A.    California State University Fullerton.
18      Q.    Did you graduate?
19      A.    Yes, I did.
20      Q.    What year?
21      A.    1990.
22      Q.    What degree did you get?
23      A.    Business administration, bachelor of
24   arts.
25      Q.    What did you do after graduating?
0014
 1                M. Bharadwaj
 2      A.    I worked for a mortgage company.
 3      Q.    What was the name of it?
```

```
 4      A.      First Connecticut Mortgage I believe.
 5      Q.      And how long did you work there?
 6      A.      Two years.
 7      Q.      What did you do after that?
 8      A.      I worked at like a temp agency.
 9      Q.      Why did you leave the mortgage company?
10      A.      Moved to Texas.
11      Q.      You moved to Texas or they moved to
12 Texas?
13      A.      No, we did, I did.
14      Q.      And you were at the temp agency from
15 when to when?
16      A.      I believe somewhere between '95 to
17 '96.
18      Q.      You graduated in 1990 and then you
19 went to the mortgage company you said for about
20 two years.  That would take you to about 1992.
21      A.      I apologize.  After college I worked
22 for a bank for a couple of years and then I
23 moved to Connecticut, I'm sorry.
24      Q.      A bank before the mortgage company?
25      A.      Correct.
0015
 1              M. Bharadwaj
 2      Q.      And when was that, from when to when?
 3      A.      1990 to 1992.
 4      Q.      And so you worked at the mortgage
 5 company from?
 6      A.      From '92 to '94.
 7      Q.      And the temp agency?
 8      A.      I believe from '94 to '95 I think.
 9      Q.      What did you do after that?
10      A.      I started work with Cigna.
11      Q.      So you think you started at Cigna
12 what year?
13      A.      I believe it was '95.
14      Q.      And when you started at Cigna, what
15 was your position?
16      A.      Benefit analyst at the time.
17      Q.      Benefits analyst?
18      A.      Uh-huh.
19      Q.      What does a benefits analyst do?
20      A.      They evaluate claims.
21      Q.      And how long did you have that
22 position?
23      A.      From '95 I did leave -- I left Cigna
24 towards the end of '96.  For about a year and a
25 half.
0016
 1              M. Bharadwaj
 2      Q.      And why did you leave Cigna at that
 3 point?
 4      A.      Family.
 5      Q.      And when did you return to Cigna?
 6      A.      I believe it was sometime in
 7 '90 -- I believe it was sometime in '99.
 8      Q.      Between the time you left Cigna for
```

```
 9   family reasons and the time you returned to
10   Cigna in about 1999, did you work anywhere
11   else?
12        A.    No, I didn't.
13        Q.    All right.  When you returned to
14   Cigna in 1999, what was your position?
15        A.    I was a case manager.
16        Q.    And how does that differ from a
17   benefits analyst?
18        A.    It's the same position, just the job
19   title changed.
20        Q.    And did there come a point when that
21   was no longer your title or position?
22        A.    Yes.
23        Q.    When was that?
24        A.    End of 2001.
25        Q.    What happened at that time?
0017
 1              M. Bharadwaj
 2        A.    I became an appeals claim manager.
 3        Q.    And what are the duties of an
 4   appeals claim manager?
 5        A.    Review claims that are denied and
 6   determine whether they should remain denied or
 7   not.
 8        Q.    And did that title ever change?
 9        A.    No.
10        Q.    So that's your current position?
11        A.    Correct.
12        Q.    Outside of salary, do you get any
13   other sort of compensation from Cigna?
14        A.    No.
15        Q.    Who do you report to currently?
16        A.    I report to Gary Person.
17        Q.    And when did you first start reporting
18   to him?
19        A.    End of 2001.
20        Q.    What is his title?
21        A.    Appeal team manager.
22        Q.    What does an appeal team manager do?
23        A.    He manages the appeal team.
24        Q.    What does that consist of?
25        A.    I don't know.
0018
 1              M. Bharadwaj
 2        Q.    From 2001 to the present, he has
 3   been the person you've reported to the entire
 4   time?
 5        A.    Yes.
 6        MR. DELOTT:  Let's mark this as
 7      Exhibit 1.
 8        (MB Exhibit 1, Document bearing
 9      Bates Nos. CLICNY 629-630, marked for
10      identification, as of this date.)
11        Q.    I'm marking as Exhibit 1 a document
12   that's been Bates stamped CLICNY 629-630 and
13   ask you to take a look at it.
```

```
14              MR. KNOPF:  I'm sorry, I misheard
15      you.  629?
16              MR. DELOTT:  630.
17              MR. KNOPF:  Okay.
18      A.      Okay.
19      Q.      Have you ever seen this document
20 before?
21      A.      Just now.
22      Q.      So this is the first time you've
23 ever seen that document?
24      A.      Correct.
25      Q.      All right.  At the bottom of 630, is
0019
 1                   M. Bharadwaj
 2 that your name?
 3      A.      Yes.
 4      Q.      Did you ever send a letter out with
 5 this date to an attorney named Andrew Siegel?
 6      A.      According to the letter I did.
 7      Q.      I'm going to ask you to take a look
 8 at the very first sentence of 629.  The first
 9 sentence uses the word "denial"; do you see
10 that?
11      A.      Okay.
12      Q.      Is a denial of benefits the same as
13 a termination of benefits?
14      A.      I don't know.
15      Q.      Well, would you send out a letter if
16 you didn't know what it meant?
17      A.      No.
18      Q.      All right.  Have you ever heard the
19 word "termination" and heard the word "denial"?
20      A.      Yes.
21      Q.      Do you have any idea if they mean the
22 same or different things?
23      A.      I don't know.
24      Q.      Is this a letter that you would have
25 written?
0020
 1                   M. Bharadwaj
 2      A.      Yes, I wrote this letter.
 3      Q.      Do you ever sign your name or have
 4 letters go out under your name that someone else
 5 wrote?
 6      A.      No.
 7      Q.      Do you ever send letters out if you
 8 don't know what you're writing about?
 9      A.      No.
10      Q.      All right.  So then what I'm asking
11 you is, is that a word that you used in your
12 letter in the very first sentence?
13      A.      Yes, it is a word that I used.
14      Q.      Then what did you mean by that first
15 sentence?
16      A.      I'm upholding the previous denial of
17 the claim.
18      Q.      Do you commonly use words that you
```

```
19    don't understand the meaning of?
20       A.    No.
21       Q.    All right.  So then what does the
22    word "denial" mean?
23       A.    He's not entitled to benefits.
24       Q.    And what does the word "termination
25    of benefits" mean?
0021
 1                M. Bharadwaj
 2       A.    His benefits ended.
 3       Q.    Is there a difference between a
 4    denial of benefits and a termination of
 5    benefits?
 6       A.    I don't know.  I'm denying the
 7    benefits.
 8       Q.    As far as you're concerned, the word
 9    "denial of benefits," I should say the term
10    "denial of benefits" and the term "termination
11    of benefits" means the same thing?
12       A.    I don't know.
13       Q.    Well, you wrote the letter.  Who
14    else would know if not you?
15       A.    I'm upholding the previous denial of
16    the claim.  He's not entitled to benefits.
17       Q.    I understand that's what you wrote.
18    I'm asking you do you understand a denial of
19    benefits to be anything different than a
20    termination of benefits?
21       A.    No.
22       Q.    So if you had a brand new claim, you
23    would sit there and if you were not going to
24    approve benefits for someone who had a brand
25    new claim, you would say I am writing to tell
0022
 1                M. Bharadwaj
 2    you about the termination of your benefits?
 3       A.    No, I wouldn't.
 4       Q.    So there is a difference between a
 5    termination of benefits and a denial of
 6    benefits?
 7       A.    Yes.
 8            MR. KNOPF:  I think she's testified
 9       to that.
10            MR. DELOTT:  No, she hasn't.
11            MR. KNOPF:  Yes, she has.  She
12       said --
13            MR. DELOTT:  No, the record will
14       speak for itself.
15            MR. KNOPF:  I know, but she also
16       said that termination means the end of
17       benefits.
18            MR. DELOTT:  I know you like to
19       testify but we're here to get her testimony.
20            MR. KNOPF:  Don't play these games.
21            MR. DELOTT:  This is not a game.
22            MR. KNOPF:  I don't think so either.
23            MR. DELOTT:  You're trying to
```

```
24        interrupt because you don't like the
25        answers that are coming out right now.
0023
 1              M. Bharadwaj
 2              MR. KNOPF:  No, I don't.  It makes
 3        no difference.  Your questions at this
 4        point --
 5              MR. DELOTT:  If it makes no
 6        difference, then there's no reason for
 7        you to be saying anything.
 8              MR. KNOPF:  Objection.
 9              MR. DELOTT:  Can you read back my
10        last question and her last response.
11              (Record read.)
12        Q.    When you wrote this letter, do you
13   know whether or not the claimant had been paid
14   any long-term disability benefits by Cigna?
15        A.    According to this letter he was.
16        Q.    Okay.  So then would it have been
17   correct to say that this was a termination of
18   benefits as opposed to a denial of benefits?
19              MR. KNOPF:  It doesn't say denial
20        of benefits.  It says denial of claim.
21              Is that what you mean?
22              MR. DELOTT:  Exactly what the letter
23        states.
24        A.    Yes, it means I'm denying his claim.
25        Q.    So a denial of claim is not any
0024
 1              M. Bharadwaj
 2   different than a termination of a claim; is
 3   that your understanding that the two are the
 4   same?
 5        A.    No.
 6        Q.    Okay.  What's your understanding?
 7        A.    Termination of benefits is the end
 8   of the benefits.
 9        Q.    And a denial?
10        A.    A denial is I'm saying he's not
11   entitled to benefits.
12        Q.    Okay.  Did anyone have to approve
13   your decision?
14        A.    Yes.
15        Q.    Who is that?
16        A.    That would have been Gary Person.
17        Q.    And what did he do to approve your
18   decision?
19        A.    I don't know.  He reviewed my -- he
20   reviewed the claim file and my letter.
21        Q.    And how do you know that?
22        A.    I gave him the claim file.
23        Q.    Where is that reflected in the claim
24   file?
25        A.    I don't know.
0025
 1              M. Bharadwaj
 2   RQ       MR. DELOTT:  I'm going to call for
```

```
 3          the production of the documents relating
 4          to Mr. Person's review of this claim file
 5          because to the extent it's not in the
 6          claim file, I'm going to have to depose
 7          him.
 8          Q.     I'm going to ask you to take a look
 9     at the second sentence of the penultimate
10     paragraph on 629.
11          A.     I'm sorry, can you repeat which
12     sentence.
13          Q.     Let me point it out.  The second
14     sentence in the second to last paragraph on
15     629, do you see where it refers to a peer
16     review?
17          A.     Yes.
18          Q.     What's a peer review?
19          A.     It's a medical review of the
20     information that's contained in the file.
21          Q.     Who decides if a peer review is
22     necessary?
23          A.     It was discussed with my manager.
24          Q.     And what was discussed?
25          A.     Whether we should do a peer review.
0026
 1               M. Bharadwaj
 2          Q.     All right.  And is that conversation
 3     reflected in the claim file?
 4          A.     It should be.
 5          Q.     And if it's not?
 6          A.     I don't know.
 7          Q.     Who would know then?
 8          A.     My manager would know.
 9     RQ        MR. DELOTT:  Again, I'm going to
10          call for the production of the document
11          reflecting the discussion between the
12          deponent and Gary Person regarding whether
13          or not a peer review is needed because I've
14          gone through all thousand pages plus and I
15          haven't found it.
16               MR. KNOPF:  Mr. Delott, we're not
17          in state court here.  If you want to make
18          requests, you can make requests and you
19          could do it in a supplemental writing after
20          the deposition.
21               If you want to make a placeholder
22          of things you want, that's fine, but I'm
23          not going to sit here and write down a
24          list in the deposition.  Do it afterwards
25          and we'll respond to it.
0027
 1               M. Bharadwaj
 2               MR. DELOTT:  I'll do it my way.
 3          Q.     When is a peer review needed?
 4          A.     It was needed for this case.
 5          Q.     Why was it needed in this case?
 6          A.     To clar -- to review the medical
 7     information in the file to clarify functionality.
```

```
 8       Q.     What was unclear about the
 9  functionality?
10       A.     Whether the information supported
11  his ability to perform his occupation.
12       Q.     I'm sorry, whether his?
13       A.     Whether the information in the file
14  supported inability to perform his occupation.
15       Q.     Are there any guidelines that you
16  typically use to determine whether or not you
17  need a peer review?
18       A.     No.
19       Q.     Do you discuss with your management
20  every case whether or not a peer review is
21  needed?
22       A.     No.
23       Q.     Under what circumstances do you
24  discuss whether or not a peer review is needed?
25       A.     I don't recall.
0028
 1               M. Bharadwaj
 2       Q.     In general, not in this case.
 3       A.     I don't know.  It depends on the
 4  claim.  I don't know.
 5       Q.     Do you recall why you needed to
 6  discuss a peer review in this particular case?
 7       A.     No, I don't remember.
 8       Q.     Why would you need a peer review if
 9  you can always ask the treating doctor any of
10  these questions?
11       A.     I don't know.  I don't remember in
12  this case.
13       Q.     In any case.
14       A.     I don't know.
15       Q.     Who would know?
16       A.     My manager.
17       Q.     And that's Gary Person?
18       A.     Correct.
19       Q.     Did you assume that the treating
20  doctors in this case were not competent to
21  evaluate the claimant's functionality?
22       A.     No.
23       Q.     Did you ask the treating doctors
24  what the claimant's functionality was?
25       A.     I don't recall.
0029
 1               M. Bharadwaj
 2       Q.     Is there any reason why you would
 3  not ask the treating doctors what the claimant's
 4  functionality was?
 5       A.     I don't remember in this case.
 6       Q.     Why would you ask an outside doctor,
 7  a peer review doctor to review the medical
 8  records to determine what the functionality --
 9  to clarify the functionality and not the
10  treating doctor?
11       A.     I don't recall in this case.
12       Q.     What about in any case?
```

```
13      A.      I don't know.  Depends on the case.
14      Q.      Under what circumstances would you
15 not have a peer review doctor clarify
16 functionality as opposed to the treating doctor?
17      A.      I don't know.
18      Q.      Do you know who did the peer review
19 in this particular case?
20      A.      According to this letter, a Dr. Weiss.
21      Q.      Is there any reason for you to believe
22 that Dr. Weiss was more competent to evaluate
23 the claimant's functionality than the treating
24 doctor?
25      A.      I don't know.
0030
1                   M. Bharadwaj
2      Q.      Was he in a better position to
3 assess the claimant's functionality than the
4 treating doctor?
5      A.      I don't know.
6      Q.      Who would know?
7      A.      I don't.
8      Q.      Can you think of any good reason why
9 you would have had a peer review doctor as
10 opposed to the treating doctor assess the
11 functionality in this particular case?
12      A.      I don't recall.
13      Q.      I'm not asking whether or not you
14 can recall.  I'm asking you if you can think of
15 any reason why you would have asked a peer
16 review doctor as opposed to the treating doctor
17 assess the claimant's functionality in this
18 case.
19      A.      I don't know.
20      Q.      You can't think of any reason?
21      A.      I don't remember in this case.
22      Q.      I'm not asking if you can
23 remember.  I'm asking you --
24      A.      I've answered your question.  No, I
25 don't know.
0031
1                   M. Bharadwaj
2      Q.      You don't know in any circumstance
3 why you would have had a peer doctor review the
4 claimant's functionality as opposed to the
5 treating doctor?
6      A.      I don't know.
7      Q.      Does being able to examine the
8 claimant provide any benefit to being able to
9 assess that person's functionality?
10      A.      I don't know.
11      Q.      When you make a determination, your
12 decision as to whether or not a claimant is
13 able to work, do you give the same amount of
14 weight to a peer review doctor as to a treating
15 doctor?
16      A.      Yes.
17      Q.      Does the fact that a treating doctor
```

```
18    was able to physically observe and see a
19    claimant firsthand provide any benefit to
20    evaluating the claimant's functionality?
21         A.    I don't know.
22         Q.    If you don't know, then why would
23    you give the two doctors the same weight?
24         A.    I don't know.
25         Q.    In this case did you give the same
0032
 1                M. Bharadwaj
 2    weight to Dr. Weiss as you gave to the treating
 3    doctor?
 4         A.    I don't remember in this case.
 5         Q.    Under what circumstance would you
 6    give more weight to a peer review doctor than a
 7    treating doctor?
 8         A.    I don't know.
 9         Q.    So you just flip a coin?
10         A.    No.
11         Q.    Then how do you determine whose
12    opinion you give greater weight to?
13         A.    I don't know.  It depends on the
14    claim file.
15         Q.    And what in the claim file would
16    lead you to give more weight to a peer review
17    doctor than a treating doctor?
18         A.    I don't know.
19         Q.    How many times has Cigna used
20    Dr. Weiss for a peer review?
21         A.    I don't know.
22         Q.    Have you come across claim files
23    with Dr. Weiss performing peer reviews for
24    Cigna?
25         A.    I don't remember.
0033
 1                M. Bharadwaj
 2    RQ       MR. DELOTT:  I'm going to call for
 3         the production of all peer reviews by
 4         Dr. Weiss for Cigna.
 5         Q.    Did you review Dr. Weiss' peer review
 6    for plaintiff's medical records?
 7         A.    I'm sorry, repeat the question please.
 8         Q.    Did you review Dr. Weiss' peer review
 9    for plaintiff's medical records?
10         A.    His report, yes.
11         Q.    His report you said?
12         A.    Yes.
13         Q.    And how do you know that you reviewed
14    it?
15         A.    I don't remember.  From the claim
16    file I guess.
17         Q.    Are there any documents in the claim
18    file indicating that you reviewed Dr. Weiss'
19    peer review?
20         A.    This document you showed me.
21         Q.    Anything other than that?
22         A.    I don't remember.
```

```
23      Q.     When you review a peer review -- let
24  me make this more specific.  When you reviewed
25  Dr. Weiss' peer review, did you agree with the
0034
 1                  M. Bharadwaj
 2  basis for his conclusion?
 3      A.     I don't remember.
 4      Q.     Can you tell by reading that
 5  document?
 6      A.     From reading this, yes, I did.
 7      Q.     So by reading that document you can
 8  tell that you did accept Dr. Weiss' opinion?
 9      A.     Yes.
10      Q.     When you reviewed Dr. Weiss' peer
11  review, did you simply defer to his conclusion
12  or did you make an independent judgment that
13  his conclusion was correct?
14      A.     I don't recall.
15      Q.     In general when you look at a peer
16  review document, do you simply accept what that
17  doctor says or do you make an independent
18  analysis of whether or not his conclusion is
19  correct?
20      A.     I look at his conclusion and the
21  information that's in the file.
22      Q.     And then you draw your own conclusion
23  as to whether or not his conclusion is correct?
24      A.     Yes, I suppose so.
25      Q.     Well, are there any circumstances
0035
 1                  M. Bharadwaj
 2  when you simply don't use your independent
 3  judgment but you simply accept what the doctor
 4  says?
 5      A.     I don't remember.
 6      Q.     Are there circumstances when you
 7  would simply accept what the doctor says as
 8  opposed to using your own independent judgment?
 9      A.     I'm sorry, can you repeat that
10  again.
11              MR. DELOTT:  Can you read that back.
12              (Record read.)
13      A.     I don't know.
14      Q.     How many peer reviews have you looked
15  at in connection with evaluating claims?
16      A.     I don't know.
17      Q.     More than 100?
18      A.     I don't know.
19      Q.     More than a thousand?
20      A.     I really don't know.
21      Q.     Ten?
22      A.     It was quite a lot.
23      Q.     How many years have you been
24  reviewing claims?
25      A.     In the appeals team?
0036
 1                  M. Bharadwaj
```

```
 2      Q.      No, altogether.
 3      A.      Ten years.
 4      Q.      Ten years.
 5              And about how many claims do you
 6   think you review a year?
 7      A.      I don't know.  I couldn't guess.
 8      Q.      More than 100?
 9      A.      More than 100.
10      Q.      More than 100 a year.
11              So that's over a thousand for a
12   minimum over ten years?
13      A.      I guess.
14      Q.      Is it fair to say that you review
15   more than 200 claims a year?
16      A.      I would say so.
17      Q.      All right.  So in the thousands of
18   claims that you've reviewed, how many times do
19   you think you come across peer reviews?
20      A.      I don't know.
21      Q.      Hundreds of times?
22      A.      Probably.
23      Q.      So when you review peer reviews, do
24   you simply accept what the peer review doctor
25   says?
0037
 1                  M. Bharadwaj
 2      A.      I did in this case, I did.
 3      Q.      In this case you just accepted what
 4   he said?
 5      A.      In conjunction with the claim file.
 6      Q.      So you exercised your independent
 7   judgment?
 8      A.      Correct.
 9      Q.      I'm going to ask you to read the
10   first sentence of the last paragraph on 629.
11      A.      Okay.
12      Q.      You state that Dr. Weiss said the
13   records do not support limitations and
14   restrictions to prevent the plaintiff from
15   functioning in a sedentary capacity and in the
16   next sentence you state Dr. Weiss stated that
17   an FCE showed the plaintiff had a sedentary
18   capacity; am I correct?
19              I'm not quoting, I'm paraphrasing.
20      A.      Okay.
21      Q.      All right.  Did you agree with
22   Dr. Weiss' conclusions based upon your
23   independent analyze or did you simply accept
24   what the peer review said?
25      A.      I agree with Dr. Weiss' analysis.
0038
 1                  M. Bharadwaj
 2      Q.      You agree with his analysis, okay.
 3              So you used your judgment to agree
 4   with his analysis?
 5      A.      Yes.
 6      Q.      What was the basis for Dr. Weiss'
```

```
 7    conclusion that the plaintiff could do sedentary
 8    work?
 9        A.    I don't know.
10        Q.    Can you tell by looking at that
11    exhibit?
12        A.    He reviewed the medical records and
13    functional capacity evaluation.
14              MR. DELOTT:  Let's mark this as
15        Exhibit 2.
16              (MB Exhibit 2, Documents bearing
17         Bates Nos. CLICNY 726-749, marked for
18         identification, as of this date.)
19        Q.    I'm marking as Exhibit 2 Bates
20    stamped CLICNY 726 through 749.  I ask you if
21    -- well, take a look at that and tell me if
22    you've ever seen it before.
23        A.    I don't recall it.
24              MR. KNOPF:  Why don't you flip
25         through the pages and see if it rings a
0039
 1                M. Bharadwaj
 2         bell.
 3              THE WITNESS:  Okay.
 4        A.    I don't recall it.
 5              MR. KNOPF:  We're going to take a
 6         two-minute break.
 7              (Recess taken.)
 8    BY MR. DELOTT:
 9        Q.    You don't recall seeing that
10    document.
11              Can you tell by looking at your
12    letter dated December 7th, 2006 whether or not
13    you reviewed that FCE before deciding to uphold
14    the termination?
15        A.    I can't tell.  Dr. Weiss had reviewed
16    it.
17        Q.    Dr. Weiss reviewed it.
18              Is it possible that you would have
19    made a decision without reviewing the FCE
20    yourself?
21        A.    I'm sure I did review it at the time.
22        Q.    You don't recall but you're sure
23    that you did review the FCE; is that correct?
24        A.    We review all the documents that are
25    in the file so.
0040
 1                M. Bharadwaj
 2        Q.    I'm sorry?
 3        A.    We review the entirety of the medical
 4    information in the file so I'm sure I did.
 5        Q.    When you reviewed the FCE, did you
 6    defer to the physical therapist's conclusion or
 7    did you make your independent judgment as to
 8    whether or not the analysis was correct?
 9        A.    I don't recall on this one.
10        Q.    Well, whenever you review a medical
11    record or an FCE, do you simply defer to the
```

12  conclusion of the author or do you make your
13  own independent review of that medical record?
14      A.    I review, I'll make my own
15  independent review.
16      Q.    Okay.  How do you know whether or
17  not the FCE that's Exhibit 2 shows that the
18  plaintiff has a sedentary work capacity?
19      A.    From looking at this, the conclusion
20  and she clicked off sedentary work capacity.
21      Q.    So that's the physical therapist's
22  conclusion you're looking at on page 726?
23      A.    Uh-huh.
24      Q.    Did you look at any of the data in
25  the entire FCE report?
0041
 1              M. Bharadwaj
 2      A.    The remainder of the pages, the
 3  whole thing?
 4      Q.    Yes.
 5      A.    I would have looked at it.
 6      Q.    Okay.  Do you see where they have
 7  the physical demand categories?
 8      A.    Uh-huh.
 9      Q.    Okay.  Is that how you determine
10  whether or not a job is sedentary, by that
11  standard?
12      A.    Look at the Dictionary of
13  Occupational Titles.
14      Q.    In other words, is that same
15  standard that you used at Cigna to determine
16  whether or not a job is sedentary the same
17  standard that's being used by the physical
18  therapist?
19      A.    I believe so.
20      Q.    So the physical therapist concluded
21  that the plaintiff could do sedentary work
22  according to the Department of Labor Dictionary
23  of Occupational Titles?
24      A.    From looking at this, yes.
25      Q.    All right.  And how many hours of
0042
 1              M. Bharadwaj
 2  sitting in an eight-hour day does that involve?
 3      A.    It doesn't say.  It doesn't specify
 4  here.
 5      Q.    Well, you used your -- you just
 6  testified that you didn't simply accept the
 7  physical therapist's conclusion, you did your
 8  own analysis, your own independent judgment.
 9  So how many hours of sedentary work -- how many
10  hours of sitting was required for sedentary
11  work?
12      A.    I don't know.
13      Q.    Well, if you don't know how many
14  hours of sitting is needed to do sedentary
15  work, then how could you conclude that the
16  physical therapist's conclusion was accurate?

```
17      A.      We use a Dictionary of Occupational
18  Titles.
19      Q.      According to that, how many hours of
20  sitting is needed?
21      A.      I don't know off the top of my head.
22      Q.      Can a person do sedentary work if
23  they're able to sit for only one hour in an
24  eight-hour day?
25      A.      I don't know.
0043
 1              M. Bharadwaj
 2      Q.      Well, then if you don't know how
 3  many hours of sitting is needed, then how do
 4  you know that the physical therapist's
 5  conclusion was correct?
 6              MR. KNOPF:  Objection.
 7              You can answer.
 8      A.      According to her testing.
 9      Q.      But you said you used your
10  independent judgment.
11      A.      Yes.
12      Q.      So when you use your independent
13  judgment to evaluate whether or not the
14  physical therapist's conclusions are correct,
15  how did you determine how many hours of sitting
16  was needed to do sedentary work?
17      A.      I don't recall.
18      Q.      Well, do you currently determine
19  whether or not claimants are capable of doing
20  sedentary work?
21      A.      Yes.
22      Q.      You've reviewed thousands of
23  long-term disability claims, correct?
24      A.      Uh-huh.
25      Q.      Hundreds of times you've had to
0044
 1              M. Bharadwaj
 2  determine whether or not a claimant was capable
 3  of sedentary work?
 4      A.      Yes.
 5      Q.      How many hours of sitting does a
 6  person have to do in an eight-hour day to be
 7  able to do sedentary work?
 8      A.      I don't know.
 9      Q.      Well, what's the major aspect of
10  being able to do sedentary work?
11      A.      I don't know.  Sitting.
12      Q.      Sitting.
13      A.      I don't know how many hours exactly.
14      Q.      So then if you don't know how many
15  hours of sitting is required to do sedentary
16  work, how can you conclude whether or not a
17  person's disabled?
18      A.      From the information that's contained
19  in the claim file.
20      Q.      You used your independent judgment
21  to determine whether or not the physical
```

22  therapist's conclusion and Dr. Weiss'
23  conclusion were correct; that's what you
24  testified to, correct?
25      A.    Yes.
0045
 1              M. Bharadwaj
 2      Q.    All right.  So using your independent
 3  judgment, how do you determine whether or not a
 4  person is able to do sedentary work, how many
 5  hours of sitting is needed to do that?
 6      A.    Whatever the Dictionary of
 7  Occupational Titles definition is.
 8      Q.    If the Dictionary of Occupational
 9  Titles said that you need to be able to sit six
10  hours a day to do sedentary work, does that FCE
11  support the ability to do sedentary work?
12      A.    Yes, it does.
13      Q.    And how do you know that?
14      A.    From the information in the file and
15  the results of the FCE.
16      Q.    You're looking at the --
17      A.    Dr. Weiss' review.
18      Q.    You're looking at the conclusion of
19  the FCE.  The results of the FCE are the data
20  that's contained after the conclusions, right?
21      A.    Correct, the whole --
22      Q.    And you looked at that?
23      A.    Uh-huh.
24      Q.    If the Dictionary of Occupational
25  Titles said that the claimant had to be able to
0046
 1              M. Bharadwaj
 2  sit for at least five hours a day to do
 3  sedentary work, is that supported?
 4          MR. KNOPF:  Do you want her to
 5      look through the report?
 6          MR. DELOTT:  I'm asking right now
 7      for her general information.
 8      A.    I don't know.
 9          MR. KNOPF:  Well --
10          MR. DELOTT:  I'm going to get to
11      your question, which is my question
12      afterwards.
13      A.    From review of everything and the
14  information, it supports that he can do
15  sedentary work.
16      Q.    But sedentary work, you mentioned
17  something about sitting.
18      A.    Uh-huh.
19      Q.    That's the major attribute of
20  sedentary work is sitting?
21      A.    Yes.
22      Q.    So in eight hours, how many hours of
23  sitting would that involve?
24      A.    Whatever the occupational requirements
25  are from the Dictionary of Occupational Titles.
0047

```
                    M. Bharadwaj
 1
 2      Q.      You've done this hundreds of times.
 3  How many hours?
 4      A.      I don't know.
 5      Q.      You've reviewed hundreds of claims --
 6              MR. KNOPF:  Next question, Mr. Delott.
 7              MR. DELOTT:  No.
 8              MR. KNOPF:  Ask your next question.
 9              MR. DELOTT:  Let's go to the judge.
10              MR. KNOPF:  Fine.
11              MR. DELOTT:  Let's go.
12              (Recess taken.)
13              MR. DELOTT:  We went to see the
14          judge.  The judge is busy.  We're going
15          to proceed with the questioning.
16              The defense counsel, let him speak
17          for himself, said that we would have the
18          questioning over objection.  If the
19          matter is still not resolved, we'll
20          return sometime after two o'clock to have
21          the matter resolved by the Court.
22              MR. KNOPF:  My comment is going to
23          be very simple because I don't want to
24          take up valuable paper.
25                  I'll withdraw my instruction not
0048
 1                  M. Bharadwaj
 2          to answer this particular question.
 3          We'll see how it goes.
 4              If we unfortunately can't get
 5          along, we will end the deposition and
 6          take it up with the Court at the Court's
 7          convenience at another time.
 8  BY MR. DELOTT:
 9      Q.      Since there's been a time lag, let
10  me just recap a couple things.  You stated that
11  you use your independent judgment when
12  analyzing documents, including FCE reports --
13      A.      Okay.
14      Q.      -- including this particular FCE
15  report, correct?
16      A.      Correct.
17      Q.      And you testified that you've
18  evaluated thousands of cases, hundreds of cases
19  where you had to evaluate claimants to see
20  whether or not they could do sedentary work; am
21  I correct?
22      A.      Uh-huh.
23      Q.      In determining whether or not a
24  person is able to do sedentary work, you have
25  to know what the functionality is; is that
0049
 1                  M. Bharadwaj
 2  correct?
 3      A.      Correct.
 4      Q.      You testified earlier that the
 5  reason for the peer review is that you needed
```

```
 6     to clarify the claimant's functionality; is
 7     that correct?
 8         A.      Correct.
 9         Q.      So what functionality determines
10     whether or not a claimant is capable of
11     sedentary work?
12         A.      The medical information, the FCE and
13     the medical review.
14         Q.      So in terms of functionality, you
15     said that the main component of sedentary work
16     is sitting; is that correct?
17         A.      Correct.
18         Q.      All right.  And we're evaluating
19     people for a full days work, not part-time work,
20     correct?
21         A.      Correct.
22         Q.      So we're talking about eight hours,
23     correct?
24         A.      Correct.
25             MR. KNOPF:  Of work?
0050
 1                 M. Bharadwaj
 2             MR. DELOTT:  Of work.
 3         Q.      So during an eight-hour workday, if
 4     the main component of sedentary work is
 5     sitting, we're talking about a minimum of how
 6     many hours?
 7         A.      I don't know what the minimum is.
 8         Q.      You don't know the minimum number of
 9     hours of sitting that's required for sedentary
10     work?
11         A.      Correct.
12         Q.      If you don't know the minimum number
13     of hours that's required for sedentary work,
14     then how do you know whether or not this FCE,
15     the data in it, supports the conclusion of the
16     physical therapist?
17             MR. KNOPF:  Objection.
18             You can answer.
19         A.      I don't know.
20         Q.      Well, you stated that you don't
21     simply accept the physical therapist's conclusion,
22     correct?
23         A.      Correct.
24         Q.      You looked at the data from the FCE?
25         A.      Correct.
0051
 1                 M. Bharadwaj
 2         Q.      And based upon your independent
 3     judgment, you determined that the data supported
 4     the conclusion of the physical therapist?
 5         A.      Correct, it was sent to the medical
 6     review and it supported he could do sedentary
 7     work.
 8         Q.      No, I'm not talking about what the
 9     medical reviewer said.
10             You said that you used independent
```

```
11    judgment to determine whether on the data in
12    the FCE supported the therapist's conclusion.
13         A.    Yes.
14         Q.    What data in the FCE supports the
15    claimant's ability to do sedentary work?
16         A.    I don't know.  The various testing
17    that they did.  I don't know.
18         Q.    Well, let me take it one at a time
19    then.  You reviewed the data on 728 and on 734.
20    These are some of the pages in the FCE; is that
21    what you testified to?
22         A.    Right, that's part of the FCE.
23         Q.    It states that -- let's take a look
24    at the FCE, it's page 728.  At the top it says
25    U.S. Department of Labor DOT category.
0052
1                    M. Bharadwaj
2         A.    Okay.
3         Q.    What do you understand that to mean?
4         A.    It's U.S. Department of Labor
5    department of title category.
6         Q.    All right.  So you're not familiar --
7         A.    Dictionary of Occupational Titles,
8    I'm sorry.
9         Q.    So the categories here are taken
10    from the Dictionary of Occupational Titles or
11    DOT?
12         A.    According to the form, correct, yes.
13         Q.    The very top line states that
14    lifting floor to knuckle and it says unable.
15         A.    Okay.
16         Q.    Does that support the claimant's
17    ability to do sedentary work?
18         A.    I don't know.
19         Q.    The second line says knuckle to
20    shoulder, and this is asking in terms of how
21    many pounds could be lifted, and it states
22    unable.  Does that support the claimant's
23    ability to do sedentary work?
24         A.    I don't know.
25         Q.    The third line, lifting floor to
0053
1                    M. Bharadwaj
2    shoulder, states unable to do any lifting.
3    Does that support the claimant's ability to do
4    sedentary work?
5         A.    I don't know.
6         Q.    The next category says sitting. You
7    see the X here next to sitting.  How many hours
8    of sitting does it say the claimant can do?
9         A.    Up to two and a half hours.
10         Q.    Up to two and a half hours?
11         A.    Yes.
12         Q.    Does that support the claimant's
13    ability to do sedentary work?
14         A.    Yes, according to the FCE, it did.
15         Q.    "According to" meaning the conclusion
```

```
16    of the physical therapist?
17         A.    Uh-huh.
18         Q.    But I'm asking you for your
19    independent judgment which you said you
20    exercised in evaluating the data and the
21    physical therapist's conclusion.
22               Based upon your independent
23    judgment, does this data support the conclusion?
24         A.    Yes.
25         Q.    All right.  And how do you know
0054
 1               M. Bharadwaj
 2    that?
 3         A.    From reviewing the FCE and the
 4    medical information and --
 5         Q.    We're not talking about any other
 6    medical information.  We're just talking about
 7    the FCE.
 8               You said you used independent
 9    judgment to review the data and by reviewing
10    the data you determined that you agreed with
11    the conclusion of the physical therapist.
12         A.    Uh-huh.
13         Q.    So if the data here states that the
14    claimant is limited to sitting for less than
15    2.5 hours a day, how does that support the
16    claimant's ability to do sedentary work?
17         A.    I look at the file, the whole thing
18    as a whole.
19         Q.    The whole FCE as a whole?
20         A.    FCE and the file as a whole.
21         Q.    All right.  So you stated that you
22    needed the peer review to clarify the claimant's
23    functionality.
24         A.    Correct.
25         Q.    In terms of functionality, how much
0055
 1               M. Bharadwaj
 2    sitting does the claimant have to be able to do
 3    in an eight-hour day to do his sedentary work?
 4         A.    I don't know.
 5         Q.    Well, if you don't know how many
 6    hours of sitting is needed, then how do you
 7    determine whether or not the conclusion of the
 8    physical therapist is correct?
 9               MR. KNOPF:  Objection.
10               You can answer.
11         A.    I don't know.
12         Q.    If the department of -- I'm sorry,
13    if the Dictionary of Occupational Titles stated
14    that sedentary work requires the ability to sit
15    frequently 2.5 to 5.5 hours a day, would this
16    FCE support the claimant's ability to do
17    sedentary work?
18         A.    I'm sorry, can you please repeat the
19    question.
20               MR. DELOTT:  Can you read that back.
```

```
21              (Record read.)
22              MR. KNOPF:  As to sitting, Jeff,
23        you're focusing only on sitting?
24              MR. DELOTT:  Yes.
25       A.     That was checked off yes, I guess.
0056
 1              M. Bharadwaj
 2       Q.     But if it's not checked off and the
 3  2.5 is checked off?
 4              MR. KNOPF:  Can I see.
 5       A.     No, I suppose not.
 6       Q.     If the DOT or the case law states
 7  that sitting, sedentary work required 5.5 or
 8  more hours a day, would this FCE support the
 9  ability to do sedentary work?
10              MR. KNOPF:  Objection to case law.
11              MR. DELOTT:  Okay.  Noted.
12       A.     I don't know.
13       Q.     Well, how is -- I'm sorry.
14       A.     If the DOT requires constant as
15  opposed to in reference to his sitting, no.
16       Q.     When you reviewed this FCE, did you
17  ever ask anyone at Cigna what the DOT required
18  in terms of these activities listed on 728?
19       A.     I don't recall.
20       Q.     When you review files to evaluate
21  whether a claimant is capable of sedentary
22  work, do you ever discuss the case with a
23  vocational expert or consultant?
24       A.     On occasion.
25       Q.     All right.  And on those occasions,
0057
 1              M. Bharadwaj
 2  why would you speak with or consult with a
 3  vocational consultant?
 4       A.     To obtain the Dictionary of
 5  Occupational Titles description.
 6       Q.     When you're evaluating --
 7              MR. KNOPF:  Are you done with your
 8        answer?
 9              THE WITNESS:  Yes.
10       Q.     When you're evaluating a claim on
11  behalf of Cigna to determine whether or not a
12  claimant is capable of working, how do you
13  determine whether the medical evidence supports
14  the ability to do a particular job?
15       A.     I'm sorry, please repeat that.
16       Q.     Let me ask a different question.
17              When you're determining whether or
18  not a person is entitled to benefits --
19       A.     Okay.
20       Q.     -- do you compare the medical data
21  to the categories of physical demands listed on
22  726?
23       A.     Yes.
24       Q.     Okay.  So in order to determine
25  whether or not a person is capable of let's say
```

```
0058
 1                M. Bharadwaj
 2   sedentary work, you'd have to know what the
 3   physical demands are of sedentary work, correct?
 4        A.      Correct.
 5        Q.      And the demands of sedentary work
 6   are defined according to the U.S. Department of
 7   Labor's Dictionary of Occupational Titles; is
 8   that correct?
 9        A.      Yes.
10        Q.      And you've been doing this work for
11   you said about ten years?
12        A.      Yes.
13        Q.      All right.  Do you know what --
14   after ten years, do you know what the physical
15   demands are for sedentary work according to the
16   DOT?
17        A.      I don't memorize the DOT, no.
18        Q.      How many times have you done this
19   over ten years?
20             MR. KNOPF:  Objection.
21             You can answer.
22        A.      I don't know.
23        Q.      Have you had to determine whether a
24   person is capable of doing the physical demands
25   of sedentary work more than 100 times?
0059
 1                M. Bharadwaj
 2             MR. KNOPF:  Objection.
 3             You can answer.
 4        A.      I don't know.
 5        Q.      But you've been trying to determine
 6   whether or not people are capable of sedentary
 7   work for about a ten-year period of time?
 8             MR. KNOPF:  Objection.
 9             You can answer.
10        A.      Yes, I guess.
11        Q.      All right.  Over that ten-year
12   period of time, is it fair to say that you've
13   had to evaluate at least a thousand claimants
14   who are capable of sedentary work?
15             MR. KNOPF:  Objection.
16        A.      I don't know.  I don't count them.
17        Q.      On a typical week, how many claims
18   do you evaluate?
19             MR. KNOPF:  Objection.
20        A.      I don't know.
21        Q.      Do you keep records of how many
22   claims you evaluate?
23        A.      No.
24        Q.      Are there any documents,
25   computerized systems, data, anything that
0060
 1                M. Bharadwaj
 2   indicates how many claims you review?
 3        A.      I don't know.
 4        Q.      Who would know?
```

```
 5        A.      I don't know.
 6        Q.      Does anyone keep statistics on the
 7   work that you do?
 8        A.      I don't know.
 9        Q.      Do you ever have performance reviews?
10        A.      Yes.
11        Q.      How often?
12        A.      Once a year.
13        Q.      And when you have a performance
14   review, what is it based upon?
15        A.      My ability to do my job.
16        Q.      And how is that measured?
17        A.      I don't know.  By my manager.
18        Q.      Is it measured by how many claims
19   you evaluate?
20        A.      I don't know.
21        Q.      Is it measured by what your work
22   volume is?
23        A.      I don't know.
24        Q.      And who would know that?
25        A.      My manager.
0061
 1               M. Bharadwaj
 2        Q.      And who is that?
 3        A.      Gary Person.
 4        Q.      All right.  If you had to determine
 5   whether or not the claimant was capable of
 6   light work based upon this FCE, how would you
 7   determine that?
 8        A.      I don't know.  It depends on the
 9   claim.
10        Q.      Well, let's make believe Mr. Alfano's
11   past work was light and you're trying to
12   determine whether or not he could do light
13   work.  By looking at this FCE, the data here,
14   would he be capable to doing light work?
15               MR. KNOPF:  Objection.
16               That's got nothing to do with the
17        case, Jeff.
18               You can answer.
19        A.      I don't know.
20        Q.      So you don't have the ability to
21   evaluate the data in an FCE to determine
22   whether or not a person's capable of doing a
23   certain category of work?
24               MR. KNOPF:  Objection.
25               You can answer.
0062
 1               M. Bharadwaj
 2        A.      I guess based on this couple of
 3   pieces of information, no, I don't know.
 4        Q.      So based upon an FCE -- based upon
 5   this FCE, are you able to determine whether or
 6   not the claimant is capable of doing any
 7   particular category of work?
 8        A.      In conjunction with the information
 9   in the file.
```

```
10      Q.      Well, forget about the file for the
11 time being.  I'm not asking about any other
12 medical evidence that may be contained in this
13 file.
14              There's a conclusion that a physical
15 therapist will draw after conducting an FCE.
16 So let's make believe you're going to draw your
17 own conclusion because you said you use your
18 independent judgment.
19      A.      Okay.
20      Q.      So forgetting about this paragraph
21 on conclusions --
22      A.      Okay.
23      Q.      -- and you have to look at the data
24 here in the FCE, according to the data here,
25 what category of work is the claimant able to
0063
 1              M. Bharadwaj
 2 do?
 3              MR. KNOPF:  Objection.
 4              You can answer.
 5      A.      Sedentary work.
 6      Q.      And what do you base that upon?
 7      A.      On the information that's in the FCE.
 8      Q.      What information in the FCE shows
 9 that the claimant is capable of doing sedentary
10 work?
11      A.      The testing and --
12      Q.      What particular --
13      A.      -- the therapist says he can do --
14      Q.      No.  No.  Remember, we're
15 disregarding the conclusions of the therapist.
16 We're not looking at her conclusions.  We're
17 just looking at the raw data.
18              So based upon the data which is
19 contained in pages 728 through 749, tell me
20 which data supports the claimant's ability to
21 do sedentary work and which data does not
22 support the claimant's ability to do sedentary
23 work.
24      A.      I don't know.
25      Q.      If you don't know what data supports
0064
 1              M. Bharadwaj
 2 the claimant's ability to do sedentary work and
 3 which data does not support the claimant's
 4 ability to do sedentary work, then how can you
 5 use your independent judgment to determine
 6 whether or not the physical therapist's
 7 conclusion that based upon the data in the FCE
 8 the claimant's capable of sedentary work?
 9              MR. KNOPF:  Objection.
10              You can answer.
11      A.      I don't know.
12      Q.      Does the claimant's ability to reach
13 overhead for less than 2.5 hours a day support
14 his ability to do sedentary work?
```

```
15        A.     I don't know.
16        Q.     Does the claimant's ability to reach
17   at a desk level for less than 2.5 hours a day
18   support the claimant's ability to do sedentary
19   work?
20        A.     I don't know.
21        Q.     Well, if the claimant's unable to do
22   any reaching at floor level, does that support
23   his ability to do sedentary work?
24        A.     I don't know.
25        Q.     If the claimant only has the ability
0065
 1              M. Bharadwaj
 2   to do firm hand grasping less than 2.5 hours a
 3   day bilaterally, left hand and right hand, does
 4   that support his ability to do sedentary work?
 5        A.     I don't know.
 6        Q.     What about simple grasping with his
 7   right or left hand less than 2.5 hours a day,
 8   does that support his ability to do sedentary
 9   work?
10        A.     I don't know.
11        Q.     What about fine motor fingering with
12   his left and right hand less than 2.5 hours a
13   day, does that support his ability to do
14   sedentary work?
15        A.     I don't know.
16        Q.     Foot controls, if the claimant has
17   the ability -- if the claimant is only able to
18   use foot controls with his left and right foot
19   less than 2.5 hours a day, does that support
20   his ability to do sedentary work?
21        A.     I don't know.
22        Q.     If the claimant is able to see
23   constantly, does that support his ability to do
24   sedentary work?
25        A.     I don't know.
0066
 1              M. Bharadwaj
 2        Q.     If the claimant's able to hear
 3   constantly, does that support his ability to do
 4   sedentary work?
 5        A.     I don't know.
 6        Q.     If the claimant's able to talk
 7   constantly, does that support his ability to do
 8   sedentary work?
 9        A.     I don't know.
10        Q.     If the claimant is unable to balance,
11   does that support his ability to do sedentary
12   work?
13        A.     I don't know.
14        Q.     If the claimant is unable to do any
15   stooping, does that support his ability to do
16   sedentary work?
17        A.     I don't know.
18        Q.     If the claimant is unable to do any
19   kneeling, does that support his ability to do
```

```
20    sedentary work?
21         A.    I don't know.
22         Q.    If the claimant is unable to do any
23    crouching, does that support his ability to do
24    sedentary work?
25         A.    I don't know.
0067
 1                 M. Bharadwaj
 2         Q.    If the claimant is unable to do any
 3    crawling, does that support his ability to do
 4    sedentary work?
 5         A.    I don't know.
 6         Q.    If the claimant's only able to be
 7    on his feet for sometime between zero and
 8    2.5 hours, does that support his ability to do
 9    sedentary work?
10         A.    I don't know.
11         Q.    If the claimant's only able to be
12    seated for between zero and 2.5 hours a day,
13    does that support his ability to do sedentary
14    work?
15         A.    I don't know.
16         Q.    Mr. Alfano's job was working at a
17    computer primary; is that correct?
18         A.    If that's what the record says.
19         Q.    If the claimant --
20         A.    I don't recall.
21         Q.    If the records that you reviewed
22    state that Mr. Alfano's job is primarily a desk
23    position --
24         A.    Okay.
25         Q.    -- does this ability to sit for only
0068
 1                 M. Bharadwaj
 2    between zero and 2.5 hours a day support his
 3    ability to do that job?
 4         A.    I don't know.  On the FCE it does.
 5         Q.    Excuse me?
 6         A.    According to the FCE it does.
 7         Q.    According to the FCE data or
 8    according to the physical therapist's
 9    conclusion?
10         A.    According to everything.
11         Q.    Well, you just said you didn't know
12    whether everything that we just went over
13    supported his ability to do sedentary work.
14               So when you're referring to
15    everything, you point out to me in the FCE data
16    what you're referring to that supports his
17    ability to do sedentary work.
18         A.    I believe everything supports his
19    ability.
20         Q.    So you're changing everything you
21    said previously?
22         A.    Yes.
23         Q.    Well, we'll have to go over this
24    again.  So now if the claimant is unable to do
```

```
25   any balancing, you're saying that supports his
0069
 1                M. Bharadwaj
 2   ability to do sedentary work?
 3       A.    I don't know the answer to these
 4   questions.
 5                MR. DELOTT:  Well, can you read
 6         back her statement regarding everything
 7         supports.
 8                (Record read.)
 9       Q.    Point out everything in the FCE data
10   that supports his ability to do sedentary work.
11       A.    I don't know.
12       Q.    Do you want to withdraw your
13   statement regarding "everything"?
14       A.    I'll withdraw.
15       Q.    Thank you.
16             All right.  There's some additional
17   data that's broken down on page 734 --
18       A.    Okay.
19       Q.    -- and it breaks down lifting in
20   terms of pounds.
21       A.    Okay.
22       Q.    Does anything on CLICNY 734, does
23   any of the lifting data ten pounds all the way
24   up through 100 pounds, does anything there
25   support the claimant's ability to do sedentary
0070
 1                M. Bharadwaj
 2   work?
 3       A.    I don't know.
 4                MR. DELOTT:  Let's mark this as
 5         Exhibit 3.
 6                (MB Exhibit 3, Document bearing
 7         Bates Nos. CLICNY 631-634, marked for
 8         identification, as of this date.)
 9       Q.    I've marked as Exhibit 3 Bates stamp
10   CLICNY 631 through 634.  Have you ever seen
11   this before?
12       A.    I don't remember this.
13       Q.    Excuse me?
14       A.    I don't recall this.
15       Q.    I'm going to ask you to take a look
16   at it first.
17       A.    Yes, I did.
18       Q.    You looked through the entire
19   document?
20       A.    Uh-huh.
21       Q.    And you don't know whether or not
22   you've ever seen it before?
23       A.    I'm sure I did when I reviewed the
24   file.
25       Q.    I'm going to ask you to read the
0071
 1                M. Bharadwaj
 2   first section which is on 631 entitled "Contact
 3   with the provider."  Do you know whether or not
```

```
 4      Dr. Weiss ever spoke with doctor --
 5              MR. KNOPF:  Do you want her to read
 6          it or do you want to ask a question while
 7          she's reading it?
 8              MR. DELOTT:  She said she's
 9          already --
10          A.      You asked me to read it so I'm
11      reading it now.
12          Q.      Okay.  Let me know when you're done
13      reading it.
14          A.      Okay.
15          Q.      Do you know if Dr. Weiss ever spoke
16      with the treating doctors?
17          A.      According to this, no.
18          Q.      Is that something that Dr. Weiss
19      would have done on his own or is that what you
20      or Cigna would have asked Dr. Weiss to have
21      done?
22          A.      It looks like it was asked here in
23      question number 3 --
24          Q.      Okay.
25          A.      -- if you follow.
0072
 1                  M. Bharadwaj
 2              MR. KNOPF:  Were you finished with
 3          your answer?
 4              THE WITNESS:  Uh-huh.
 5          Q.      The second section which looks like
 6      the bottom half of 631 and about the top third,
 7      top half of 632 is entitled "Summary of records."
 8          A.      Okay.
 9          Q.      You just reviewed that letter, that
10      section?
11          A.      This on the records section?
12          Q.      Yes.
13          A.      Okay.
14          Q.      Does it summarize all or some of the
15      records in plaintiff's claim file?
16          A.      Okay.
17          Q.      Well, do you know whether the report
18      of Dr. Weiss summarized all the medical records
19      of plaintiff in the claim file or just some of
20      them?
21          A.      I believe all of them.
22          Q.      Does it do anything other than
23      summarize those medical records?
24          A.      In the summary?
25          Q.      Yes.
0073
 1                  M. Bharadwaj
 2          A.      No, just the summary.
 3          Q.      The last section of this report
 4      starts on 632 --
 5          A.      Okay.
 6          Q.      -- and it's three questions, correct?
 7          A.      Correct.
 8          Q.      I'm going to ask you to read the
```

```
 9   first question and the answer to that first
10   question and let me know when you're done.
11       A.     Okay.
12       Q.     According to Dr. Weiss, what records
13   show plaintiff can do his sedentary work duties?
14       A.     I don't know the information that he
15   reviewed.
16       Q.     Well, according to the answer, what
17   does he indicate, what documents support the
18   claimant's ability to do sedentary work?
19       A.     Upon review of the medical information
20   and functional capacity evaluation.
21       Q.     So he states two things?
22       A.     Upon review of the medical information
23   are supported.
24       Q.     Right.
25       A.     The medical information and then he
0074
 1              M. Bharadwaj
 2   refers to a functional capacity evaluation.
 3       Q.     All right.  He says upon reviewing
 4   those documents but what does he identify as
 5   supporting the sedentary functional capacity?
 6       A.     The medical information and the
 7   functional capacity evaluation.
 8       Q.     I didn't quite hear you.
 9       A.     The medical information and the
10   functional capacity evaluation.
11       Q.     In or and?
12              MR. KNOPF:  She said and.
13       A.     And medical information and upon
14   review of the medical information and then he
15   also refers to the functional capacity
16   evaluation.
17       Q.     So the second sentence where it says
18   the functional capacity exam of 7/26/05
19   recommended sedentary work?
20       A.     Correct.
21       Q.     Does he identify any other documents
22   that support the ability to do sedentary work?
23       A.     He reviewed whatever is listed,
24   whatever is listed in here.
25       Q.     But he doesn't identify anything,
0075
 1              M. Bharadwaj
 2   does he?
 3       A.     He identifies -- he lists what he
 4   reviewed in his question number 2.
 5       Q.     So you're interpreting that statement
 6   as every single document that he summarized
 7   supports the claimant's ability to do sedentary
 8   work?
 9       A.     He reviewed all these documents and
10   upon his review of all the medical information
11   and the FCE.
12              MR. DELOTT:  Can you read back my
13         question.
```

```
14              (Record read.)
15      A.      Correct.
16              MR. KNOPF:  Just so that the record
17      is not confusing, are you referring to --
18      the witness was pointing to the list on
19      question 2 and you were using the word
20      "summary" which we looked at earlier which
21      starts on 1 and goes over to 2.  I just
22      want there to be no confusion based on what
23      the witness is pointing to.
24              MR. DELOTT:  Valid point.
25              MR. KNOPF:  You have to listen to
0076
 1                  M. Bharadwaj
 2       his question carefully.
 3              THE WITNESS:  Okay.
 4              MR. DELOTT:  I don't know whether
 5       I should have her read it back.
 6      Q.      You stated that it was your
 7      interpretation that the doctor's answer to
 8      question 1 was that all the medical information
 9      listed in the summary --
10              MR. KNOPF:  This.
11      Q.      -- supports the claimant's --
12      A.      Summary.
13      Q.      -- ability to do sedentary work.
14      A.      Well, and all the information that
15      he reviewed in here.
16      Q.      So all the information listed under
17      question 2 and all the information listed in
18      the summary of records, every single one of
19      those documents supports the claimant's ability
20      to do sedentary work?
21      A.      The medical information as a whole.
22      Q.      So you're saying some of them do
23      support and some of them don't support?
24      A.      No.
25      Q.      Well, which of those records support
0077
 1                  M. Bharadwaj
 2      the claimant's ability to do sedentary work and
 3      which do not support the claimant's ability to
 4      do sedentary work?
 5      A.      I don't know.  His review of the
 6      medical information and the FCE.
 7      Q.      So by reviewing Dr. Weiss' report,
 8      you can't tell what records he believes
 9      supports the claimant's ability to do sedentary
10      work and which records do not?
11              MR. KNOPF:  Objection.
12              You can answer.
13      A.      I don't know.
14      Q.      Do you see where Dr. Weiss states
15      that the plaintiff is restricted from prolonged
16      sitting?
17      A.      Yes.
18              MR. KNOPF:  In question 1?
```

```
19      A.      In question 1?
20      Q.      Yes.
21              What does prolonged sitting mean?
22      A.      I don't know.
23      Q.      Is prolonged sitting more than
24  2.5 hours in an eight-hour day?
25      A.      I don't know.
0078
 1              M. Bharadwaj
 2      Q.      Do you know how many hours in an
 3  eight-hour day the plaintiff could sit without
 4  doing any prolonged sitting?
 5      A.      I don't know.
 6      Q.      Do you see where Dr. Weiss states
 7  that the plaintiff would be required to do
 8  intermittent standing?
 9      A.      Yes.
10      Q.      What does intermittent standing
11  mean?
12      A.      I don't know.  Standing on occasion.
13  I don't know.
14      Q.      How many hours in an eight-hour day
15  would the plaintiff have to stand to do
16  intermittent standing?
17      A.      I don't know.
18      Q.      If you don't know what prolonged
19  sitting or intermittent standing means, then
20  how can you independently review Dr. Weiss'
21  conclusion that the claimant is capable of
22  doing sedentary work?
23      A.      I don't know.  Based on his review,
24  prolonged sitting, he'd have to get up now and
25  then.
0079
 1              M. Bharadwaj
 2      MR. DELOTT:  I'm sorry.  Can you
 3    just read it back.
 4          (Record read.)
 5      Q.      You testified earlier today that you
 6  used your independent judgment in determining
 7  whether or not Dr. Weiss' conclusion that the
 8  claimant's capable of doing sedentary work was
 9  correct.
10      A.      Uh-huh.
11      Q.      But if you don't know how many hours
12  in an eight-hour day the plaintiff would need
13  to sit without prolonged sitting or how many
14  hours he would need to stand or how many times
15  he would need to switch from sitting to
16  standing, then how can you independently
17  evaluate his conclusion?
18      A.      I don't recall in this case.
19      Q.      Well, it doesn't have to be this
20  case.  I'm not asking you for your memory of
21  what you did.
22      A.      I reviewed this along with all the
23  medical information that's contained in the
```

```
24    file.  The decision was based on everything in
25    the file.
0080
 1                 M. Bharadwaj
 2        Q.     Your --
 3        A.     The decision was based on everything
 4    in the file.
 5        Q.     I'm not asking you about everything
 6    in the file.  My question was limited to this
 7    review by Dr. Weiss.  You stated that you used
 8    your independent judgment to --
 9        A.     Correct.
10        Q.     -- evaluate whether or not his
11    conclusion was correct.
12        A.     Correct.
13        Q.     So I'm asking you to tell me how you
14    were able to conclude that Dr. Weiss' ultimate
15    conclusion was accurate if you don't know how
16    long the claimant needed to sit or stand because
17    that was the basis for the doctor's conclusion.
18        A.     I don't know.
19        Q.     I'm going to ask you to read
20    question 3 and let me know when you're done.
21    That's question 3 on page 633.
22        A.     Okay.
23        Q.     What did this ask Dr. Weiss to do?
24        A.     If you find the available information
25    conflicting or if you disagree with attending
0081
 1                 M. Bharadwaj
 2    provider, please contact the claimant's AP,
 3    Dr. Alexiades and Dr. Roach.
 4        Q.     What was the purpose for asking
 5    Dr. Weiss to contact those two doctors?
 6        A.     If he finds any information
 7    conflicting.
 8        Q.     Okay.  But why would Cigna be
 9    telling Dr. Weiss to contact those two doctors?
10        A.     I don't know.  It's part of our
11    process.
12        Q.     When you say part of the process,
13    what process are you referring to?
14        A.     It's part of the questions that we
15    ask the peer review doctor.
16        Q.     Why do you ask the review doctor to
17    do that?
18        A.     To talk to the physician if he
19    disagrees with anything in the file --
20        Q.     Well --
21        A.     -- or if he wants to clarify
22    information I guess.
23        Q.     And why would Cigna suggest that the
24    peer review doctor contact the treating doctors
25    about that?
0082
 1                 M. Bharadwaj
 2        A.     I don't know.
```

```
 3       Q.      I'm going to ask you to look at 634,
 4  CLICNY 634.  Who asked Dr. Weiss to write that
 5  addendum?
 6       A.      I have no idea.
 7       Q.      Who would know?
 8       A.      I don't know.
 9       Q.      Did Dr. Weiss write that addendum on
10  his own?
11       A.      I don't know.
12       Q.      Dr. Weiss states that Dr. Roach's
13  April 19th, 2005 and June 14th, 2005 reports
14  did not contain objective physical findings.
15  Is that an accurate statement?
16       A.      I'm sorry, where are you reading
17  from?
18       Q.      Let me take a look.  It's the second
19  sentence.
20       A.      Okay.
21       Q.      What objective physical findings did
22  Dr. Weiss identify that showed the plaintiff
23  could do sedentary work?
24       A.      I don't know.
25              MR. DELOTT:  Okay.  The last exhibit.
0083
 1              M. Bharadwaj
 2              (MB Exhibit 4, Document bearing
 3          Bates No. CLICNY 105, marked for
 4          identification, as of this date.)
 5       Q.      I've marked as Exhibit 4 Bates
 6  stamped CLICNY 105 and ask you to take a look
 7  at that and let me know when you're done
 8  reviewing it.
 9       A.      Okay.
10       Q.      Who is Mary Ryan?
11       A.      I don't know.
12       Q.      Do you know why Mary Ryan's name is
13  on this document?
14       A.      I don't know who she is.  I don't
15  know.
16       Q.      It refers to a Unilinks file.  What
17  is Unilinks?
18       A.      I don't know.
19       Q.      Did you prepare this document?
20       A.      I don't -- my name's on it but I
21  don't remember it.
22       Q.      You don't remember it but how would
23  your name get on this document?
24       A.      I don't know.  It's something that
25  happened in 2003.  Obviously I wrote it.
0084
 1              M. Bharadwaj
 2       Q.      When did you write it?
 3       A.      According to this, January 14th of
 4  '03.
 5       Q.      And you were trying to determine
 6  whether or not the plaintiff could work as a
 7  wage and salary manager?
```

```
 8      A.      At that time.
 9      Q.      And what kind of position was that
10  according to the Dictionary of Occupational
11  Titles?
12      A.      Everything here is considered to be
13  sedentary.
14      Q.      You wrote that the plaintiff's
15  symptoms and exam abnormalities supported
16  severe spinal stenosis and nerve root
17  impingement; is that correct?
18      A.      Are you reading from that paragraph?
19      Q.      I'm not reading anything.  I'm
20  paraphrasing it.
21      A.      Okay.  Severe, yes, it says it
22  supports diagnosis of severe multilevel spinal
23  stenosis and nerve root impingement.
24      Q.      So it was a combination of the
25  plaintiff's symptoms and his exam abnormalities
0085
 1              M. Bharadwaj
 2  that supported his claim according to your
 3  document?
 4      A.      According to this, yes.
 5      Q.      All right.  Now, this document says
 6  that a Gary Person approved your decision to
 7  reverse the denial of plaintiff's benefits.
 8      A.      Oh, okay.  Yes.
 9      Q.      This is the same Gary Person who you
10  referred to earlier?
11      A.      Yes.
12      Q.      And you reported to him?
13      A.      Yes.
14      Q.      What was his title at that time?
15      A.      Appeal team manager.
16      Q.      Why did he have to approve your
17  decision?
18      A.      To determine if he agrees with my
19  findings.
20      Q.      To determine?
21      A.      If he agrees with my findings of my
22  decision.
23      Q.      And if he did not agree with your
24  determination, what would happen?
25      A.      He would tell me he didn't.  He
0086
 1              M. Bharadwaj
 2  would advise me that he disagreed and --
 3      Q.      So he would veto your decision in
 4  effect?
 5      A.      Correct.
 6      Q.      Now, did you have to get his approval
 7  when you terminated his benefits?
 8              MR. KNOPF:  Objection.
 9              You can answer.
10      A.      Prior to, yes.
11      Q.      Now, when Mr. Person approved your
12  decision to approve benefits, did he review the
```

13   claim file at that time?
14      A.    According to this, that's what it
15   states, he reviewed the file.
16      Q.    Would he ever approve a decision
17   without reviewing the documents?
18      A.    No.
19            MR. DELOTT:  Do you want to take a
20       break?  I just have one last series of
21       questions so this is a good time to take
22       a break.
23            MR. KNOPF:  You need a break?
24            MR. DELOTT:  No, but I just want
25       to get through this last part without
0087
1                 M. Bharadwaj
2         another break.
3            (Recess taken.)
4    BY MR. DELOTT:
5       Q.    I ask you to take a look at page 2,
6    the second page of Exhibit 1, and you reviewed
7    this previously?
8       A.    Earlier today, yes.
9       Q.    Now, in this document you said that
10   the plaintiff could work as a wage and salary
11   manager, correct -- I'm sorry, could not work.
12      A.    I'm sorry, repeat the question,
13   please.
14      Q.    You were concluding, you stated in
15   this letter that the plaintiff could not work
16   as a wage and salary manager; is that correct?
17      A.    You're stating that I'm saying that
18   he can't work?
19      Q.    Yes, cannot.
20      A.    No.
21      Q.    What did you conclude?
22      A.    I concluded that the medical doesn't
23   support -- I'm trying to word it, word myself.
24   I concluded that the medical does not support
25   his inability to work.
0088
1                 M. Bharadwaj
2       Q.    Well, you just stated a double
3    negative.  Is that any different from what I
4    said?
5       A.    It sounded like you asked me my
6    letter concluded that the medical supports his,
7    supports his inability to work.  I concluded
8    that the medical does not support his claim
9    that he's unable to work.
10      Q.    All right.  So just to avoid any
11   double negatives, your letter is stating that
12   the claimant could not work -- I'm sorry.
13            MR. KNOPF:  No.
14      Q.    Withdrawn.
15            You're stating --
16            MR. KNOPF:  It's such a tricky
17       question that you can't even get it out.

```
18       Q.     You're saying that the claimant can
19  resume working as a wage and salary manager?
20       A.     Correct.
21       Q.     Now, that's the opposite of what you
22  concluded in Exhibit 3, correct, on January
23  14th, 2003?
24              MR. KNOPF:  Wrong document.
25              MR. DELOTT:  That's not Exhibit 3?
0089
 1                 M. Bharadwaj
 2              MR. KNOPF:  No.
 3              MR. DELOTT:  I'm sorry.
 4              MR. KNOPF:  It might be Exhibit 4
 5       but not 3.
 6              MR. DELOTT:  Yes.
 7       Q.     So that's the opposite of what you
 8  concluded in Exhibit 4 on January 14th, 2003?
 9       A.     Correct, that was --
10       Q.     What objective physical findings
11  that supported the plaintiff's claim on
12  January 14th, 2003 did not support his claim
13  beyond October 27th, 2005?
14       A.     Can you repeat the question, please.
15              MR. DELOTT:  Just read that back.
16              (Record read.)
17       A.     The information in the file since
18  that time, the FCE, the peer review report.
19       Q.     The FCE, peer review report?
20       A.     And any other medical information
21  that's in the file.
22       Q.     We'll get to that in a second.
23              What exam abnormalities that
24  supported the plaintiff's claim in 2003 no
25  longer supported his claim in 2005?
0090
 1                 M. Bharadwaj
 2       A.     I don't know.
 3       Q.     What symptoms that supported the
 4  plaintiff's claim in 2003 no longer supported
 5  his claim in 2005?
 6       A.     I don't know.
 7       Q.     All right.  Now, you just said the
 8  FCE and the peer review.  Was there anything
 9  else besides those two documents?
10       A.     Medical information, medical records
11  that are in the file.
12       Q.     I'm going to give you the entire
13  claim file.  Now, I will represent that there
14  are no, and your attorneys can verify this
15  afterwards, that there are no medical records
16  after 1/14/2003 that appear before page 631.
17  That leaves about 400 pages.
18       A.     Okay.
19       Q.     More than half, about half those
20  pages are not even medical records --
21       A.     Okay.
22       Q.     -- so that leaves you about
```

```
23    200 pages, and we've already gone over the FCE
24    and Dr. Weiss' report and that totals 30 pages.
25    So we're talking about 100 plus pages.
0091
 1                    M. Bharadwaj
 2            I'm going to ask you to go through
 3    that now and you show me what medical records
 4    show that there are objective physical findings
 5    that supported the plaintiff's claim in 2003
 6    that no longer supported them in 2005.
 7               MR. KNOPF:  What Bates range would
 8          you like the witness to look through?
 9               MR. DELOTT:  Above 631.
10               MR. KNOPF:  You want her to look
11          above 631 through 1,027, that's 400 pages?
12               MR. DELOTT:  I just explained half
13          those pages are not even medical records.
14               MR. KNOPF:  Let me tell you
15          something, I will allow the witness to do
16          that, but I am going to bring this
17          transcript and your shenanigans to the
18          court with an application for costs if
19          you want the witness to go over 400 pages
20          of records that she indicated to you --
21               MR. DELOTT:  No.
22               MR. KNOPF:  -- earlier she hasn't
23          reviewed to look for some medical record.
24               Have you gone through it and can
25          represent that there is or isn't
0092
 1                    M. Bharadwaj
 2          something?
 3               MR. DELOTT:  You're obviously
 4          protesting too much because you don't
 5          like where this is going.
 6               You bring whatever motion you
 7          want --
 8               MR. KNOPF:  It makes no difference
 9          to me --
10               MR. DELOTT:  -- and I'll bring
11          sanctions against you for a totally
12          frivolous application.
13               MR. KNOPF:  This is going --
14               MR. DELOTT:  Make my day.
15               You have 400 pages, half those
16          aren't even medical records so that
17          leaves about 200 pages, and besides the
18          time we took out to visit the Court, this
19          has not been a very long deposition.
20               You want to make your application,
21          make your application.  In the meantime,
22          let's proceed.
23               MR. KNOPF:  So what pages would
24          you like her to look through?
25               MR. DELOTT:  Again, 631 and above.
0093
 1                    M. Bharadwaj
```

```
 2              MR. KNOPF:  Okay.  Go ahead and do
 3       that.
 4              And we're beginning this at 12:35.
 5              MR. DELOTT:  Fine.
 6              MR. KNOPF:  Go ahead.
 7              I apologize to you on behalf of
 8       attorneys in New York, I apologize to you
 9       that you have to do this but I'll allow
10       you to do this.  We'll take care of it
11       later.
12              MR. DELOTT:  I'll note that the
13       witness is spending time not looking at
14       the medical records but at the computer
15       logs.
16              MR. KNOPF:  The witness is going
17       through this page by page as you asked
18       her to.
19              MR. DELOTT:  And then she stopped
20       and was reading the computer logs.
21              MR. KNOPF:  You know what, let me
22       tell you something, you are some piece of
23       work.  She's looking through the
24       documents that you asked her to.
25              MR. DELOTT:  The more noise you
0094
 1              M. Bharadwaj
 2       make, the more it proves that this is a
 3       point that hurts your case.
 4              MR. KNOPF:  1:05.
 5              Do you remember what the question
 6       was?
 7       Q.    You're not able to pull out any
 8  documents, any other documents besides the peer
 9  review and the FCE?
10       A.    I don't know.
11       Q.    You don't know what?
12       A.    I don't recall.  There's a lot of
13  medical --
14       Q.    I'm not asking you to go back in
15  time.  My last question was what documents in
16  the file that you just looked through supported
17  the claimant's disability in 2003 that no
18  longer support it in 2005.
19       A.    I don't know.
20       Q.    But you just reviewed them so how
21  can you not know?  You were able to know back
22  when you made the decision.  How can you not
23  know now?
24       A.    Well, I only had what, an hour.
25  So no, I don't know.
0095
 1              M. Bharadwaj
 2       Q.    So sitting here right now, you were
 3  unable to identify any other documents besides
 4  the peer review and the FCE that show the
 5  claimant's condition had improved?
 6       A.    I don't know.
```

```
 7        Q.      Well, didn't I ask you to pull out
 8   any document that showed an improvement that
 9   the condition that supported -- that the
10   findings that supported it in 2003 no longer
11   support it in 2005?
12        A.      I'm not disputing that he doesn't
13   have the condition.
14             MR. DELOTT:  Read my question back
15        before we started the record review.
16             (Record read.)
17        Q.      All right.  So where are they?
18             The question is pending.
19        A.      Okay.
20        Q.      You're not going to get it by looking
21   at your attorney.
22             MR. KNOPF:  Well, I'm putting the
23        papers together so she's looking in this
24        direction so.
25        A.      I don't know.
0096
 1                 M. Bharadwaj
 2        Q.      Well, we just spent a half hour so
 3   you could go through and look at all the
 4   documents.  What were you doing all this time
 5   when you were leafing through 200 pages?
 6             MR. KNOPF:  She answered your
 7        question.
 8        A.      I said I don't know.
 9        Q.      So you were just leafing through the
10   paper for no particular purpose?
11             MR. KNOPF:  Objection.
12             I believe your question has been
13        answered.
14             MR. DELOTT:  No, my question was
15        stated, I asked her to --
16             MR. KNOPF:  What medical records
17        are there and she said I don't know.  She
18        said it a couple times.
19             MR. DELOTT:  No, that was not the
20        question that I asked.  I just asked what
21        was she doing when she was going through --
22             MR. KNOPF:  I understand.
23             MR. DELOTT:  -- the last half hour
24        looking --
25             MR. KNOPF:  But it's really --
0097
 1                 M. Bharadwaj
 2             MR. DELOTT:  -- through the 200
 3        pages and she said I don't know.
 4             MR. KNOPF:  It's related to your
 5        earlier question.  You said what were you
 6        looking for.  She answered.
 7             MR. DELOTT:  Let me rephrase it so
 8        it's clear.
 9             You just put that out of order.
10             MR. KNOPF:  No, it's right here.
11        You got your stuff in there.
```

```
12        Q.     You just reviewed the claim file
13   from 631 through the end; is that correct?
14        A.     Correct.
15        Q.     Were you able to identify any
16   records that showed that the claimant's
17   condition had improved between the time you
18   approved his disability through the time you
19   upheld the termination of his benefits?
20        A.     I don't recall.
21        Q.     You don't recall back then or you
22   don't recall just now when you just reviewed
23   the documents?
24        A.     I don't recall.
25        Q.     That's not an answer.  It was one or
0098
 1                  M. Bharadwaj
 2   the other.
 3              MR. KNOPF:  Ask her a question.
 4        Q.     What don't you recall?
 5        A.     I don't recall from looking at the
 6   file just now.
 7        Q.     You mean we just spent a half hour
 8   looking at the documents and you don't recall
 9   what you looked at?
10        A.     The information, like I said, I
11   don't recall.
12        Q.     So then it's correct that you were
13   unable to identify any document that supported
14   the claimant's termination between the time you
15   approved and the time you disapproved?
16        A.     Like I said, I don't recall.
17        Q.     Well, you know what, we're going to
18   have to go the Court because we're going to
19   have to do this again.
20              I asked you as you were going
21   through it to identify any document but you
22   didn't identify anything.  So as you were going
23   through each document, what were you looking
24   for besides turning the pages?
25        A.     I gave you my answer.  I don't
0099
 1                  M. Bharadwaj
 2   recall.
 3        Q.     No, that's not --
 4              MR. KNOPF:  He's asking what you
 5         were looking for --
 6        A.     I was just looking --
 7              MR. KNOPF:  -- whether you were
 8         looking for the medical records he was
 9         asking for or something else.
10        A.     I was looking at the medical
11   records.
12        Q.     And why were you looking at them?
13        A.     Because you asked me to.
14        Q.     And what did I ask you to do with
15   them?
16        A.     Identify the medical record that
```

```
17    showed a change in his condition from I guess
18    2003 and from when the claim is now denied.
19         Q.    And you were unable to do that?
20         A.    No.
21         Q.    No, you were not able to do that?
22         A.    Correct.
23               (Continued on following page.)
24
25
0100
 1               M. Bharadwaj
 2               MR. DELOTT:  No further questions.
 3               MR. KNOPF:  Thanks.  See you
 4         later.  I hope you enjoyed your day.
 5               (Time Noted:  1:12 p.m.)
 6
 7         _____
 8               MEDHA BHARADWAJ
 9
10    Sworn to and subscribed before me
11    this _____ day of _____, 2008.
12
13    _____
14         NOTARY PUBLIC
15
16
17
18
19
20
21
22
23
24
25
0101
 1
 2               C E R T I F I C A T E
 3
 4    STATE OF NEW YORK  )
 5                      :  SS.
 6    COUNTY OF NEW YORK )
 7
 8         I, Ann Brunetti, a Shorthand Reporter
 9    and Notary Public within and for the State of
10    New York, do hereby certify:
11         That MEDHA BHARADWAJ, the witness whose
12    deposition is hereinbefore set forth, was duly
13    sworn by me, and that such deposition is a true
14    record of the testimony given by the witness.
15         I further certify that I am not related
16    to any of the parties to this action by blood
17    or marriage and that I am in no way interested
18    in the outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto set
20    my hand this 30th day of June 2008.
21
```

```
22                    _____
23                              ANN BRUNETTI
24
25
0102
 1
 2   June 17, 2008
 3                         I N D E X
 4   WITNESS              EXAMINATION BY     PAGE
 5   MEDHA BHARADWAJ        MR. DELOTT       4-100
 6
 7   REQUESTS (RQ:) 25, 26, 33
 8
 9                    E X H I B I T S
10   MB                                     FOR IDENT.
11   1,  Documents bearing Bates Nos.
12       CLICNY 629-630                        18
13   2,  Documents bearing Bates Nos.
14       CLICNY 726-749                        38
15   3,  Document bearing Bates Nos.
16       CLICNY 631-634                        70
17   4,  Document bearing Bates No.
18       CLICNY 105                            83
19
20
21
22
23
24
25
```