UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                  :
STEVEN ALFANO,                                    :
                                                  :
                          Plaintiff,              :
                                                  :            07 Civ. 9661 (GEL)
      -v.-                                        :
                                                  :        **OPINION AND ORDER**
                                                  :
CIGNA LIFE INSURANCE COMPANY                      :
OF NEW YORK, et al.,                              :
                                                  :
                          Defendants.             :
                                                  :
-------------------------------------------------------------x

Jeffrey Delott, Law Offices of Jeffrey Delott, New
York, New York, for plaintiff.

Fred N. Knopf, Emily A. Hayes (of Counsel),
Wilson, Elser, Moskowitz, Edelman & Dicker LLP,
New York, New York, for defendant.

GERARD E. LYNCH, District Judge:

        Plaintiff Steven Alfano commenced this action against defendant CIGNA Life Insurance

Company of New York, challenging the termination of his long-term disability benefits under

Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"),

codified at 29 U.S.C. § 1132(a)(1)(B).  Both parties now move for summary judgment.  For the

reasons discussed below, plaintiff's motion will be granted, and defendant's motion will be

denied.

                              **BACKGROUND**

**I.      The Long-Term Disability Plan**

        Through group insurance contract number NYK-1972 (the "Policy"), defendant CIGNA

Life Insurance Company of New York ("CIGNA") provides benefits to disabled participants in

the Cornell University Weill Medical College Long-Term Disability Insurance Plan (the

"Plan").[1]  (P. 56.1 Stmt. ¶ 3; D. 56.1 Stmt. ¶ 2; CLICNY 588.)  According to the Plan, a

participant is disabled when, because of injury or sickness, "he is unable to perform all the

material duties of his regular occupation," or "he is earning less than 80% of his Indexed Basic

Earnings."  (CLICNY 593; see also P. 56.1 Stmt. ¶ 7; D. 56.1 Stmt. ¶ 6.)  Provided a participant

demonstrates his disability and remains disabled for the 180-day waiting period established by

the Plan, he is entitled to a monthly benefit equal to the lesser of: (1) 60% of his "Monthly Basic

Earnings"[2] (up to a maximum of $15,000) less the amount of any "Other Benefits" received for

that month, "excluding any Other Benefits received by or on behalf of [his] dependents," or (2)

70% of his "Basic Earnings" less the amount of any "Other Benefits," including those received

by his dependents.[3]  (CLICNY 598; see also P. 56.1 Stmt. ¶ 4; D. 56.1 Stmt. ¶¶ 5, 7.)  Where a

participant becomes disabled prior to his sixty-third birthday, long-term disability benefits

("LTD benefits") – which are adjusted for a maximum of five annual cost of living increases of

3% – issue until the participant is no longer disabled or until he turns sixty-five, whichever is

---

[1] The Policy was issued to Cornell's Weill Medical College by INA Life Insurance Company of New York, and had an effective date of July 1, 1989.  (D. 56.1 Stmt. ¶ 3; P. Suppl. 56.1 Stmt. ¶ 3; CLICNY 588.)  INA Life Insurance Company is now known as CIGNA Life Insurance Company of New York.  (P. 56.1 Stmt. ¶ 2; D. 56.1 Stmt. ¶ 3.)

[2] A participant's basic earnings are determined as of the time he becomes disabled. (CLICNY 598.)

[3] "Other Benefits" include, inter alia, social security disability benefits ("SSD benefits"). (CLICNY 600.)  If a disabled participant does not apply for SSD benefits, the Plan provides that the estimated amount of any such benefits should be deducted from the participant's disability award.  (P. 56.1 Stmt. ¶ 13; D. Suppl. 56.1 Stmt. ¶ 13; CLICNY 514, 601.)  In order to facilitate the implementation of this provision, participants are obligated to execute a reimbursement agreement pursuant to which they must remit any SSD benefits to CIGNA and reimburse CIGNA for overpayment where such benefits are subsequently awarded.  (P. 56.1 Stmt. ¶ 14;  D. Suppl. 56.1 Stmt. ¶ 14; CLICNY 474.)

earlier.  (P. 56.1 Stmt. ¶¶ 5-6; D. 56.1 Stmt. ¶¶ 8, 10; CLICNY 603, 604.)

## II.     Alfano's Work History

Plaintiff Steven Alfano, a 51-year old resident of New York who was hired by Cornell's

Weill Medical College ("Weill") on August 5, 1991, as a wage and salary manager, participated

in the Plan.  (P. 56.1 Stmt. ¶¶ 1, 9, 10; D. Suppl. 56.1 Stmt. ¶ 1, 9, 10; D. 56.1 Stmt. ¶¶ 1, 4;

CLICNY 527.)  As a wage and salary manager, he "administer[ed] the non-academic

compensation program to ensure internal and external equity and compliance with internal policy

and federal and local laws governing wage and salary."  (D. 56.1 Stmt. ¶ 14; P. Suppl. 56.1 Stmt.

¶ 14.)  According to Weill's description of the position, because "[m]ost work [is] performed

sitting at [a] desk," the employee "[m]ust be able to sit for extended periods," (P. 56.1 Stmt. ¶

11; D. Suppl. 56.1 Stmt. ¶ 11; CLICNY 479), though he could get up and move about as needed.

(D. 56.1 Stmt. ¶ 15; P. Suppl. 56.1 Stmt. ¶ 15; cf. CLICNY 379.)  Consistent with this

description, and in reliance on the definitions outlined in the U.S. Department of Labor's

Dictionary of Occupational Titles (the "DOT"), CIGNA itself classified Alfano's occupation as

sedentary.  (P. 56.1 Stmt. ¶ 11; D. Suppl. 56.1 Stmt. ¶ 11; CLICNY 104, 379, 479, 879.)

## III.    Alfano's Pre-Application Medical History

On May 15, 1996, after being involved in a car accident that left him with back pain and

left leg weakness, Alfano began receiving medical treatment from Dr. Michael Alexiades, an

orthopedic surgeon.  (P. 56.1 Stmt. ¶ 20; D. Suppl. 56.1 Stmt. ¶ 20; CLICNY 350.)  Alfano's

condition worsened in May 2000, and on or about June 5, 2000, following Dr. Alexiades's

conclusion that Alfano's back pain left him "unable at this point to work," Alfano left his job at

Weill.  (P. 56.1 Stmt. ¶¶ 21-22; D. Suppl. 56.1 Stmt. ¶¶ 21-22; CLICNY 116, 515, 527.)  A

lumbar MRI conducted several days later showed that Alfano suffered from moderate to severe

spondylosis and moderate spinal stenosis[4] at the L5-S1 level, with mild impingement on the left

L5 nerve root.[5]  (P. 56.1 Stmt. ¶ 23; D. Suppl. 56.1 Stmt. ¶ 23; CLICNY 283.)  Responding to a

later request made pursuant to the Family and Medical Leave Act, Dr. Alexiades opined that

Alfano could not do any lifting or prolonged sitting or standing.  (P. 56.1 Stmt. ¶ 24; D. Suppl.

56.1 Stmt. ¶ 24; CLICNY 290-91.)  On July 20, 2000, an electromyography ("EMG")[6]

interpreted by Dr. Stephen Scelsa, a neurologist, revealed that Alfano had either an L5-S1

radiculopathy or polyneuropathy.[7]  (P. 56.1 Stmt. ¶ 25; D. Suppl. 56.1 Stmt. ¶ 25; CLICNY 284-

86, 485-89.)

---

[4] Spondylosis, also known as spinal osteoarthritis, is a degenerative disorder that may result in a loss of normal spinal structure and function.  The condition can cause pressure on nerve roots, resulting in pain or paresthesia (shocks) in the limbs.  Spinal stenosis is a condition involving the narrowing of the spinal canal and the resultant pinching of nerves, which can lead to pain in the buttocks, limping, numbness or loss of sensation in the lower extremities, cramping, problems with bladder and bowel function, and other impairments in physical activity.  Spinal stenosis is often caused by osteoarthritis-related bone damage.

[5] On July 24, 2002, Dr. Keith Roach – Alfano's primary care physician – read this MRI as showing that Alfano "suffers from moderate to severe L5-S1 spondylosis with disc space narrowing, disc desiccation, degenerative type III end-plate marrow changes, an annular disc bulge, facet osteoarthritis and a prominent posterolateral osteophyte formation, with impingement of the exiting L5 nerve root and . . . moderate spinal stenosis."  (CLICNY 251.)

[6] An EMG measures the electrical activity of muscles.  Often performed in conjunction with a nerve conduction study, it is one of several tests used to assist doctors in diagnosing polyneuropathy.

[7] Radiculopathy is not a specific condition, but rather a term used to describe pain and other symptoms like numbness, tingling and weakness in one's extremities resulting from problems in his or her nerve roots.  Polyneuropathy is a pattern in which the peripheral nerves in one's body malfunction simultaneously.  Symptoms include, but are not limited to, muscle weakness, pins-and-needles sensation, numbness, loss of sensation, burning pain, unsteady gait, problems with bladder and/or bowel function, fluctuation in blood pressure, and impotence.

4

Despite receiving two epidural injections during this time, Alfano continued to experience severe back pain and numbness of the legs.  (P. 56.1 Stmt. ¶ 26; D. Suppl. 56.1 Stmt. ¶ 26; CLICNY 116.)  Dr. Alexiades therefore referred him to Dr. Sean McCance, a spine specialist.  (Id.; CLICNY 454.)  After evaluating Alfano, Dr. McCance concluded that Alfano suffered from discogenic back pain and L5-S1 radiculopathy, both of which stemmed from an impingement of the L5 nerve root.  (P. 56.1 Stmt. ¶ 27; D. Suppl. 56.1 Stmt. ¶ 27; CLICNY 454-55.)  Because of the weakness in Alfano's legs, Dr. McCance strongly recommended that Alfano undergo surgery for a fusion at L5-S1.  (Id.)

Following Dr. McCance's recommendation, Alfano sought a second opinion from Dr. Robert Snow, a neurosurgeon.  (P. 56.1 Stmt. ¶ 28; D. Suppl. 56.1 Stmt. ¶ 28; CLICNY 492.) Dr. Snow diagnosed Alfano with L5-S1 radiculopathy secondary to lumbar stenosis, and recommended a laminectomy and possible discectomy.[8]  (Id.)  In an effort to explore his options for non-surgical treatment, Alfano also consulted Dr. James Farmer, an orthopedic spine specialist at the Hospital for Special Surgery.  (P. 56.1 Stmt. ¶ 29;  D. Suppl. 56.1 Stmt. ¶ 29; CLICNY 292-93.)  Dr. Farmer diagnosed Alfano with degenerative disc disease at the L5-S1 level and recommended physical therapy.  (Id.)  When physical therapy failed to alleviate Alfano's symptoms, Dr. Farmer also diagnosed him with radicular symptoms and identified L5 nerve root compression as the probable cause.  (P. 56.1 Stmt. ¶ 30; D. Suppl. 56.1 Stmt. ¶ 30; CLICNY 294.)  During a subsequent visit, Dr. Farmer renewed Alfano's preexisting prescription

---

[8] A laminectomy is a surgical procedure designed to relieve pain related to spinal stenosis.  The procedure involves the removal or trimming of the portion of the vertebral bone called the lamina, thus widening the spinal canal and providing more space for the spinal nerves and thecal sac (the tube filled with cerebrospinal fluid surrounding the spinal cord).  A discectomy is a surgical procedure in which a doctor removes the part of a vertebral disc that causes pain by stressing the spinal cord and/or surrounding nerves.

5

for Vioxx[9] and suggested that he undergo additional physical therapy.  (P. 56.1 Stmt. ¶ 31; D. Suppl. 56.1 Stmt. ¶ 31; CLICNY 295.)

## IV.     Alfano's Application for Social Security and LTD Benefits

Shortly after he became unable to work, Alfano applied for SSD benefits.  (Cf. P. 56.1 Stmt. ¶¶ 13, 16; D. Suppl. 56.1 Stmt. ¶¶ 13, 16.)  On August 27, 2002, the Social Security Administration ("SSA") concluded that he was totally disabled as of June 5, 2000, and awarded him monthly benefits.  (P. 56.1 Stmt. ¶ 16; D. Suppl. 56.1 Stmt. ¶ 16; CLICNY 217-18, 257-67.) In reaching this conclusion, a United States Administrative Law Judge ("ALJ") found Alfano unable to perform his past work as a wage and salary administrator, as well as any other type of work.  (P. 56.1 Stmt. ¶ 17; D. Suppl. 56.1 Stmt. ¶ 17; CLICNY 266.)  In particular, he cited Alfano's "need to sit and stand at will and his need to lie down approximately ½ hour to 2 hours during each day" as the source of this inability.  (CLICNY 264.)

On December 1, 2000, Alfano also applied for LTD benefits under the Plan.  (P. 56.1 Stmt. ¶ 32; D. Suppl. 56.1 Stmt. ¶ 32; CLICNY 515-27.)  The application required his doctors to complete CIGNA's Physical Ability Assessment ("PAA") form.  (P. 56.1 Stmt. ¶ 33; D. Suppl. 56.1 Stmt. ¶ 33; CLICNY 497-98, 1006-007.)  The PAA uses the terms "continuously," "frequently," and "occasionally," and specifies that, in an 8-hour day, "continuously" means more than 5.5 hours, "frequently" means 2.5 to 5.5 hours, and "occasionally" means less than 2.5 hours.  (P. 56.1 Stmt. ¶ 34; D. Suppl. 56.1 Stmt. ¶ 34; CLICNY 497-98.)  According to a PAA completed by Dr. Snow, Alfano could sit only occasionally, i.e., less than 2.5 hours in an 8-hour

---

[9] Vioxx is a nonsteroidal anti-inflammatory drug used to reduce pain, inflammation, and stiffness caused by osteoarthritis, among other things.  It was withdrawn from the U.S. market in 2004 amid concerns of an increased risk of heart attack and stroke with long-term, high-dosage use.

day.  (P. 56.1 Stmt. ¶ 35; D. Suppl. 56.1 Stmt. ¶ 35; CLICNY 493.)  In a separate PAA, Dr.

Scelsa opined that Alfano could sit frequently, i.e., between 2.5 and 5.5 hours in an 8-hour day.

(P. 56.1 Stmt. ¶ 36; D. Suppl. 56.1 Stmt. ¶ 36; CLICNY 483.)

After receiving Alfano's PAA forms, CIGNA decided to conduct an independent medical

exam ("IME") before resolving his claim.  (P. 56.1 Stmt. ¶ 37; D. Suppl. 56.1 Stmt. ¶ 37;

CLICNY 388.)  On February 5, 2001, CIGNA requested the IME from an orthopedist

specializing in back care.  (P. 56.1 Stmt. ¶ 38; D. Suppl. 56.1 Stmt. ¶ 38.)  Two days later, it

informed Alfano that his failure to attend the scheduled IME "may result in the termination of

[his] present and future benefits."  (P. 56.1 Stmt. ¶ 39; D. Suppl. 56.1 Stmt. ¶ 39; CLICNY 359.)

On February 9, 2001, however, CIGNA canceled the IME without giving a reason.  (P. 56.1

Stmt. ¶ 39; D. Suppl. 56.1 Stmt. ¶ 39; CLICNY 358.)

Alfano's initial claim was denied on February 12, 2001, on the grounds that he had not

satisfied the requisite 180-day waiting period.  (P. 56.1 Stmt. ¶ 40; D. Suppl. 56.1 Stmt. ¶ 40;

CLICNY 379.)  In particular, CIGNA noted that although a July 20, 2000, evaluation performed

by Dr. Scelsa identified certain restrictions on Alfano's ability to work, none of Dr. Scelsa's

restrictions – nor those identified by any of Alfano's other treating physicians – would have

prevented him from performing his own occupation, which fell "within the sedentary physical

demand level as outlined by the U.S. Department of Labor's Dictionary of Occupational Titles."

(Id., CLICNY 376-80, 454-55, 483, 493; cf. P. 56.1 Stmt. ¶ 41; D. Suppl. 56.1 Stmt. ¶ 41.)  In a

March 19, 2001, letter, Alfano's then-counsel appealed the denial.  (P. 56.1 Stmt. ¶ 43; D. Suppl.

56.1 Stmt. ¶ 43.)  CIGNA replied on April 12, 2001, upholding the denial on the same grounds

cited in its original decision.  (P. 56.1 Stmt. ¶ 44; D. Suppl. 56.1 Stmt. ¶ 44; CLICNY 362-65.)

On April 15, 2002, Alfano again appealed his denial of LTD benefits.  (D. 56.1 Stmt. ¶ 20.)  In support of his appeal, he later submitted additional medical records, including MRIs of his spinal cord and other notes and reports from Drs. Alexiades, Farmer, Roach, and Scelsa.[10] (D. 56.1 Stmt. ¶ 21; P. Suppl. 56.1 Stmt. ¶ 21; CLICNY 248-54, 279-317.)  The records included a July 12, 2002, report, in which Dr. Alexiades concluded that Alfano had to lie down for 1.5 - 2 hours per day, could not sit, stand, or walk for prolonged periods of time (i.e., 15-20 minutes), could not lift or carry more than 5 pounds, had experienced no change in condition since he stopped working on June 5, 2000, and therefore remained "totally disabled."  (P. 56.1 Stmt. ¶ 59; D. Suppl. 56.1 Stmt. ¶ 59; CLICNY 253-54.)  This report echoed a February 7, 2002, record included with the April 2002 appeal in which – relying on Alfano's positive straight leg raise, weakness walking on his toes, and MRI test results – Dr. Alexiades diagnosed Alfano with L5-S1 spondylosis with stenosis and radiculopathy, and determined that he must lie down for .5 - 2 hours two to three times during an 8-hour workday, and could sit for only 2 hours in an 8-hour workday.  (P. 56.1 Stmt. ¶ 52; D. Suppl. 56.1 Stmt. ¶ 52; P. Suppl. 56.1 Stmt. ¶ 20; CLICNY 297-303.)

Alfano also submitted a July 24, 2002 letter from Dr. Roach, noting that Dr. Roach had diagnosed him with approximately 27 different medical conditions,[11] prescribed him Vicodin and Vioxx for pain, given him a poor prognosis, and concluded that "he is totally disabled and should

---

[10] Some of Alfano's medical records from late 2001 and 2002 recount various shoulder and hip problems.  (See P. Mem. 5-6; CLICNY 113-17, 121-27, 130, 132.)  However, because Alfano and his treating physicians cite his back problems as the cause of his disability, these portions of the record need not be further addressed.

[11] CIGNA clarifies that the 27 medical conditions are conditions that Dr. Roach diagnosed at one time or another from 1995 to the date of the letter.  (D. Suppl. 56.1 Stmt. ¶ 60.)

not return to work." (P. 56.1 Stmt. ¶ 60; D. Suppl. 56.1 Stmt. ¶ 60; CLICNY 250-52.)  Dr.

Roach reasoned:

> [Alfano] experiences constant pain.  He must lie down for
> approximately one-half to two hours per day because of fatigue
> associated with his pain.  He cannot sit, stand or walk for any
> prolonged period of time (i.e., 15-20 minutes), and cannot lift or
> carry anything weighing over five pounds.  Moreover, his
> condition has essentially been the same since June 5, 2000, and all
> of these limitations have been applicable since that time.

(CLICNY 251.)  These findings were consistent with a February 12, 2002, record created by Dr.

Roach that found that Alfano needed to lie down for .5 - 2 hours up to 3 times per 8-hour

workday, and could sit only 2 hours in an 8-hour workday.[12]  (P. 56.1 Stmt. ¶ 53; D. Suppl. 56.1

Stmt. ¶ 53; CLICNY 304-310.)

      Lastly, Alfano's supplemental submission contained various MRI test results.  (D. 56.1

Stmt. ¶ 21; P. Suppl. 56.1 Stmt. ¶ 21.)  Consistent with a June 9, 2000, MRI finding moderate to

severe L5-S1 spondylosis with mild impingement of the L5 nerve root and moderate L5-S1

spinal stenosis (CLICNY 283), an August 18, 2001, MRI showed that Alfano suffered from

moderate to severe spondylosis, and moderate stenosis at the L5-S1 level, as well as mild

stenosis at the L4-L5 level.[13]  (P. 56.1 Stmt. ¶ 46; D. Suppl. 56.1 Stmt. ¶ 46; CLICNY 131.)

      On September 13, 2002, Alfano further advised CIGNA that the SSA had deemed him

totally disabled from any kind of work as of June 5, 2000.  (P. 56.1 Stmt. ¶ 61; D. Suppl. 56.1

Stmt. ¶ 61; CLICNY 256-267.)  He also furnished CIGNA with a copy of the SSA's decision.

_____

      [12] Like the February 2002 record from Dr. Alexiades, this record also was included with
the April 2002 appeal.  (P. Suppl. 56.1 Stmt. ¶ 20.)

      [13] On July 24, 2002, Dr. Roach read this MRI as showing that Alfano suffered from "mild
stenosis and narrowing of the neural foramina at the L4-5 level of the spine as well as
impingement on the thecal sac at L5-S1."  (CLICNY 251.)

(Id.)

By letter dated December 2, 2002, CIGNA advised Alfano that it needed to "consult a health care professional with the appropriate training and experience in the field of medic[ine] involved in the medical judgment." (P. 56.1 Stmt. ¶ 64; D. Suppl. 56.1 Stmt. ¶ 64; CLICNY 243.) CIGNA subsequently requested that Dr. David Trotter, an orthopedic surgeon, conduct a peer review of Alfano's file. After reviewing the file, Dr. Trotter concluded that Alfano was unable to perform his regular occupation on a full-time basis from June 6, 2000, to December 10, 2002 – the date of the report. (P. 56.1 Stmt. ¶¶ 65-66, 68; D. Suppl. 56.1 Stmt. ¶¶ 65-66, 68; CLICNY 233-36.) Even assuming Alfano were to take a part-time position, Dr. Trotter believed that he still could not perform if the occupation did not allow for changing physical positions and occasionally lying down. (CLICNY 233-36.) He also opined that Alfano's stenosis and nerve root impingement – the conditions that precluded him from working full-time in his sedentary occupation – would persist no matter what physical position he assumed. (P. 56.1 Stmt. ¶ 67; D. Suppl. 56.1 Stmt. ¶ 67; CLICNY 235.)

Based on Dr. Trotter's conclusion and a medical review conducted by Nurse Karen Haley that corroborated Alfano's inability to perform sedentary work, Medha Bharadwaj – a CIGNA appeals claim manager – reversed the decision denying Alfano LTD benefits, and Alfano's claim was re-opened. (P. 56.1 Stmt. ¶ 69; D. Suppl. 56.1 Stmt. ¶ 69; CLICNY 105-06.) In overturning CIGNA's denial of the claim, Bharadwaj reasoned that Alfano's symptoms and abnormal exam and test results all supported ongoing severe multilevel spinal stenosis and nerve root impingement sufficient to preclude him from performing his sedentary occupation. (P. 56.1 Stmt. ¶ 70; D. Suppl. 56.1 Stmt. ¶ 70; CLICNY 105.) In particular, she noted that Alfano's L5-

S1 nerve roots appeared to be the cause of his radiculopathy; that surgery was indicated; that

Alfano's pain correlated with his medical findings; and that his body size may have contributed

to his severe spinal pathology.  (P. 56.1 Stmt. ¶ 74; D. Suppl. 56.1 Stmt. ¶ 74; CLICNY 105.)

By letter dated January 24, 2003, CIGNA advised Alfano of its decision, and thereafter

paid Alfano benefits due from December 3, 2000, to February 2, 2003.  (P. 56.1 Stmt. ¶ 76; D.

Suppl. 56.1 Stmt. ¶ 76; D. Mem. 3-4.)  CIGNA's January 24, 2003, letter was followed by an

April 10, 2003, letter, advising Alfano that his receipt of future benefits required him to prove

that he was unable to engage in the essential duties of his regular occupation.[14]  (P. 56.1 Stmt. ¶

79; D. Suppl. 56.1 Stmt. ¶ 79; CLICNY 168.)  Consistent with the terms of the Plan, Alfano's

LTD benefits were reduced by the amount of his SSD benefits.  (P. 56.1 Stmt. ¶ 18; D. Suppl.

56.1 Stmt. ¶ 18; see also P. 56.1 Stmt. ¶ 75; D. Suppl. 56.1 Stmt. ¶ 75.)

Following its decision to grant Alfano LTD benefits, CIGNA periodically reviewed his

claim to ensure his continued eligibility.  In doing so, CIGNA would request, and Alfano or his

treating physicians would submit, periodic updates regarding his condition, including updated

medical records and disability questionnaires.  On April 20, 2003, Alfano completed CIGNA's

disability questionnaire, which requested information regarding his work history, medications,

and SSD benefits, among other things.  (P. 56.1 Stmt. ¶ 82; D. Suppl. 56.1 Stmt. ¶ 82; CLICNY

159-61.)  On July 24, 2003, CIGNA requested that Dr. Alexiades complete a PAA form.  (P.

56.1 Stmt. ¶ 83; D. Suppl. 56.1 Stmt. ¶ 83; cf. CLICNY 143.)  Approximately one week later,

---

[14] In its January 24, 2003, letter, CIGNA claimed that Alfano's future benefits hinged on his ability to demonstrate that he was unable to perform the essential duties of any occupation. (P. 56.1 Stmt. ¶ 76; D. Suppl. 56.1 Stmt. ¶ 76.)  Alfano contested this position in a March 27, 2003, letter, and requested that CIGNA issue a corrected letter.  (P. 56.1 Stmt. ¶ 78; D. Suppl. 56.1 Stmt. ¶ 78; CLICNY 169.)  Presumably, the April 10, 2003, letter was intended to serve that purpose.  (See P. 56.1 Stmt. ¶ 79; D. Suppl. 56.1 Stmt. ¶ 79.)

Robert Castellon, one of CIGNA's senior claim managers, concluded that Alfano's medical records and Dr. Trotter's report supported a finding of total disability.  (P. 56.1 Stmt. ¶ 84; D. Suppl. 56.1 Stmt. ¶ 84; CLICNY 103.)

Subsequent records were consistent with those supporting Alfano's disability.  X-rays of his cervical spine in September 2004 showed degenerative disc disease, disc space narrowing, and osteophytes at the C6-C7 level.  (P. 56.1 Stmt. ¶ 85; D. Suppl. 56.1 Stmt. ¶ 85; CLICNY 963.)  In response to CIGNA's request for an update, Dr. Roach opined in an October 2004 PAA that Alfano could sit, stand, and walk occasionally.  (P. 56.1 Stmt. ¶ 86; D. Suppl. 56.1 Stmt. ¶ 86; CLICNY 968-69, 975-76.)  Consistent with this conclusion, in November 2004 Dr. Roach found that Alfano suffered from a class 5 physical impairment, which imposes severe limitations on one's functional capacity and renders him incapable of even minimal sedentary activity.  (P. 56.1 Stmt. ¶ 90; D. Suppl. 56.1 Stmt. ¶ 90; CLICNY 961.)

Dr. Roach's PAA ultimately led CIGNA to request that Rosemary Jenkins, a Vocational Rehab Counselor ("VRC"), conduct an exploratory Transferable Skills Analysis ("TSA").[15] (CLICNY 80, 101; cf. P. 56.1 Stmt. ¶ 87; D. Suppl. 56.1 Stmt. ¶ 87.)  She conducted the analysis on November 18, 2004.  (P. 56.1 Stmt. ¶ 89; D. Suppl. 56.1 Stmt. ¶ 89; CLICNY 73.)  Taking into account the restrictions identified in Alfano's October 2004 PAA, as well as the information in his disability questionnaires and job description, Jenkins concluded that Alfano was capable of performing nine sedentary occupations.  (Id.)

_____

[15] The objective of a TSA is to determine whether an individual has acquired skills in one occupation that can be transferred to another.  As Alfano notes, it is not entirely clear why CIGNA found a TSA relevant in this case.  (P. Mem. 8.)  The Plan's definition of disability requires only that Alfano be unable to perform his "regular occupation."  It is therefore irrelevant whether the skills he acquired in his "regular occupation" could be transferred to another occupation.

On December 1, 2004, Mark Sodders, a CIGNA case manager, requested a formal TSA so that he could ask Dr. Roach to review the DOT job descriptions of any occupations Alfano was deemed capable of performing.  (P. 56.1 Stmt. ¶ 91; D. Suppl. 56.1 Stmt. ¶ 91; CLICNY 957.)  The requested TSA was conducted by Holly Jule, another VRC.  (P. 56.1 Stmt. ¶ 92; D. Suppl. 56.1 Stmt. ¶ 92; CLICNY 944-953.)  She reviewed the TSA performed by Jenkins, and, in a December 13, 2004, report, noted that one of the four occupations her own TSA identified was Alfano's occupation as a wage and salary administrator.  (Id.; CLICNY 69.)  She also noted that all four occupations permitted Alfano to get up, move about, change positions, and alternate sitting, standing and walking, as needed.  (Id.)

On January 20, 2005, CIGNA sent the four identified occupations to Dr. Roach for his review and comment.  (P. 56.1 Stmt. ¶ 93; D. Suppl. 56.1 Stmt. ¶ 93; CLICNY 886-903.)  On April 11, 2005, Sodders advised Alfano that unless Dr. Roach responded to that letter by April 28, 2005, Alfano would have to attend a Functional Capacity Evaluation ("FCE").  (P. 56.1 Stmt. ¶ 94; D. Suppl. 56.1 Stmt. ¶ 94; CLICNY 885.)  On April 19, 2005, Dr. Roach opined that Alfano was incapable of performing any of the four occupations identified by the TSA because he could not sit for prolonged periods of time without the "frequent need for standing, laying [sic] down, or using ice on his back."  (CLICNY 882-83; see also P. 56.1 Stmt. ¶ 95; D. Suppl. 56.1 Stmt. ¶ 95.)

In response to Dr. Roach's comment, Scott Taylor, a doctor of osteopathy and CIGNA medical director, reviewed Alfano's file to resolve a perceived discrepancy between Dr. Roach's earlier statement that Alfano could occasionally sit, stand, and walk, and his April 2005, letter, which said that Alfano could not perform any of the four occupations identified by the TSA

because of his frequent need to stand, lie down, and ice his back.  (Cf. P. 56.1 Stmt. ¶¶ 96-97; D. Suppl. 56.1 Stmt. ¶¶ 96-97; CLICNY 670, 883.)  According to CIGNA, in addition to reviewing Alfano's file, Dr. Taylor spoke by telephone with Dr. Roach, who informed Dr. Taylor that the perceived incompatibility of his two opinions was the result of CIGNA's misinterpretation of the meaning of the phrase "occasionally sit, stand and walk."  (See D. 56.1 Stmt. ¶ 36.)  CIGNA asserts that Dr. Roach stated that this phrase meant that Alfano could work 3 - 4 hours during the course of an entire workday, but that he could not sit continuously for more than 30 minutes without moving to some other activity.  (Id.)  It also maintains that before concluding the conversation by noting that an FCE would be helpful in assessing Alfano's capabilities, Dr. Roach opined that if Alfano returned to work, he should begin with 4 hours a day and increase his hours as he was able.[16]  (Id.)

Based on his review of Alfano's file and his conversation with Dr. Roach, Dr. Taylor determined that Alfano's claimed limitations and restrictions, including his inability to sit for prolonged periods of time and his need to change positions frequently, were not supported by the record, particularly given the lack of any clinically measurable tests or documented abnormalities in tests for strength or range of motion.  (D. 56.1 Stmt. ¶ 37; CLICNY 88-89; cf. P. 56.1 Stmt. ¶ 97; D. Suppl. 56.1 Stmt. ¶ 97.)  Dr. Taylor did, however, agree with Dr. Roach that an FCE would be useful in determining Alfano's functional capacity.  (CLICNY 88-89; P. 56.1 Stmt. ¶ 99; D. Suppl. 56.1 Stmt. ¶ 99.)

On June 14, 2005, following his conversation with Dr. Taylor, Dr. Roach wrote to Dr. Taylor a letter making clear his position that Alfano could work for up to 30 minutes at a time

---

[16] Although not entirely clear from his statement of facts, Alfano appears to dispute the veracity of CIGNA's account of this telephone conversation.  (See P. Suppl. 56.1 Stmt. ¶ 36.)

14

and not more than 2 hours total in an 8-hour workday.  (P. 56.1 Stmt. ¶ 101; D. Suppl. 56.1 Stmt. ¶ 101; CLICNY 843.)  Based on his prior treatment of Alfano and his observation of Alfano during 20-30 minute office visits, Dr. Roach concluded that Alfano could not perform more extensive sedentary work because of his need for narcotic pain medication, his need to lie down at will, and his limited ability to sit, all of which demonstrated that "he ha[d] not improved in the last five years."  (CLICNY 843.)  Dr. Roach's opinion was subsequently corroborated by a July 8, 2005, lumbar MRI showing that Alfano's back condition was deteriorating.  Whereas an August 2001 MRI revealed that the thecal sac was being impinged at the L5-S1 level, the 2005 MRI showed that there was a "mass-effect upon the thecal sac and S1 nerve roots."  (P. 56.1 Stmt. ¶ 102; D. Suppl. 56.1 Stmt. ¶ 102; CLICNY 251, 698.)  The 2005 MRI also showed development of spinal stenosis at the L4-L5 level, which previous MRIs had shown existed only at the L5-S1 level.  (CLICNY 698.)

On July 26, 2005, Jacqueline Genovese of Sports Physical Therapy of New York conducted Alfano's FCE.  (P. 56.1 Stmt. ¶ 103; D. Suppl. 56.1 Stmt. ¶ 103; CLICNY 726-27.) The summary conclusion appearing on the first page of the FCE stated:

> The results of this evaluation indicate that Steven Alfano is currently functioning safely at a sedentary level for an eight hour period according to NY Department of Labor Standards.  He is able to manipulate objects at desk level, push 20 lbs and pull 14 lbs.  He was unable to stoop, kneel, crouch, or crawl due to decreased range of motion as well as weakness and buckeling [sic] of his lower extremities.  Although Mr. Alfano was very cooperative attempting all required tests, he was unable to complete the lifting, both static and dynamic, as well as the step test.  I stopped these tests due to frequent buckeling [sic] and increased risk of falling.  He had two episodes of loss of balance due to buckeling [sic] requiring the assistance of the examiner in order to prevent a fall.  As described by Mr. Alfano, his job required him to be in a prolonged sitting posture.  The clinical data

15

> obtained at this evaluation does not support his ability to tolerate sitting for any duration greater than 10-15 minutes without a drastic change in position.[17]  During the exam he frequently lied [sic] down to alleviate symptoms.  His physiologic changes were appropriate with his increased subjective complaints.  His effort during the exam was maximal and consistent with a negative REG score and appropriate physiological changes.  His range of motion was severely limited both when the patient was aware and unaware of observation.

(CLICNY 726.)  Although Genovese concluded that Alfano could function at the sedentary level during an 8-hour workday, the tests Alfano performed during the FCE showed that Alfano could sit less than 2.5 hours per day, and no more than 10-15 minutes at a time, and that he could stand less than 2.5 hours per day.  (P. 56.1 Stmt. ¶¶ 104, 108; D. Suppl. 56.1 Stmt. ¶¶ 104, 108; CLICNY 728, 731, 734.)  The FCE also indicated that Alfano had "[s]ignificant [l]imitation in lumbar range of motion," and could not do any lifting, carrying, stooping, kneeling, crouching, or crawling.  (CLICNY 730; see also P. 56.1 Stmt. ¶¶ 105-06; D. Suppl. 56.1 Stmt. ¶¶ 105-06; CLICNY 728.)

On August 9, 2005, Ginny Schmidt, another VRC, conducted a second formal TSA.  (P. 56.1 Stmt. ¶ 112; D. Suppl. 56.1 Stmt. ¶ 112; CLICNY 718-23.)  Based not only on the results of Alfano's FCE, but also on the finding that Alfano was limited to a sedentary occupation that involved no significant lifting or carrying, permitted the occasional ability to sit, stand, and walk, and allowed for changes in physical position as needed, Schmidt identified seven occupations that Alfano was capable of performing, including his own occupation as a wage and salary manager.  (CLICNY 718.)

---

[17] In the body of the FCE report, Genovese notes that this change in position often involved "lying down and sitting in a reclined position."  (CLICNY 731.)

16

Citing the FCE and the Schmidt TSA, CIGNA concluded that Alfano was no longer disabled, as he was capable of performing his regular occupation.  (56.1 Stmt. ¶ 117; D. Suppl. 56.1 Stmt. ¶ 117; CLICNY 668-71, 717; cf. P. 56.1 Stmt. ¶ 115; D. Suppl. 56.1 Stmt. ¶ 115.)  On September 28, 2005, it informed Alfano in writing that his benefits would be terminated effective October 27, 2005.  (P. 56.1 Stmt. ¶ 116; D. Suppl. 56.1 Stmt. ¶ 116; CLICNY 706-10.) The letter stated, in relevant part:

> Based upon the pertinent vocational and medical documentation contained in the file, we have determined that you retain the capacity to perform your own occupation as identified in the formal Transferable Skills Analysis.  Therefore, we must deny your claim for Long-Term Disability benefits beyond September 28, 2005.
>
> In reviewing your claim, CIGNA Life Insurance Company of New York considered your claim file as a whole for purposes of determining your entitlement to benefits.  The Policy provides that CIGNA Life Insurance Company of New York would pay benefits only if you were prevented by Disability as defined [in the Policy], and would continue to provide information to us validating such. However, based on the information listed above, you do not meet the definition of disability.  As such, your claim is denied as of September 28, 2005, and to prevent financial hardship, we will pay benefits through October 27, 2005, and no benefits are payable under Policy number NYK 1972 beyond October 27, 2005.

(CLICNY 671.)

By letter dated February 22, 2006, Alfano – acting through counsel – appealed the decision.  (P. 56.1 Stmt. ¶ 119; D. Suppl. 56.1 Stmt. ¶ 119; CLICNY 678-98.)  In support of his appeal, he submitted additional medical records, including disability forms completed by Dr. Alexiades on January 11, 2006, and by Dr. Roach on January 6, 2006, as well as the July 8, 2005, MRI discussed above.  (P. 56.1 Stmt. ¶ 119; D. Suppl. 56.1 Stmt. ¶ 119; CLICNY 684-98.) Dr. Alexiades's report concluded that Alfano needed to lie down for .5 to 2 hours at a time, two

17

or three times per day; was limited to sitting for a total of 2 hours during an 8-hour workday; was

limited to standing and walking for less than 1.5 hours during an 8-hour workday; and could lift

and carry between 0 and 5 pounds only on an occasional basis.  (P. 56.1 Stmt. ¶ 120; D. Suppl.

56.1 Stmt. ¶ 120; CLICNY 684-90.)  The document reiterated that these findings were based on

Alfano's positive leg raise, weakness walking on his toes, and MRIs showing L5-S1 and L4-L5

spinal stenosis, spondylosis, degenerative disc bulging, and facet joint degenerative change.

(CLICNY 685.)  Similarly, Dr. Roach's report concluded that Alfano had to lie down several

times a day, sometimes hourly, and for up to several hours at a time; was limited to sitting for a

total of 2 hours during an 8-hour workday; was limited to standing and walking for less than 1

hour during an 8-hour workday; and could lift and carry between 0 and 5 pounds only

occasionally.  (P. 56.1 Stmt. ¶ 121; D. Suppl. 56.1 Stmt. ¶ 121; CLICNY 691-97.)

On March 3, 2006, the records submitted by Alfano were reviewed by Kay Rhodes, a

nurse case manager.  (P. 56.1 Stmt. ¶ 122; D. Suppl. 56.1 Stmt. ¶ 122; CLICNY 673-75.)

Having reviewed the records, she noted:

> Additional medical provided is insufficient to support a change in
> severity of deficits that significantly impacts function after the
> FCE.  This is evidenced by the FCE which was performed on
> 7/25/06 revealing that the [claimant] had functionality at the
> sedentary level.  The VRC identified positions that included the
> restrictions and limitations for alternating [claimant's] position
> when necessary.  The forms that were completed by the APs with
> the additional medical provided vague responses from both APs
> with no objective measurable findings for range of motion and
> neurological deficits. . . . The [restrictions and limitations] the
> forms gave were inconsistent with what the [claimant] tested in
> capabilities on the FCE on 7/26/05.

(CLICNY 675.)

18

Following this review, the LTD appeals team reviewed Alfano's file.  Dr. Mendez, a CIGNA medical director whose credentials are unknown, found: "FCE reviewed along with job requirements.  Validity measures met.  Exam concluded Mr. Alfano was able to perform his sedentary-level work duties.  So original decision remains supported."  (P. 56.1 Stmt. ¶ 129; D. Suppl. 56.1 Stmt. ¶ 129; CLICNY 657.)

By letter dated March 29, 2006, Alfano was notified that his file and the medical information he submitted were reviewed by a medical director who concluded that Alfano could perform sedentary work, and that nothing in the newly-submitted information altered that conclusion.  (P. 56.1 Stmt. ¶ 131; D. Suppl. 56.1 Stmt. ¶ 131; CLICNY 655-56.)  The letter acknowledged that Alfano suffered from spinal stenosis, but maintained that "the presence of a condition, diagnosis or treatment plan does not equate disability under the policy.  Based on the documentation on file regarding your functionality you do not meet the definition of Disability and we must affirm the previous denial of your claim."  (CLICNY 656.)

On September 15, 2006, Alfano – again acting through counsel – appealed.  (P. 56.1 Stmt. ¶ 138; D. Suppl. 56.1 Stmt. ¶ 138; CLICNY 641-45.)  He provided CIGNA with an August 24, 2006, letter from Dr. Roach, stating that he continued to be totally disabled from spinal stenosis and required large doses of narcotics to cope with the side effects of his condition.  (P. 56.1 Stmt. ¶ 137; D. Suppl. 56.1 Stmt. ¶ 137.)  Alfano himself noted that the side effects of his medication were so severe that they often interfered with his ability to concentrate well enough to perform his occupation.  (P. 56.1 Stmt. ¶ 139; D. Suppl. 56.1 Stmt. ¶ 139; CLICNY 641-45.)

In response to this appeal, CIGNA referred Alfano's file for peer review.  (P. 56.1 Stmt. ¶ 140; D. Suppl. 56.1 Stmt. ¶ 140; CLICNY 636-37.)  The peer review was conducted by Dr.

19

Michael Weiss, an orthopedic surgeon whom Alfano contends specializes in hip and knee replacements.  (P. 56.1 Stmt. ¶ 143; D. Suppl. 56.1 Stmt. ¶ 143; CLICNY 631-33.)  Dr. Weiss identified all of the records CIGNA gave him to review.  (P. 56.1 Stmt. ¶ 144; D. Suppl. 56.1 Stmt. ¶ 144; CLICNY 632-33.)  Although he attempted to contact Drs. Alexiades and Roach, he was unable to do so.[18]  (CLICNY 631.)  On November 13, 2006, Dr. Weiss issued the following analysis:

> Upon review of the medical information, the restrictions and limitations precluding the claimant from sedentary work capacity are not supported in the documentation provided to me from 10/27/05 to present.  A functional capacity evaluation of 7/26/05 recommended sedentary work duties.  The claimant would be capable of sedentary duty, but would be restricted from prolonged sitting, in that he would require intermittent standing.  He would be restricted to limited walking, not greater than one block.

(P. 56.1 Stmt. ¶ 146; D. Suppl. 56.1 Stmt. ¶ 146; CLICNY 632.)

At CIGNA's request, Dr. Weiss attempted to telephone Dr. Alexiades on several more occasions, but to no avail.  (CLICNY 634.)  Dr. Weiss noted these attempts in an addendum to his November 13, 2006, report.  (Id.)  That addendum also discussed his review of two earlier submissions from Dr. Roach, both of which concluded that Alfano was unable to perform sedentary work.  (Id.)  Dr. Weiss opined that Dr. Roach's conclusion was not supported by any "objective physical findings" that correlated to Alfano's complaints and did not adequately explain the cause of Alfano's inability to perform such work.  (Id.; P. 56.1 Stmt. ¶ 152; D. Suppl. 56.1 Stmt. ¶ 152.)

---

[18] Alfano argues that, despite CIGNA's instructions to the contrary, Dr. Weiss never actually made these calls because he determined that there was "no further need to contact either Dr. Alexiades or Dr. Roach."  (CLICNY 633; see also P. 56.1 Stmt. ¶ 145.)

On the strength of Dr. Weiss's report, CIGNA upheld its decision to terminate Alfano's LTD benefits.  It notified Alfano of its decision in a December 7, 2006, letter from Medha Bharadwaj, the same appeals claim manager who had determined that Alfano was entitled to benefits in 2003.  (P. 56.1 Stmt. ¶ 154; D. Suppl. 56.1 Stmt. ¶ 154; CLICNY 629-30.)  The letter acknowledged that Alfano faced certain limitations based on his diagnoses and treatment, and that these limitations were once sufficient to support an award of LTD benefits, but stated that "an explanation of [his] functionality and how his functional capacity prevented him from continuously performing the material duties of his occupation beyond October 27, 2005 was not clinically supported.  The presence of a condition, diagnosis or treatment does not necessarily equate to a presence of a disabling condition or decreased level of functionality."  (CLICNY 630.)

Having exhausted his administrative remedies with his September 15, 2006, appeal, Alfano commenced this action on October 31, 2007.

## V.    The Parties' Contentions

Neither party disputes that Alfano's back condition rendered him unable to perform sedentary work, and thus his regular occupation, as of June 5, 2000, or that – in recognition of this fact – CIGNA paid Alfano LTD benefits for the period December 3, 2000, to October 27, 2005.  The only question is whether CIGNA acted properly when it terminated Alfano's LTD benefits in 2005.  Citing the evidence underlying his initial benefits award, post-award evidence suggesting that his condition has deteriorated or – at a minimum – remained the same, and CIGNA's failure to identify any evidence otherwise demonstrating improvement, Alfano contends that the record clearly supports his continued disability and that CIGNA therefore erred

21

in terminating his benefits.  (P. Mem. 1, 17-20; P. Opp. 8-13.)

CIGNA, in contrast, contends that its decision to terminate Alfano's benefits is justified by vocational and medical evidence showing that he is now capable of performing sedentary work and, thus, his regular occupation.  (D. Opp. 7-10; D. Mem. 11-18.)  In particular, it relies on the FCE concluding that Alfano could safely perform sedentary work for an 8-hour period, the TSAs finding Alfano's occupation among those he could perform despite his limitations, and several reviews conducted by medical professionals that also find Alfano capable of performing his regular occupation.  (See id.)  While CIGNA asserts that it considered Alfano's entire file, it emphasizes that it was not required to credit the opinions of Alfano's treating physicians or the determination of the SSA.  (D. Opp. 4-7, 9-12; D. Mem. 14.)

## DISCUSSION

### I.    Summary Judgment Standard

Summary judgment provides an appropriate mechanism for a court to consider a challenge to the termination of disability benefits under ERISA.  See, e.g., Suarato v. Bldg. Servs. 32BJ Pension Fund, 554 F. Supp. 2d 399, 414-15 (S.D.N.Y. 2008) (collecting cases); see also Gannon v. Aetna Life Ins. Co., No. 05 Civ. 2160, 2007 WL 2844869, at *6 (S.D.N.Y. Sept. 28, 2007) (noting that "summary judgment provides an appropriate vehicle whereby the Court can apply substantive ERISA law to the administrative record").  In such an action "the contours guiding the court's disposition of the summary judgment motion are necessarily shaped through the application of the substantive law of ERISA."  Ludwig v. NYNEX Service Co., 838 F. Supp. 769, 780 (S.D.N.Y. 1993).

As in any context, summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the "burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). However, when moving against a party who will bear the ultimate burden of proof on an issue, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (noting that a "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof") (internal quotation marks omitted).

Once the moving party has satisfied its burden, the burden then shifts to the nonmoving party to come forward with affidavits, depositions, interrogatories or other sworn evidence sufficient to create a genuine issue of material fact for trial. See Fed. R. Civ. P. 56(e)(2); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The nonmoving party may not satisfy this burden simply by "show[ing] that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; see also Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (holding that a nonmovant cannot defeat a motion for summary judgment "merely . . . on the basis of conjecture or surmise"), quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (internal quotation

marks omitted).  Rather, the nonmovant must advance "enough evidence to support a jury

verdict in its favor."  Trans Sport, Inc., 964 F.2d at 188.  "Where the record taken as a whole

could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue

for trial.'"  Matsushita, 475 U.S. at 587 (quotation omitted).

These standards apply with equal force where, as here, the parties have filed cross-

motions for summary judgment.  See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir.

2001).  In such a situation, "a court need not enter judgment for either party.  Rather, each

party's motion must be examined on its own merits, and in each case all reasonable inferences

must be drawn against the party whose motion is under consideration."  Id. (citation omitted).

## II.   ERISA Standard and Scope of Review

Section 502(a) of ERISA, codified at 29 U.S.C. § 1132(a), permits the beneficiary of an

employee benefit plan to bring a civil action "to recover benefits due to him under the terms of

his plan, [and] to enforce his rights under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  As

the Supreme Court has held, "a denial of benefits challenged under § 1132(a)(1)(B) is to be

reviewed under a *de novo* standard unless the benefit plan gives the [plan] administrator or

fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of

the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see also McCauley

v. First Unum Life Ins. Co., __ F.3d __, 2008 WL 5377680, at *2 (2d Cir. 2008); Krauss v.

Oxford Health Plans, Inc., 517 F.3d 614, 622 (2d Cir. 2008).

When undertaking such review, the court should consider only the evidence in the

administrative record unless good cause for considering additional evidence is shown.[19]  See

_____

[19] Where the administrative body reviewing a claim for benefits has a conflict of interest, good cause sufficient to support consideration of evidence outside of the administrative record

Connors v. Connecticut Gen. Life Ins. Co., 272 F.3d 127, 134-35 (2d Cir. 2001); DeFelice v. Am. Int'l Life Ass. Co. of New York, 112 F.3d 61, 66-67 (2d Cir. 1997). Once the court determines the evidence properly before it, it "may render a determination on a claim without deferring to an administrator's evaluation of the evidence," Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 296 (2d Cir. 2004), and "is free to evaluate [a treating physician's] opinion in the context of any factors it consider[s] relevant, such as the length and nature of the[ doctor-patient] relationship, the level of the doctor's expertise, and the compatibility of the opinion with the other evidence." Connors, 272 F.3d at 135.

Here, the Court need not determine whether the plan administrator had discretionary authority to determine eligibility for benefits, as both parties agree that this case is to be reviewed *de novo*. (See P. Mem. 3; D. Mem. 1, 10.)

## III.   The LTD Benefits Claim

Alfano argues that because the available medical and vocational evidence supports his claim that he has remained unable to perform sedentary work since June 5, 2000, CIGNA's termination of his LTD benefits was improper. (P. Mem. 1, 17-20.) CIGNA, however, contends

---

may exist. See Locher v. Unum Life Ins. Co. of Am., 389 F.3d 288, 294-96 (2d Cir. 2004); DeFelice, 112 F.3d at 66-67. Alfano argues that the conflict of interest arising from CIGNA's role as both claim reviewer and claim payor provides good cause for this Court to consider the deposition of Medha Bharadwaj, the appeals claim manager who wrote the letter awarding benefits, as well as the letter terminating them. (P. Opp. 20-24.) The Second Circuit has made clear, however, that a conflict of interest is not *per se* good cause for looking beyond the administrative record, particularly where it is not accompanied by evidence of deficiencies in an administrator's claim review process. See Locher, 389 F.3d at 294-96. In the absence of any evidence suggesting that there is a deficiency in the procedures CIGNA uses to review claims, the Court is hesitant to conclude that the conflict of interest arising from CIGNA's role as claim reviewer and claim payor constitutes good cause for considering Bharadwaj's deposition. The issue is largely academic, however, as even if the Court were to find good cause, the deposition would not in any way alter its decision.

that its decision to terminate Alfano's benefits is supported by the opinions of independently

retained medical professionals and by the vocational evidence of record.  (D. Opp. 7-10; D.

Mem. 11-18.)  It also contends that it was not required to credit evidence derived from Alfano's

treating physicians or the SSA's August 27, 2002, decision finding him totally disabled.  (D.

Opp. 4-7; D. Mem. 14.)  Instead, it asserts that the mere fact that it considered this evidence is

sufficient.  (D. Opp. 9-12.)

In an ERISA action, the claimant bears the burden of demonstrating his entitlement to

benefits.  See Paese v. Hartford Life & Accident Ins. Co., 449 F.3d 435, 441 (2d Cir. 2006)

(noting that a plaintiff challenging the denial of benefits under ERISA bears "the burden of

proving by a preponderance of the evidence that he is totally disabled within the meaning of the

plan").  Alfano must therefore prove by a preponderance of the evidence that, because of injury

or sickness, (1) "he is unable to perform all the material duties of his regular occupation," or (2)

"he is earning less than 80% of his Indexed Basic Earnings."  (CLICNY 593.)

While Alfano intimates that CIGNA's decision to terminate a prior benefits award

somehow alters this burden of proof, his suggestion finds no basis in the law.  An administrator

"is not required to disprove the possibility that [a claimant is] disabled in order to terminate [his]

benefits; rather, it is [the claimant's] burden to demonstrate [his] disability under the Plan."  Lee

v. Aetna Life & Cas. Ins. Co., No. 05 Civ. 2960, 2007 WL 1541009, at *4 (S.D.N.Y. May 24,

2007) (citation omitted).  Once a claimant's benefits are terminated, however, he is entitled to a

"full and fair review" of his claim that "takes into account all comments, documents, records,

and other information [he] submit[s]."  29 C.F.R. § 2560.503-1(h); see also Lee, 2007 WL

1541009, at *5.  Accordingly, a "reversal in policy preceded by no significant change in [the

26

claimant's] physical condition" will weigh against the administrator and in favor of the claimant.

Connors, 272 F.3d at 136.

The parties do not dispute that Alfano's regular occupation is sedentary. According to

the DOT, sedentary work is defined as:

> Exerting up to 10 pounds of force occasionally (Occasionally:
> activity or condition exists up to 1/3 of the time) and/or a
> negligible amount of force frequently (Frequently: activity or
> condition exists from 1/3 to 2/3 of the time) to lift, carry, push,
> pull, or otherwise move objects, including the human body.
> Sedentary work involves sitting most of the time, but may involve
> walking or standing for brief periods of time. Jobs are sedentary if
> walking and standing are required only occasionally and all other
> sedentary criteria are met.

U.S. Department of Labor, Dictionary of Occupational Titles (4th ed. 1991); cf. 20 C.F.R. §

404.1567. Consistent with this definition, the Second Circuit has noted that "sedentary work

'generally involves up to two hours of standing or walking and six hours of sitting in an eight-

hour work day.'" Connors, 272 F.3d at 136 n.5 (emphasis and quotation omitted). For purposes

of this dispute, the issue is therefore whether Alfano has shown, by a preponderance of the

evidence, that he is incapable of sitting for 6 hours and standing or walking for 2 hours.

A.      Treating Physician Evidence

Alfano asserts that he is entitled to LTD benefits because the medical evidence of record,

particularly that derived from his treating physicians, makes clear that he has been disabled

continuously since June 5, 2000. (P. Mem. 1, 17-20, 28, 31.) CIGNA, however, argues that the

medical professionals it engaged to review Alfano's file concluded that Alfano had presented no

evidence of disability from October 27, 2005, to the present, thus justifying its decision to

terminate Alfano's benefits. (D. Mem. 12-14; D. Opp. 9-10.) While the professionals

27

considered the opinions held by Alfano's treating physicians, CIGNA maintains that they were not required to credit those opinions.  (D. Mem. 14; D. Opp. 6-7.)  Although CIGNA rightfully notes that, in the ERISA context, the opinions of a claimant's treating physicians are not entitled to any special weight, its suggestion that this rule permits it to reject the opinions of treating physicians for any or no reason at all is contrary to established law.  Because CIGNA does not cite any rational justification for its decision to discredit Alfano's treating physician evidence, this evidence is entitled to substantial weight.

In the context of ERISA claims, there is no "treating physician rule."  That is, while administrators may not arbitrarily discredit reliable evidence, courts may not "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation."  Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  In addition, plan administrators may rely on the opinion of independent medical reviewers despite the fact that such reviewers may not have conducted an examination of the claimant, or may have adopted an opinion that conflicts with those held by the claimant's treating physicians.  See Fitzpatrick v. Bayer Corp., No. 04 Civ. 5134, 2008 WL 169318, at *14 (S.D.N.Y. Jan. 17, 2008); Wagner v. First Unum Life Ins. Co., No. 02 Civ. 9135, 2003 WL 21960997, at *5 (S.D.N.Y. Aug. 13, 2003).  These standards necessarily restrict a court reviewing an administrator's decision for abuse of discretion.  However, where – as here – a court reviews an administrator's decision de novo, it "is free to evaluate [a treating physician's] opinion in the context of any factors it consider[s] relevant, such as the length and nature of the[ doctor-patient] relationship, the level of the doctor's expertise,

and the compatibility of the opinion with the other evidence." <u>Connors</u>, 272 F.3d at 135; <u>see</u> <u>also</u> <u>Paese</u>, 449 F.3d at 442 (noting that the lack of a treating physician rule "does not mean that a district court, engaging in a *de novo* review, cannot evaluate and give appropriate weight to a treating physician's conclusions, if it finds these opinions reliable and probative").

The medical evidence supporting Alfano's claim that he is disabled is extensive.  On or about June 5, 2000, Dr. Alexiades, an orthopedic surgeon, determined that Alfano was "unable at this point to work."   (P. 56.1 Stmt. ¶ 22; D. Suppl. 56.1 Stmt. ¶ 22; CLICNY 116.)  Following this determination, Alfano left his job as a wage and salary manager.  (<u>See</u> <u>id</u>.)  Shortly thereafter, he underwent a lumbar MRI, which showed that he suffered from moderate to severe spondylosis and moderate spinal stenosis at the L5-S1 level, with mild impingement on the left L5 nerve root.  (P. 56.1 Stmt. ¶ 23; D. Suppl. 56.1 Stmt. ¶ 23; CLICNY 283.)  This finding was corroborated by: (1) a July 20, 2000, EMG showing either an L5-S1 radiculopathy or polyneuropathy; (2) an August 18, 2001, MRI showing moderate to severe spondylosis, moderate stenosis at the L5-S1 level, and mild stenosis at the L4-L5 level; (3) a July 24, 2002, interpretation of the June 2000 MRI as showing "moderate to severe L5-S1 spondylosis with disc space narrowing, disc desiccation, degenerative type III end-plate marrow changes, an annular disc bulge, facet osteoarthritis and a prominent posterolateral osteophyte formation, with impingement of the exiting L5 nerve root and . . . moderate spinal stenosis," and of the August 2001 MRI as showing "mild stenosis and narrowing of the neural foramina at the L4-5 level of the spine as well as impingement on the thecal sac at L5-S1"; (4) a September 14, 2004, x-ray showing degenerative disc disease, disc space narrowing, and osteophytes at the C6-C7 level; and (5) a July 8, 2005, MRI showing a "mass-effect upon the thecal sac and S1 nerve roots" and

moderate spinal stenosis at the L4-L5 level in addition to the preexisting spinal stenosis at the L5-S1 level.  (P. 56.1 Stmt. ¶¶ 25, 46, 85, 102; D. Suppl. 56.1 Stmt. ¶¶ 25, 46, 85, 102; CLICNY 131, 251, 284-86, 485-89, 698, 963.)

While Dr. Alexiades and Dr. Roach, Alfano's primary care physician, appear to have played the most prominent role in the treatment of his back condition, their opinions are bolstered by the opinions of Dr. Scelsa, Dr. McCance, Dr. Snow, and Dr. Farmer, a neurologist, spine specialist, neurosurgeon, and orthopedic spine specialist, respectively.  Dr. Scelsa found that Alfano suffered from L5-S1 radiculopathy or polyneuropathy, Dr. McCance diagnosed discogenic back pain and L5-S1 radiculopathy stemming from an impingement of the L5 nerve root, Dr. Snow found L5-S1 radiculopathy secondary to lumbar stenosis, and Dr. Farmer diagnosed degenerative disc disease at the L5-S1 level and radicular symptoms likely stemming from L5 nerve root compression.  (P. 56.1 Stmt. ¶¶ 25, 27-29; D. Suppl. 56.1 Stmt. ¶¶ 25, 27-29; CLICNY 284-86, 292-93, 454-55, 485-89, 492.)  Not only did these doctors prescribe Alfano narcotics for pain management, but they also recommended such treatments as physical therapy, surgery for a fusion at L5-S1, and a laminectomy and possible discectomy.  (See id.)

In addition to the clinical tests interpreted by Alfano's treating physicians and the physicians' subsequent diagnoses, from 2002 to 2006, the physicians, particularly Dr. Alexiades and Dr. Roach, issued numerous reports and letters in which they opined that Alfano was totally disabled, could not sit, stand, or walk for prolonged periods of time, could not sit for more than 2 - 2.5 hours per day, and needed to lie down for .5 - 2 hours, 2 or 3 times per day.  (P. 56.1 Stmt. ¶¶ 24, 35, 52-53, 59-60, 86, 90, 101, 120-21, 137; D. Suppl. 56.1 Stmt. ¶¶ 24, 35, 52-53, 59-60, 86, 90, 101, 120-21, 137; CLICNY 250-54, 290-91, 297-310, 493, 684-98, 843, 961, 968-69,

975-76.)  These opinions were based on the clinical tests discussed above, and Alfano's positive leg raises and weakness walking on his toes, among other things.  (See id.)

Taken together, this evidence provides compelling support for Alfano's claim that he suffers from a back condition that precludes him from sitting for 6 or more hours per day, thus rendering him disabled within the meaning of the Plan.  Not only have his primary care physician and his orthopedic surgeon issued scores of reports and letters concluding that his back condition is totally disabling, but these conclusions have been corroborated by no less than four independent specialists.  Alfano's treating physicians are not the only ones to agree that he is unable to perform his sedentary occupation.  Dr. David Trotter, an orthopedic surgeon retained by CIGNA to review Alfano's file, also concluded that Alfano's back condition precluded him from performing his regular occupation on a full-time basis.  (P. 56.1 Stmt. ¶¶ 65-66, 68; D. Suppl. 56.1 Stmt. ¶¶ 65-66, 68; CLICNY 233-36.)  In addition to reaching the same general conclusion as that announced by Alfano's six treating physicians, Dr. Trotter opined that Alfano's stenosis and nerve root impingement would persist no matter what physical position he assumed.  (P. 56.1 Stmt. ¶ 67; D. Suppl. 56.1 Stmt. ¶ 67; CLICNY 235.)

For the reasons discussed below, none of the medical or vocational evidence cited by CIGNA is sufficient to overcome the opinions of seven physicians, five of whom are specialists and six of whom had ongoing doctor-patient relationships with Alfano, that Alfano is unable to perform sedentary work.  Accordingly, Alfano's treating physician evidence – all of which counsels in favor of his entitlement to benefits – will be accorded substantial weight.

B.     The SSA Determination

Alfano cites the SSA's favorable decision as further evidence of his entitlement to LTD benefits.  (P. Mem. 6-7.)  CIGNA argues that, as a plan administrator, it is not bound by SSA determinations.  (D. Opp. 4-6.)  While CIGNA recites a familiar and entirely valid point of law, it does not follow that this rule permits it, or the Court, to arbitrarily disregard an SSA decision. Given the absence of any purported justification for ignoring the SSA's findings, as well as its wholesale failure to cite any evidence contradicting those findings, CIGNA erred in discrediting the SSA decision.

Although a plan administrator is not bound by the SSA's determination that a claimant is disabled,[20] see Badawy v. First Reliance Standard Life Ins. Co., 581 F. Supp. 2d 594, 605 (S.D.N.Y. 2008), a district court engaging in a de novo review "act[s] well within its discretion when it consider[s] the SSA's findings as some evidence of total disability."  Paese, 449 F.3d at 442 (emphasis added).  Cf. Billinger v. Bell Atlantic, 240 F. Supp. 2d 274, 285 (S.D.N.Y. 2003). Here, the SSA concluded that Alfano was disabled as of June 5, 2000.  (P. 56.1 Stmt. ¶ 16; D. Suppl. 56.1 Stmt. ¶ 16; CLICNY 217-18, 257-67.)  The ALJ adjudicating Alfano's claim found him not only unable to perform his past work as a wage and salary administrator, but unable to perform any other type of work as well.  (P. 56.1 Stmt. ¶ 17; D. Suppl. 56.1 Stmt. ¶ 17; CLICNY 266.)  In reaching this conclusion, he specifically noted that Alfano was "precluded from performing all of his past relevant work activity given his need to sit and stand at will and his

---

[20] The rule that a plan administrator is not bound by determinations of the SSA exists largely because the definition of disability controlling in a social security determination often differs from the definition of disability controlling in an ERISA plan determination.  See Acierno v. First Unum Life Ins. Co., No. 98 Civ. 3885, 2002 WL 1208616, at *3 (E.D.N.Y. Mar. 31, 2002).  Cf. Billinger, 240 F. Supp. 2d at 285.

need to lie down approximately ½ hour to 2 hours during each day."[21]  (CLICNY 264.)

Ironically, although CIGNA now argues – without citing any evidence undermining the SSA's conclusion – that it is not bound by the SSA's determination that Alfano is totally disabled, it accepted the SSA decision awarding Alfano disability benefits without question when it reduced Alfano's initial LTD benefits award by the amount of his SSD benefits.[22]  More importantly, this is not a situation in which the definition of disability adopted by a plan differs so markedly from the SSA's disability findings as to render those findings irrelevant or unhelpful.  To the contrary, the SSA decision granting Alfano disability benefits squarely addresses the issue at the heart of Alfano's claim for LTD benefits – whether he is capable of performing his regular occupation.  The SSA, moreover, is an objective governmental body that undertakes a thorough review of applicants' eligibility for benefits, and has neither the incentive to disperse benefits liberally, nor a reputation for overindulging applicants.  Thus, while the SSA decision granting Alfano benefits is not determinative of his claim under the Plan, it is "one piece of evidence" in support of that claim, Billinger, 240 F. Supp. 2d at 285, and therefore should have been considered.  See Neely v. Pension Trust Fund of the Pension, Hospitalization and Benefit Plan of the Electrical Industry, No. 00 Civ. 2013, 2004 WL 2851792, at *11 (E.D.N.Y. Dec. 8, 2004).  Because it is probative of Alfano's entitlement to benefits under the

_____

[21] The ALJ ultimately proceeded to determine whether the SSA had demonstrated that Alfano retained the residual functioning capacity to perform other jobs.  (See CLICNY at 264-65.)  However, for present purposes, this portion of the SSA decision is irrelevant, as the Plan requires only that Alfano demonstrate his inability to perform his regular occupation, not that he demonstrate his inability to perform any and all occupations.

[22] In fact, CIGNA essentially forces Plan participants to apply for SSD benefits, as even those who have not applied for such benefits face the risk that CIGNA will reduce their LTD benefits award by the amount they would have received had they actually applied.  (P. 56.1 Stmt. ¶ 13; D. Suppl. 56.1 Stmt. ¶ 13; CLICNY 514, 601.)

Plan, and is corroborated by record evidence establishing Alfano's disability, the Court accords the SSA determination substantial weight.

        C.      <u>Vocational Evidence</u>

CIGNA cites a variety of vocational evidence in support of its claim that Alfano is capable of performing his sedentary occupation, and that its termination of his LTD benefits was therefore proper.  (D. Mem. 12-13, 16-18; D. Opp. 7-9.)  At first glance, this evidence appears to support CIGNA's position.  However, close examination demonstrates that the evidence is not only internally inconsistent, but also inconsistent with the record as a whole.  (P. Mem. 10-13, 19-20, 26-27; P. Opp. 1-8.)  As CIGNA offers no rational reason why its superficial reading of vocational evidence should trump the actual data underlying that evidence or the opinions of Alfano's treating physicians – all of which support an entitlement to benefits – the evidence upon which it seeks to rely is an inadequate justification for its termination of benefits.

        1.      <u>The TSAs</u>

The vocational evidence cited by CIGNA includes an exploratory TSA conducted on November 18, 2004, a formal TSA conducted on December 13, 2004, and a second formal TSA conducted on August 9, 2005, all of which purport to identify various occupations that Alfano is capable of performing.  (D. Mem. 16-18; P. 56.1 Stmt. ¶¶ 87, 89, 91, 92, 112; D. Suppl. 56.1 Stmt. ¶¶ 87, 89, 91, 92, 112; CLICNY 69, 73, 80, 101, 718-23, 944-53.)  The exploratory TSA relied on Dr. Roach's October 2004 PAA, which concluded that Alfano could sit, stand, and walk occasionally (P. 56.1 Stmt. ¶¶ 86, 89; D. Suppl. 56.1 Stmt. ¶¶ 86, 89; CLICNY 73, 968-69, 975-76), while the first formal TSA – in turn – relied on the exploratory TSA.  (P. 56.1 Stmt. ¶ 92; D. Suppl. 56.1 Stmt. ¶ 92; CLICNY 69, 944-53.)  Unlike the first two TSAs, the August

2005 TSA relied primarily on the results of Alfano's FCE.  (CLICNY 718.)  The exploratory TSA identified nine occupations that Alfano was capable of performing, the first formal TSA identified four, and the second formal TSA identified seven.

Because Alfano's occupation as a wage and salary manager was among the occupations identified by both the first and second formal TSAs, CIGNA argues that he is capable of performing his regular occupation and, hence, ineligible for further disability benefits.  This argument is meritless.  Neither the TSAs nor CIGNA provide any explanation – let alone a persuasive one – as to why Alfano should be deemed capable of performing his sedentary occupation when the October 2004 PAA that the TSAs purported to take into account indicates that Alfano cannot sit for more than 2.5 hours per day.  This sitting tolerance pales in comparison to the 6 hours per day generally recognized as the minimum tolerance required for sedentary work.  See Connors, 272 F.3d at 136 n.5.  Moreover, when CIGNA submitted the results of the first formal TSA to Dr. Roach, he informed CIGNA that, in his opinion, Alfano was incapable of performing any of the four identified occupations because he could not sit for prolonged periods of time without the "frequent need for standing, laying [sic] down, or using ice on his back."  (CLICNY 882-83; see also P. 56.1 Stmt. ¶ 95; D. Suppl. 56.1 Stmt. ¶ 95.)

Although CIGNA subsequently instructed its medical director resolve the "discrepancy" between Dr. Roach's October 2004 conclusion that Alfano could sit, stand, and walk occasionally, and his April 2005 conclusion that Alfano could not perform any of the four occupations identified by the formal TSA (P. 56.1 Stmt. ¶¶ 96-97; D. Suppl. 56.1 Stmt. ¶¶ 96-97; CLICNY 670, 883), the existence of any such "discrepancy" is dubious at best.  CIGNA's PAA form explicitly defines the word "occasionally" to mean less than 2.5 hours per day.  (P. 56.1

Stmt. ¶ 34; D. Suppl. 56.1 Stmt. ¶ 34; CLICNY 497-98.)  Thus, by its own terms, CIGNA could

not have interpreted Dr. Roach's conclusion that Alfano could occasionally sit, stand, and walk

to mean that Alfano possessed the 6-hour per day sitting tolerance required of those performing

sedentary work.

   While CIGNA asserts that, in a phone conversation with Dr. Taylor, Dr. Roach noted that

his use of the word "occasionally" meant that Alfano could work 3 to 4 hours total during the

course of an 8-hour workday (D. 56.1 Stmt. ¶ 36), even the accuracy and significance of this

account are questionable.  Not only is the account inconsistent with the many reports in which

Dr. Roach clearly states that Alfano cannot sit for more than 2 - 2.5 hours per day, but it is also

flatly contradicted by Dr. Roach's June 14, 2005, follow-up letter.  This letter made clear Dr.

Roach's position that Alfano could work for up to 30 minutes at a time and not more than 2

hours total in an 8-hour workday.  (P. 56.1 Stmt. ¶ 101; D. Suppl. 56.1 Stmt. ¶ 101; CLICNY

843.)  It also reasoned that Alfano could not perform more extensive sedentary work because of

his need for narcotic pain medication, his need to lie down at will, and his limited ability to sit,

all of which demonstrated that "he ha[d] not improved in the last five years."  (CLICNY 843.)

Even accepting the accuracy of CIGNA's account, Dr. Roach's alleged statement still would not

support Alfano's ability to perform his sedentary occupation, as a 4-hour sitting tolerance is

insufficient to render one capable of performing sedentary work.  See Connors, 272 F.3d at 136

n.5 ("The ability to sit for a total of four hours does not generally satisfy the standard for

sedentary work.").

   The second formal TSA did not rely on the October 2004 PAA.  However, it too is

deficient.  As discussed below, Alfano's FCE cannot be relied upon as evidence that he is

36

capable of performing sedentary work.  Because the second formal TSA relied primarily on this

FCE, any attempt to cite it as evidence of Alfano's ineligibility for LTD benefits must also fail.

See Rappa v. Connecticut Gen. Life Ins. Co., No. 06 Civ. 2285, 2007 WL 4373949, at *10

(E.D.N.Y. Dec. 11, 2007) (disclaiming the reliability of a TSA showing that the claimant could

perform certain sedentary jobs, as the TSA was based on an unreliable FCE).

 In sum, far from demonstrating Alfano's ability to perform sedentary work, CIGNA's

TSAs and the documents on which they rely show only that Alfano was incapable of sitting for

more than 2.5 hours in an 8-hour day – a fact that clearly weighs in favor of his claim for LTD

benefits.

  2. The FCE

 In addition to relying on the TSAs discussed above, CIGNA also relies on a July 26,

2005, FCE conducted by Jacqueline Genovese, a physical therapist.  (D. Mem. 12-13.)  Although

CIGNA touts the FCE's summary conclusion as evidence of Alfano's ability to perform

sedentary work, the conclusion is inconsistent not only with the data cited in the very body of the

evaluation report, but also with the overwhelming weight of the record evidence.  Far from

providing a valid basis for CIGNA's termination of Alfano's benefits, a proper reading of the

FCE corroborates Alfano's claim that he is disabled within the meaning of the Plan, thus

counseling in favor of his entitlement to benefits.

 In her summary conclusion on the first page of the FCE, Genovese states that "[t]he

results of this evaluation indicate that Steven Alfano is currently functioning safely at a

sedentary level for an eight hour period according to NY Department of Labor Standards."[23]

---

 [23] While the Court treats this statement as evidence of Genovese's belief that Alfano was
*capable* of functioning at the sedentary level for an 8-hour period, the statement actually says

(CLICNY 726.)  In addition to highlighting this conclusion, however, she also noted that Alfano "was unable to stoop, kneel, crouch, or crawl due to decreased range of motion as well as weakness and buckeling [sic] of his lower extremities," that "[t]he clinical data obtained at th[e] evaluation does not support his ability to tolerate sitting for any duration greater than 10-15 minutes without a drastic change in position," and that "[d]uring the exam he frequently [lay] down to alleviate symptoms."  (Id.)  These observations alone should have led CIGNA to question the validity of the conclusion that Alfano could function safely at the sedentary level for an 8-hour period.  Indeed, had CIGNA ventured even a page or two into the report, it would have discovered that the data collected during the FCE patently contradicts the summary conclusion. In particular, the data explicitly shows that Alfano is capable of sitting for less than 2.5 hours (CLICNY 728), precisely the amount of time cited by Alfano's treating physicians.[24]

That CIGNA erred in relying on the summary conclusion contained in the FCE is demonstrated not only by the underlying FCE data and medical evidence clearly pointing to a different conclusion, but by the case law as well.  In Rappa v. Connecticut General Life Insurance Company, the court rejected an insurer's reliance on the conclusion a physical therapist reached in an FCE, as the conclusion bore no resemblance to what she actually observed during the evaluation.  See Rappa, 2007 WL 4373949, at *9.  The therapist concluded that the claimant could "sit for a prolonged period with positional changes after 30 minutes, but

_____

that he is *currently* functioning at the sedentary level for an 8-hour period, and thus mischaracterizes his situation.

[24] CIGNA has not argued that Alfano intentionally underperformed during his FCE, nor could it.  In her conclusion, Genovese explicitly acknowledges that "[Alfano's] effort during the exam was maximal and consistent with a negative REG score and appropriate physiological changes.  His range of motion was severely limited both when the patient was aware and unaware of observation."  (CLICNY 726.)

[did] not indicate that she observed [the claimant] sit for a prolonged period of time–and in fact

the entire evaluation only lasted for two hours.  Furthermore, in contradiction to [the therapist's]

conclusion, she observed that [the claimant] had to get up and move around the waiting room

after only 15 minutes."  Id.  Citing this information, the therapist's own acknowledgment that the

claimant reported that pain often precluded him from sitting at all, and the therapist's failure to

discuss how the claimant's "asserted complete inability to bend forward could be accommodated

in the work place," the court concluded that "the FCE [was] suspect and d[id] not provide a

sufficient basis on which to deny [the claimant] benefits."  Id.  The court subsequently noted that

the FCE's conclusion that the claimant "could simply stretch or change position and remain

sitting throughout the day . . . [was] inconsistent with the rest of the record," particularly given

that all of the claimant's examining physicians had opined that the claimant's inability to sit for

more than 30 minutes precluded him from performing his sedentary occupation.  Id. at *10.

Alfano's situation is virtually indistinguishable from that presented in Rappa.  As in

Rappa, Genovese's conclusion that Alfano could perform sedentary work for an 8-hour period is

belied by her own observation that he could not "tolerate sitting for any duration greater than 10-

15 minutes without a drastic change in position," and that this change in position often

manifested itself in his lying down.  Moreover, CIGNA has offered no persuasive reason for

crediting Genovese's summary conclusion that Alfano can perform sedentary work on a full-

time basis, while ignoring other portions of the FCE to the contrary.  Compare Rappa, 2007 WL

4373949, at *11 (rejecting the invitation to consider a doctor's decision to check a box indicating

that a claimant was capable of performing sedentary work while ignoring subsequent comments

on the same form indicating that the claimant was permanently disabled, "could not have his

39

present job modified to allow for his impairment, [and] could not commence trial employment"). For the foregoing reasons, the conclusion CIGNA draws from Alfano's FCE is questionable and does not provide a sufficient basis for terminating his benefits.

      D.    <u>Internal and Peer Review Evidence</u>

In support of its claim, CIGNA also relies on reviews of Alfano's file conducted by medical professionals either hired or retained for that purpose. (D. Mem. 12-14.) Because these reviews conclude that Alfano is capable of performing sedentary work, CIGNA argues that they provide a sufficient justification for its termination of Alfano's benefits. This argument is also unpersuasive. Not only are the reviews "not based on any interaction with [Alfano]," but they also wholly "fail[] to adequately and credibly rebut the findings of [Alfano]'s treating physicians." <u>Rappa</u>, 2007 WL 4373949, at *11. For this reason, they cannot reasonably be relied upon as a basis for denying Alfano benefits.

In support of its position, CIGNA first cites a review conducted by Dr. Taylor, who concluded that Alfano's claimed limitations and restrictions, including the inability to sit for prolonged periods of time and the need to change positions frequently, were not supported by the record, particularly given the lack of any clinically measurable tests or documented abnormalities in tests assessing strength or range of motion. (CLICNY 88-89, 670.) Not only does this conclusion ignore the MRIs, EMG, and positive leg raises that led Alfano's physicians to conclude that he was unable to sit for more than 2 - 2.5 hours per day, but it also plainly contradicts the FCE findings made by a physical therapist retained by CIGNA itself. The FCE specifically documented Alfano's inability to complete a lifting test because of "frequent buckeling [sic] and [an] increased risk of falling," and noted that "[h]is range of motion was

severely limited both when [he] was aware and unaware of observation."  (CLICNY 726; see also CLICNY 730 (noting that Alfano had "[s]ignificant [l]imitation in lumbar range of motion").)  Absent any persuasive reason for crediting a review so seemingly inconsistent with the remainder of the record, Dr. Taylor's opinion is an insufficient basis for terminating Alfano's LTD benefits.

CIGNA also cites the findings of Kay Rhodes, a nurse case manager, Dr. Mendez, a CIGNA medical director, and Dr. Weiss, an orthopedic surgeon and peer reviewer.  After reviewing Alfano's file, Rhodes concluded that the medical evidence submitted by Alfano was insufficient to overcome the FCE finding that Alfano could perform sedentary work and the TSA findings that he could perform a number of occupations despite his need to alternate positions at will.  (CLICNY 675.)  She reasoned that "[t]he forms . . . completed by [Drs. Alexiades and Roach] with the additional medical provided vague responses . . . with no objective measurable findings for range of motion and neurological deficits. . . . The [restrictions and limitations] the forms gave were inconsistent with what the [claimant] tested in capabilities on the FCE on 7/26/05."  (Id.)  Dr. Mendez noted only that the FCE "concluded Mr. Alfano was able to perform his sedentary-level work duties.  So original decision remains supported" (CLICNY 657), while Dr. Weiss concluded that the documentation post-dating October 27, 2005, was insufficient to support Alfano's claim that he could not perform sedentary work, particularly given that "[a] functional capacity evaluation of 7/26/05 recommended sedentary work duties.  The claimant would be capable of sedentary duty, but would be restricted from prolonged sitting, in that he would require intermittent standing."   (CLICNY 632.)

41

On their face, all of these determinations rely heavily – if not exclusively – on the FCE's summary conclusion that Alfano is capable of performing sedentary work for an 8-hour period. As discussed above, this conclusion must be rejected as inconsistent with the actual data contained in the FCE.  For that reason alone, the Rhodes, Mendez, and Weiss reviews are unreliable.

The reliability of the Rhodes and Weiss reviews is diminished on other grounds as well. Contrary to Rhodes's contention that the restrictions and limitations identified by Alfano's treating physicians are inconsistent with the results of the FCE, Dr. Roach, Dr. Alexiades, and the FCE all indicated that Alfano could sit for no longer than 2.5 hours.  Additionally, while Dr. Weiss suggests that Alfano's inability to sit for prolonged periods of time is cured by his ability to stand when he is not sitting, this is a gross understatement of the problem.  Not only does this comment fail to account for Alfano's need to lie down at various times during the day, but it also ignores the fact that just as Alfano cannot sit for longer than 2 - 2.5 hours per day, he also cannot stand for longer than 2 - 2.5 hours per day.  Thus, even assuming that interspersing sitting with standing would enable Alfano to spend *more* time performing his regular occupation, his total tolerance for sitting and standing still would not permit him to engage in sedentary work, as defined by the DOT.  For these reasons, neither the Rhodes nor the Mendez or Weiss reviews constitutes a sufficient basis for terminating Alfano's LTD benefits.

In sum, "despite [CIGNA's] position that [Alfano] has improved, there is no sound basis in the record to conclude that [Alfano's] back condition, which [CIGNA] originally found to be disabling with respect to his prior occupation, has in fact improved."  Rappa, 2007 WL 4373949, at *10.  To the contrary, the evidence relating to Alfano's condition suggests that it is only

getting worse.  For the foregoing reasons, Alfano's motion for summary judgment is granted and

defendant's motion for summary judgment is denied.  Cf. Rappa, 2007 WL 4373949, at *10

("Decisions to terminate benefits in the absence of a change in condition have been held to have

been arbitrary and capricious."), citing Connors, 272 F.3d at 136.

## IV.    Remedy

Despite CIGNA's arguments to the contrary (D. Opp. 12-13), "remand of an ERISA

action seeking benefits is inappropriate 'where the difficulty is not that the administrative record

was incomplete but that a denial of benefits based on the record was unreasonable.'"  Zervos v.

Verizon N.Y., Inc., 277 F.3d 635, 648 (2d Cir. 2002) (quotation omitted).  That Alfano was

awarded benefits but subsequently lost them because of CIGNA's improper action further

weighs against remand, as the remedy that restores the *status quo ante* in such situations is

retroactive reinstatement and continuation of benefits.  See, e.g., Medoy v. Warnaco Employees'

Long Term Disability Ins. Plan, No. 97 Civ. 6612, 2008 WL 4483380, at *8 (E.D.N.Y. Sept. 30,

2008); Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771, 776 (7th Cir.

2003).  Accordingly, CIGNA's decision terminating Alfano's LTD benefits is reversed, and the

benefits shall be retroactively reinstated and continued.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted and

defendant's motion for summary judgment is denied.  Plaintiff's LTD benefits shall be

retroactively reinstated and continued.

SO ORDERED.

Dated: New York, New York
     January 30, 2009

GERARD E. LYNCH
United States District Judge

44